Filed 6/9/2023 10:49 AM
Sara L. Smith
Lubbock County  - 72nd District Court
Lubbock County, Texas

CAUSE NO. _____

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **LUBBOCK COUNTY, TEXAS** |
| | § | |
| **2B FARMS, INC.,** | § | |
| **TERRY ROBINSON, AND** | § | |
| **REBECCA ROBINSON,** | § | |
| | § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT COURT** |

### PLAINTIFF'S VERIFIED PETITION FOR ENFORCEMENT OF SECURITY AGREEMENTS, MONEY DAMAGES, APPLICATION FOR APPOINTMENT OF A RECEIVER, APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND TEMPORARY INJUNCTION, AND APPLICATION FOR WRIT OF SEQUESTRATION

TO THE HONORABLE JUDGE OF SAID COURT:

Plaintiff First Bank & Trust, a legal entity authorized to transact business in the State of Texas, submits this Plaintiff's Verified Petition For Enforcement Of Security Agreements, Money Damages, Application For Appointment Of A Receiver, Application For Temporary Restraining Order, And Temporary Injunction, And Application For Writ Of Sequestration, complaining of 2B Farms, Inc., Terry Robinson, and Rebecca Robinson (collectively, "Defendants"), and states as follows.[1]

---

[1] All facts concerning First Bank & Trust or its actions are based on personal knowledge and all other allegations are based on personal knowledge or information and belief.

**PLAINTIFF'S VERIFIED PETITION FOR ENFORCEMENT OF SECURITY AGREEMENTS, MONEY DAMAGES, APPLICATION FOR APPOINTMENT OF A RECEIVER, APPLICATION FOR TEMPORARY RESTRAINING ORDER, AND TEMPORARY INJUNCTION, AND APPLICATION FOR WRIT OF SEQUESTRATION**

16510274.4

**PAGE 1**

# I.
## PRELIMINAY STATEMENT

2B Farms, Inc. has dug a hole from which there is no return.  In particular, its bank account with First Bank & Trust is overdrawn in an amount exceeding $5 million.   In addition, it has defaulted on its business loan and now owes the bank over $3.5 million.  2B Farms is insolvent.

Accordingly, First Bank & Trust brings this action in order to secure its collateral, ensure an orderly liquidation process and the proper distribution of sale proceeds, reduce the debt, and obtain other appropriate relief.

# II.
## PARTIES

1.      Plaintiff First Bank & Trust ("First Bank") is a legal entity authorized to transact business in the State of Texas.

2.      Defendant 2B Farms, Inc. ("2B Farms"), is a corporation organized and existing under the laws of the State of Texas, whose agent for service of process is Joe Barnes, and who may be served with process through its registered agent at RT. 1 Box 103A, Ackerly, Texas 79713, or wherever he may be found.

3.      Defendant Terry Max "Bo" Robinson ("Bo Robinson") is an individual, who resides, and may be served with process, at 9397 CR 3114, Snyder, Texas 79549, or wherever he may be found.

4.      Defendant Rebecca Ann Robinson ("Rebecca Robinson") is an individual, who resides, and may be served with process, at 9397 CR 3114, Snyder, Texas 79549, or wherever she may be found.[2]

---

[2] Bo Robinson and Rebecca Robinson are referred to herein as "Guarantors."

### III.
### JURISDICTION AND VENUE

5.      Jurisdiction is proper in this Court as the amount in issue does not exceed the maximum jurisdictional limits of this Court.

6.      Venue is proper in Lubbock County because the governing loan documents discussed herein provide that the District Court of Lubbock County, Texas, is the sole and exclusive venue for any lawsuit arising from the transaction.[3]

### IV.
### DISCOVERY CONTROL PLAN

7.      Discovery in this action will be conducted under Level 3 in accordance with Texas Rule of Civil Procedure 190.4.  The parties will obtain a docket control order from the Court.

### V.
### RULE 47 PLEADING REQUIREMENTS

8.      As required by Rule 47(c) of the Texas Rules of Civil Procedure, First Bank & Trust states that it seeks monetary relief over $1,000,000.00 and non-monetary relief.

### VI.
### FACTUAL BACKGROUND

**A.      Loan And Security Agreement**

9.      On June 9, 2022, 2B Farms executed a Business Loan Agreement ("Loan Agreement") and Agricultural Security Agreement ("Security Agreement") to secure financing from First Bank for the acquisition of cattle.[4]

---

[3] Defendants have waived any right to a jury trial.

[4] The Loan Agreement and Security Agreement, together with all exhibits, modifications, and addendums are attached as Exhibits A and B, respectively to the Declaration of Curtis Chrystal (the "Chrystal Affidavit") attached hereto as Exhibit 1.

10.    In addition, on June 9, 2022, 2B Farms executed a Promissory Note (the "Note")[5] promising to pay to First Bank so much of the principal sum of three million and five hundred thousand dollars, which has been advanced by First Bank to 2B Farms pursuant to the terms of the Agreements, together with interest on the unpaid principal balance advanced thereunder from the date of the advance until paid, at a rate of 4.750% per annum based on a year of three hundred and sixty (360) days provided, however, that the interest rate is subject to change following default.[6]

## B.    2B Farms Defaults Under The Terms Of The Agreement

11.    2B Farms is in default of the Agreement for at least five reasons.

12.    First, 2B Farms, by its own admission, is insolvent.  As of May 8, 2023, 2B Farms' checking account with First Bank is overdrawn in the amount of $5,274,498.61.  Further, 2B Farms owes First Bank more than $3,508,668.65 pursuant to the Agreement.  2B Farms' debt presently due and owing to First Bank exceeds $8.7 million.  By Defendants' own admission they are insolvent.  For example, according to the financial statement submitted by Defendants to First Bank on or about April 23, 2023, even after including Guarantors' personal assets (e.g., a homestead), Defendants have a net worth of negative $1,536.684[7].

13.    Second, 2B Farms has incurred a material adverse change in its financial condition. In particular, on April 10 and April 12, 2023, 2B Farms deposited into its account with First Bank two checks totaling $5,070,398.47.  2B Farms then immediately transferred almost all of that

---

[5] Together, the Loan Agreement, Security Agreement, and Note are referred to herein as the "Agreement."

[6] See Exhibit C to the Chrystal Affidavit.

[7] See Exhibit D to the Chrystal Affidavit.

amount out of its account with First Bank.[8]  Those two checks were subsequently dishonored by the payor's bank for insufficient funds.  As a result, 2B Farms immediately had a negative balance in its account exceeding $5 million.  The negative balance has now grown to $5,274,498.61.  2B Farms, through Bo Robinson, has admitted the obvious   namely, that 2B Farms cannot cure the overdrawn account.  Bo Robinson informs First Bank that the $5 million in funds were transferred to purchase cattle from McClain Feedyard, but that 2B Farms does not have those cattle and, worse yet, the bounced checks were payments from McClain Farms, Inc. for cattle 2B Farms sold to McClain Farms, Inc.

14.    _Third_, 2B Farms is in payment default.  In particular, given the foregoing, First Bank accelerated the debt owed under the Agreement and demanded full payment.  2B Farms and Guarantors, however, have not paid the amount demanded.

15.    _Fourth,_ 2B Farms is in default because, despite demand, it has failed to turnover the Collateral to First Bank.

16.    _Fifth,_ 2B Farms is in default because it has made false and misleading statements to First Bank.  2B Farms made false and misleading statements to First Bank, and those statements centered around inflated cattle inventory.  For example, in an e-mail from Bo Robinson to Rebecca Fernandez (Commercial Banking Assistant at First Bank's Snyder, Texas branch) dated February 24, 2023,  2B Farms represented in a photograph of handwritten notes that it had obtained and sold for a profit the following cattle:

| Lot | Number Sold | Profit |
|-----|-------------|--------|
| 1630 | 435 | $10,892.40 |
| 1632 | 485 | $12,188.05 |

---

[8] _See_ Exhibit E to the Chrystal Affidavit.

| 1633 | 343 | $8,605.87 |
| 1634 | 366 | $9,201.24 |
| 1635 | 174 | $4,390.02 |
| 1636 | 126 | $3,171.42 |
| 1637 | 270 | $6,814.80 |
| 1640 | 147 | $3,707.34 |
| 1644 | 202 | $5,088.38 |

The invoice from McClain Feedyard dated two days previously (February 22, 2023)[9] regarding cattle purchased by 2B Farms, however, shows that two of the lots (Nos. 1640 and 1644) do not appear on the invoice. In the e-mail from Bo Robinson to First Bank, he represented 2B Farms' ownership of cattle that do not appear on the McClain invoice as having been purchased.

17.    In other e-mails to First Bank, Bo Robinson did not provide any invoices to demonstrate ownership of cattle. Instead, he simply forwarded photographs of handwritten notes claiming ownership. For example, in an e-mail dated January 17, 2023,[10] Bo Robinson claimed having sold 1,555 cattle:

| Lot | Number Sold | Profit |
| --- | --- | --- |
| 1397 | 268 | $6,788.44 |
| 1398 | 500 | $12,610.00 |
| 1399 | 206 | $5,189.14 |
| 1400 | 149 | $3,742.88 |
| 1401 | 432 | $10,817.28 |

18.    The "ownership" of 1,555 cattle was not documented in the e-mail dated January 17.

---

[9] See Exhibit G to the Chrystal Affidavit.

[10] See Exhibit H to the Chrystal Affidavit.

19.     In addition, in an e-mail exchange dated April 4, 2023,[11] Bo Robinson indicated he had made a principal payment on 2B Farms' revolving line of credit ("RLOC") and instructed First Bank to deposit a $2,530,920.39 check into the account of 2B Farms.   Once that task was accomplished, Bo Robinson would later inform First Bank of the amount to wire out of the account to pay for additional cattle.

20.     In the end, 2B Farms had led First Bank to believe that 2B Farms had a cattle inventory of approximately 4,000 head.   As it turns out, 2B Farms only had approximately 1,500 head of cattle.   Through a series of e-mails and handwritten notes, Bo Robinson on behalf of 2B Farms misrepresented the number of cattle owned by 2B Farms.   Those misrepresentations are an event of default under the Agreement.

21.     Despite demand, 2B Farms has failed cure the defaults.

22.     First Bank has exercised its right to accelerate the entire unpaid balance under the Promissory Note, which as of May 8, 2023, is $3,473,448.25 (the "Indebtedness").   Pursuant to the Promissory Note, interest has accrued, and continues to accrue, at a rate of 18% per annum.

23.     In addition, First Bank was forced to retain counsel.   Pursuant to the Agreement First Bank is entitled to recovery of all attorneys' fees, costs, expenses, and collection costs in this action.

## C.     The Collateral

24.     For the purpose of securing the Indebtedness, 2B Farms granted First Bank a security interest in:

---

[11] See Exhibit I to the Chrystal Affidavit.

All Livestock (including all increase and supplies) and Farm Equipment

All Feed Inventory

The Collateral includes any and all of Grantor's present and future inventory (including consigned inventory), related equipment, goods, merchandise and other items of personal property, no matter where located, of every type and description, including without limitation any and all of Grantor's present and future raw materials, components, work-in-process, finished items, packing and shipping materials, containers, items held for sale, items held for lease, items for which Grantor is lessor, goods to be furnished under contract for services, materials used or consumed in Grantor's business, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and any and all additions thereto and substitutions or replacements therefor, and all accessories, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of Insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing. or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guarantees of the forgoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, Including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on accounts, chattel paper and instruments.

The Collateral includes any and all of Grantor's present and future farm products, livestock, including aquatic goods produced in aquacultural operations, poultry, agricultural commodities and other farm products of every type and description, including without limitation all replacements and substitutions therefor and additions thereto, and further including without limitation any and all offspring, unborn livestock, and other products, previously, contemporaneously and/or in the future acquired by Grantor

whether by purchase, exchange, accretion or otherwise, and alt of Grantor's present and future inventory in any way derived or to be derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and all of Grantor's equipment in any way related thereto, and any and all additions thereto and substitutions and replacements therefor, and ell accessories, attachments, and accessions thereto, whether added now or later, and all other products and proceeds derived or to be derived therefrom, including without limitation all Insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing or from any insurer, whether due to judgment, settlement or other process, and any arid all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to any of the foregoing, Including without limitation Grantor's books, records, files, computer disks arid software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's now owned or hereafter acquired farm equipment or agricultural machinery, equipment, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation,

or use of the foregoing, and any rights of Grantor with regard thereto.[12]

First Bank's security interest is perfected as evidenced by the UCC financing statement.[13]

**1.    The remaining cattle and proceeds therefrom**

25.    As set forth above, it appears that portions of First Bank's Collateral    namely, a significant number of cattle are missing.

26.    On April 30 and May 1, 2023, First Bank had an audit and valuation of the cattle collateral performed by Tom Griffin.[14]  The results are summarized below:

| Pasture/ Pen | Head Count | Estimated Value | Total Value |
|---|---|---|---|
| Gail | 143 | $1,900.00 | $271,700.00 |
| Gail | 44 | $1,800.00 | $79,200.00 |
| Allen | 89 | $2,750.00 | $244,750.00 |
| House | 3 | $1,200.00 | $3,600.00 |
| Gail | 6 | $3,750.00 | $22,500.00 |
| Denny | 4 | $2,000.00 | $8,000.00 |
| Burrow | 7 | $5,500.00 | $38,500.00 |
| Burrow | 47 | $1,800.00 | $84,600.00 |
| Burrow | 82 | $1,530.00 | $125,460.00 |
| Burrow | 36 | $1,440.00 | $51,840.00 |
| Fenton | 195 | $1,341.25 | $261,543.75 |
| Wiggins | 68 | $1,260.00 | $85,680.00 |
| Denny | 169 | $1,500.00 | $253,500.00 |
| Denny | 50 | $1,035.00 | $51,750.00 |
| Friona (Hefner) | 126 | $1,395.00 | $175,770.00 |
| Friona (Hefner) | 125 | $1,395.00 | $174,375.00 |
| Friona (Hefner) | 142 | $1,260.00 | $178,920.00 |
| Friona (Hefner) | 196 | $1,260.00 | $246,960.00 |
| Total | 1532 | | $2,358,648.75 |

---

[12] *See* Exhibit B to the Chrystal Affidavit.

[13] *See* Exhibits J and K to the Chrystal Affidavit.

[14] *See* Exhibits L and M to the Chrystal Affidavit.

2.    **Equipment**

27.    On May 5, 2023, First Bank had a audit and valuation of the equipment collateral

performed by Robert D. Aycock.[15]  The results are as summarized as follows:

| Year | Make/Model | VIN | Value |
|------|-----------|-----|-------|
| 1997 | John Deere 8400 MFWD Tractor | RW8400P013244 | $63,750 |
| 1993 | John Deere 4560 2WD Tractor | RW4560H001732 | $36,350 |
| 1982 | John Deere 4440 2WD Tractor | 4440H001863R | $29,500 |
| 1978 | John Deere 4440 2WD Tractor | 4440H0145962R | $28,650 |
| 1997 | New Holland 8970 MFWD Tractor | 981496006574 | $60,350 |
| 2010 | John Deere 4730 Self Propelled Sprayer W/Green Star GPS 2630 Screen | NO4730X009059 PCGU2UG57062 | $122,750 |
| 2015 | Kubota SVL 90-2 Skid Steer | JKUC0902V01516491 | $56,600 |
| 2001 | Caterpillar 928G Rubber Tire Loader | 6XR02173 | $47,900 |
| 2016 | Caterpillar 938M Rubber Tire Loader | 0938MU3R02508 | $182,500 |
| 2012 | Caterpillar 120M Road Grader | 0120MJB9N00249 | $159,650 |
| 2012 | Kenworth Day Cab Truck Single Rear Axle | 1XKDAP8X7CJ331072 | $36,750 |
|  | EZ Steer GPS Screen Light Bar | G0497A0098 4510415850 | $1,850 |
|  | Trimble GPS CFX Screen & Receiver Mod. 94510-00 | 5534500624 | $8,500 |
| 2010 | John Deere 2410 Chisel Plow 27 Shanks | N02410X012070 | $36,900 |
|  | Big Ox 9 Shank V Ripper Plow | BO2659 | $1,100 |
| 1999 | John Deere 610 Chisel Plow, 15 Shank, 3 Point | P00610X007999 | $7,500 |
|  | Great Plains 6330UC-12 Chisel Plow 30 FT. | GPC10157 | $42,250 |
|  | Summers Mfg. Coil Packer Mod 106 30 Ft. | 10273 | $7,500 |

---

[15] *See* Exhibit O to the Chrystal Affidavit.

| Year | Make/Model | VIN | Value |
|---|---|---|---|
| | John Deere 158 Front Loader w/Forks & Bucket | W00158X035266 | $6,250 |
| | KBH 1610 Tank Tow Fertilizer Trailer 5th Wheel Chassis With 1610 Gal. Tank | NT03722 | $6,750 |
| | Wilson 12 Ft. Box Scraper | 44316 | $2,750 |
| | John Deere 1418 Shredder 4 row | 1418T001695 | $4,500 |
| | AG Krane Hay King Lift | | $2,850 |
| | Shop Made 500 Gal. Diesel Trailer W/12v Pump | | $1,500 |
| 1973 | Lufkin Float Flatbed Trailer W/3 - 1,600 Gal. Poly Tanks | 3988 | $8,500 |
| | Big Tex HD Utility Trailer 20 Ft. | 13906050 (Partial VIN Tag Damage) | $3,500 |
| | E Z Trail Mod. 3400 Gravity Grain Cart On 1074 Chassis 4 Wheel W/Hyd. | | $8,950 |
| 2004 | Gooseneck Brand Big Haul Livestock Trailer, 1 Axle, 42 Ft. | 16G5742114B078973 | $29,850 |
| 2007 | Big Bend 24 Ft. Livestock Trailer 2 Axle | 3BUG240257T000247 | $5,900 |
| 2007 | C & C Horse Trailer 3 Horse W/Living Quarters | 1C9WG24208N643602 | $37,750 |
| 2014 | John Deere 469 Round Baler Mega Wide Plus 4,191 Bales | E100469XPDE400109 | $34,500 |
| 2008 | Massey Ferguson 1372 Swather, Heston Series W/Swivel Hitch | 1372H556459 | $22,250 |
| | Supreme Feed Mixer Model 700, Type C-3A | 5967-001-01 | $22,150 |
| | Trioliet Feed Mixer Mod. Solo Mix 2-2800 | 06520 | $42,500 |
| | 3 - Shop Made Cattle Self Feeders | | $3,300 |
| | Diesel Storage Tank 6,700 Gal. With Pump | | $2,500 |
| | Propane Tank 500 Gal. | | $350 |
| | 1,500 Bushel Grain Bin | | $950 |

| Year | Make/Model | VIN | Value |
|------|-----------|-----|-------|
| 2003 | Lindsay Grow Smart Center Pivot Irrigation System - 8 Tower | P-51204 | $41,250 |
| | Total of all Equipment | | $1,219,150 |

## D.    The Guarantees

28.    On June 14, 2021, Guarantors entered into commercial guarantees with First Bank (the "Guarantees") whereby the Note and all obligations thereunder were personally and individually guaranteed by Guarantors.[16]

29.    As set forth above, 2B Farms is in default under the Agreement.

30.    Pursuant to the Guarantees, Guarantors are liable to First Bank in the total amount of the Indebtedness   namely, $3,526,032.91, plus attorneys' fees, costs, and interest.

## E.    2B Farms' Fate Is Sealed When It Overdraws Its Bank Account By More Than $5 Million.

31.    On or about April 10, 2023, 2B Farms deposited into its account at First Bank (account number ending in 8270) check number 7620, dated April 5, 2023, made payable to 2B Farms in the amount of $2,559,407.02.  2B Farms was given access to those funds and immediately transferred or otherwise depleted those funds.  The check, however, was subsequently dishonored by the paying bank for lack of sufficient funds and was returned to First Bank.

32.    On or about April 12, 2023, 2B Farms deposited into its account at First Bank (account number ending in 8270) check number 7621, dated April 6, 2023, made payable to 2B Farms in the amount of $2,510,991.45.  2B Farms was given access to those funds and immediately

---

[16] *See* Guarantees attached as Exhibits P and Q to the Chrystal Affidavit.

transferred or otherwise depleted those funds. The check, however, was dishonored by the paying bank for lack of sufficient funds and was returned to First Bank.

33.    The two dishonored and returned checks total $5,070,398.47.

34.    Pursuant to the customer account agreement between 2B Farms and First Bank, First Bank charged back the amounts of the returned checks against 2B Farms' account.[17] The customer account agreement provides that First Bank has "the right to charge back or otherwise debit your Account or other accounts you hold with us for any deposited Item that is returned, even if you have made withdrawals against it."[18] Further, the customer account agreement provides that 2B Farms is responsible for all overdrafts.[19]

35.    The Uniform Commercial Code ("UCC") expressly provides that where a "bank has made provisional settlement with its customer for an item and fails by reason of dishonor," the bank "may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer[.]"[20]

36.    2B Farms has breached the customer account agreement by failing to pay First Bank for the overdrafts in its account because of the dishonored and returned checks.

37.    As a result of the foregoing, other charges, and fees, the account is overdrawn in the amount of $5,274,498.61.

---

[17] *See* Exhibit R to the Chrystal Affidavit.

[18] *See* p. 5, § 9(h).

[19] *See*, pp. 11-12, § 14.

[20] TEX. BUS. & COM. CODE § 4.214(a).

## VII.
## APPLICATION FOR APPOINTMENT OF A RECEIVER

38.     A receiver may be appointed for a corporation that is insolvent or is in imminent danger of insolvency.[21]  It is also proper to appoint a receiver where the rules of equity call for such appointment.[22]  In the alternative, a court may properly appoint a receiver for property in an action by a creditor who has a probable interest in the property and the property is in danger of being lost, removed, or materially injured.[23]

39.     Moreover, the Security Agreement provides that First Bank has the right to sell the Collateral and to appoint a receiver.[24]

### A.      A Receiver Should Be Appointed For 2B Farms.

40.     As set forth herein, a receiver should be appointed for 2B Farms because:  (1) 2B Farms is insolvent or is in immediate danger of insolvency; and (2) the rules of equity call for such appointment.

41.     More specifically, the Security Agreement provides that "Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor" and:

> Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness.  The receiver may serve without bond if permitted by law.

---

[21] *See* TEX. CIV. PRAC. & REM. CODE § 64.001(a)(5).

[22] *See* TEX. CIV. PRAC. & REM. CODE § 64.001(a)(6).

[23] *See* TEX. CIV. PRAC. & REM. CODE § 64.001(a)(2), and (b).

[24] *See* Exhibit B to the Chrystal Affidavit.

Lender's rights to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver. Collect Revenues, Apply Accounts. Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property. Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.[25]

42.    Given 2B Farms defaults and untenable financial condition, pursuant to the foregoing contractual provisions, the Court should grant the request for appointment of the receiver.

   1.    **2B Farms is insolvent or in imminent danger of insolvency.**

43.    2B Farms sought financing from First Bank for livestock inventory that 2B Farms needs to maintain its business. The lending relationship between First Bank and 2B Farms ended when 2B Farms defaulted under the Agreement. First Bank has accelerated the debt and will not advance or otherwise loan funds to 2B Farms.[26]

---

[25] Exhibit B to the Chrystal Affidavit.

[26] *See, e.g.*, Exhibit A to the Chrystal Affidavit.

44.    2B Farms' financials reflect that its debts exceed its assets, even after including Guarantors assets.  2B Farms admits it cannot pay the amounts due to First Bank.

45.    2B Farms owe First Bank over $8 million.  According to 2B Farms and Guarantors their combined net worth is <u>negative</u> $1.5 million.[27]  2B Farms, therefore, is insolvent or in imminent danger of being insolvent.

46.    Accordingly, the Court should appoint a receiver over 2B Farms.

**2.    <u>The rules of equity weigh heavily in favor of appointing a receiver because appointing a receiver is the only way to prevent further damage to the property and to public interest.</u>**

47.    The Texas Civil Practices and Remedies Code specifically authorizes the appointment of a receiver "under the rules of equity."[28]  The rules of equity weigh in favor of appointing a receiver because failing to do so would result in depletion, if not destruction, of the property and further damage to the public interest.

48.    The value of the Collateral has been decreased by 2B Farms selling, transferring, destroying, or relocating the Collateral to the extent that it risks becoming unidentifiable.  Moreover, the problem of missing cattle seems to be a significant widespread problem impacting many ranchers and creditors.[29]

49.    The appointment of a receiver will allow for a replacement of 2B Farms' management.  The receiver will work to maintain and protect the Collateral, track down and

---

[27] *See* Exhibit D to Chrystal Affidavit.

[28] *See* TEX. CIV. PRAC. & REM. CODE § 64.001(a)(6).

[29] *See, e.g., Ag Texas Farm Credit Services, et al. v. McClain Feed Yard, Inc., et al.,* pending in the 222nd District Court, Deaf Smith County, Texas.  A copy of Plaintiffs' Original Petition is attached hereto as Exhibit 2.

maintain all remaining collateral, sell the Collateral in a systematic way to avoid a fire sale, properly apply all proceeds from any sale of the Collateral, and investigate whether any claims or causes of action exist while preserving 2B Farms' books and records. The rules of equity, therefore support the appointment of a receiver.[30]

**B.**   **In the Alternative, a Receiver Should Be Appointed For The Collateral.**

50.      In the alternative, the Court should appoint a receiver over the Collateral to protect the Collateral from danger of loss, removal, or material injury.[31]  Unless a receiver is appointed, the Collateral is in danger of loss, removal, or material injury.

51.      2B Farms owes First Bank over $8 million, but the Collateral has an estimated value of only $3,599,548.75, minus purchase money security interests in the amount of $160,055, for a total of $3,473,448.25.  2B Farms has not turned over the Collateral to First Bank.  The cattle must be sold at the appropriate time to maximize the return and avoid additional cost.  The equipment also must be sold in an appropriate fashion.  2B Farms' continued possession of the Collateral is a significant risk to First Bank as the continued use of the equipment will cause further depreciation, and among other things, the cattle (a) may not be sold in the best matter; (b) costs will be incurred; and (c) the proceeds may not be paid to First Bank.

52.      2B Farms created this situation and cannot be allowed to remain in possession of the Collateral.  The Court should appoint a receiver because the Collateral is in danger of loss, removal, or material injury.

---

[30] *See Mueller v. Beamalloy, Inc.*, 994 S.W.2d 855, 861 (Tex. App.   Houston [1st Dist.] 1999) (specifically stating that a court may appoint a receiver under the rules of equity); *In re Herring*, 983 S.W.2d 61, 65 (Tex. App.   Corpus Christi, 1998) (same).

[31] *See* TEX. CIV. PRAC. & REM. CODE. § 64.001(a)(2), (b).

C.    **First Bank Requests The Immediate Appointment Of Bart Schilling As The Receiver.**

53.    First Bank requests that the Court immediately appoint Bart Schilling ("Schilling") as receiver for 2B Farms, or at a minimum, the Collateral.  Schilling is uniquely qualified with extensive experience in cattle and agricultural consulting, operations, and lending.  Schilling is willing and able to serve as receiver of 2B or the Collateral.

54.    Schilling has three decades of experience in the agricultural and cattle lending industries.  Schilling's clientele includes row crop farm operations, feedlots, grow yards, stocker cattle operations, ranch operations, and commercial real estate.  Schilling currently provides consulting and accounting/record-keeping services, including livestock grazing and crop production planning, to a broad array of clients.[32]

55.    Schilling is a citizen and qualified voter of Texas and, in fact, a resident of Lubbock, Texas.  Schilling, therefore, is appropriately qualified as a receiver.[33]

56.    First Bank has discussed the situation regarding 2B Farms and the Collateral with Schilling, and he is willing and able to serve immediately as the receiver for 2B Farms or the Collateral, and work to secure the Collateral and any other property of 2B Farms.

57.    First Bank requests that the Court enter an order appointing Schilling as receiver for 2B Farms or, in the alternative, the Collateral.  Appointing Schilling as the receiver will allow for the improvements needed to secure the Collateral and ensure no acts will be taken against public policy.

---

[33] TEX. BUS. ORGS. CODE § 11.406.

## VIII.
## APPLICATION FOR TEMPORARY RESTRAINING ORDER AND TEMPORARY AND PERMANENT INJUNCTIVE RELIEF

58.      There is a substantial likelihood that First Bank will prevail on the merits of its claims.  Unless enjoined, 2B Farms will continue to:  (1) conceal, waste, or dispose of First Bank's Collateral; (2) sell the Collateral out of trust; (3) conceal, waste, or dispose of the proceeds of the sale of the Collateral to which First Bank's security interest attaches; and/or (4) otherwise hide or remove the Collateral from the jurisdiction of this Court and the reach of First Bank.

59.      Unless a Temporary Restraining Order ("TRO") is granted against 2B Farms, First Bank will suffer irreparable injury    namely, its security interests will be diminished, if not lost in their entirety.  The harm to First Bank is imminent; indeed, it has occurred and continues to occur.

60.      First Bank has no adequate remedy at law because the diminution, if not complete destruction, of its security interests will constitute irreparable injury that cannot be adequately remedied by an award of damages    the security interests were created to protect First Bank's ability to collect any damages.  If reduced to an unsecured creditor, First Bank may recover nothing, as the Collateral may be transferred or destroyed to the extent that it is unidentifiable and beyond recovery.

61.      Further, greater injury will be inflicted upon First Bank by the denial of a TRO and injunctive relief than would be inflicted upon Defendants by the granting of such relief.  By granting the TRO, 2B Farms will merely be required to abide by its legal, contractually agreed-to obligations and to maintain the status quo.

62.      The issuance of injunctive relief will not disserve the public interest.  Balancing the equities and other factors, the significant potential of irreparable harm to First Bank without the

TRO and the lack of harm to 2B Farms due to the entry of a TRO demonstrate that the relief will not disserve the public interest. First Bank asks that the Court hold 2B Farms to its word.

63.    The facts above establish the required elements for First Bank to obtain a temporary restraining order and temporary injunction against 2B Farms, those elements being: (1) a cause of action against 2B Farms; (2) a probable right to the relief sought; and (3) a probable, imminent, and irreparable injury in the interim.

64.    For those reasons, First Bank requests that the Court, pursuant to TEX. R. CIV. P. 680, enter a temporary restraining order providing that:

a.    2B Farms and its agents, servants, employees, and those acting in concert or participating with them, including Guarantors, are enjoined from selling, transferring, leasing, renting, destroying, altering, otherwise disposing of, or moving from its current location, any "Livestock (including all increase and supplies) and Farm Equipment" and "Feed Inventory," without permission of First Bank or the Court, which will ensure that the Collateral is properly protected to secure First Bank's interests. Further, 2B Farms is required to maintain all Cattle in regular course of care, including feeding, hygiene, and medical intervention.

b.    2B Farms and its agents, servants, employees, and those acting in concert or participating with them, including Guarantors, are enjoined from distributing, spending, transferring, or otherwise using or concealing the process from the sale, lease, rent, or other disposition of the Collateral that has occurred, without permission of the Court, except that such funds may be deposited in the registry of the Court.

c.    2B Farms must, within twenty-four (24) hours, provide to First Bank all books and records regarding the Collateral. More particularly, 2B Farms must provide to First Bank all books

and records regarding all Cattle in the possession of 2B Farms, including, but not limited to, information regarding head count, present weight, pound value, tag numbers, location, and condition of health.

d.      2B Farms and its agents, servants, employees, and those acting in concert or participating with them, including Guarantors, shall turnover all the Collateral to the County Constable within twenty-four (24) hours and provide the Constable access to all locations where the Collateral is located (the "Properties"), and open any such location.  If access to the Properties is not voluntarily granted for the Constable, the Constable may, using reasonable and appropriate force, access the Properties for the sole purpose of recovering the Collateral.

## IX.
## APPLICATION FOR OF WRIT OF SEQUESTRATION

65.     Despite demand, 2B Farms has failed, and continues to fail, to cure its defaults. Further, 2B Farms has failed to turnover the Collateral to First Bank, despite demand.

66.     It is within the power of 2B Farms to transfer, conceal, dispose of, destroy, or waste the Collateral or remove the Collateral from disclosed locations during the pendency of this action. In fact, without First Bank's knowledge or consent, 2B Farms as recently as May 2, 2023, sold $270,609.44 worth of cattle to Harlow Cattle, LLC.  Harlow Cattle, LLC, issued a check to Defendant Bo Robinson in this amount, allegedly made payable to 2B Farms and First Bank.  That check, however, has not been turned over to First Bank.

67.     Consequently, First Bank's security interest in the Collateral risks compromise in its entirety until the time at which a full hearing is held and judgment had.

68.     The issuance of a Writ of Sequestration, therefore, is necessary to preserve the Collateral in which First Bank has a security interest pending the outcome of this suit, including

"All Livestock (including all increase and supplies) and Farm Equipment" and "All Feed Inventory", as described in the Security Agreement.

69.     Contemporaneously filed with this Petition is First Bank's Application for Writ of Sequestration.   First Bank requests that this Court grant its Application and issue an order containing the relief requested therein.

## X.
## CAUSES OF ACTION

**A.     Enforcement Of Security Agreement And For Possession Of Secured Collateral**

70.     First Bank realleges all allegations set forth above, and incorporates the same as if set forth verbatim herein.

71.     By this action, First Bank seeks enforcement of its security interest in the Collateral as 2B Farms is in default under the terms of the Agreements.   Pursuant to the terms of the Agreements, and as a result of 2B Farms' default thereon, First Bank is entitled to immediate possession of the secured Collateral.   First Bank asks the Court to, pursuant to the terms of the Agreement, enforce the Agreement and award First Bank immediate possession of the Collateral.

**B.     Breach of Business Loan Agreement And Agricultural Security Agreement, And Note**

72.     First Bank realleges all allegations set forth above, and incorporates the same as if set forth verbatim herein.

73.     2B Farms and First Bank are parties to the Business Loan Agreement, Agricultural Security Agreement, and Note whereby 2B Farms was required to make certain payments in accordance with the terms of the Agreement.

74.     2B Farms is in default of the Agreement as set forth above.

75.     2B Farms has failed to cure its defaults.

76.     First Bank has suffered monetary damages in an amount no less than $3,526,032.91 as a direct result of 2B Farms' breach of the Agreement, on which interest, attorneys' fees, and costs continue to accrue.

## C.     Breach Of Customer Account Agreement (UCC 4-214)

77.     First Bank realleges all allegations set forth above and incorporates the same as if set forth verbatim herein.

78.     On or about April 10, 2023, 2B Farms deposited into its account at First Bank (account number ending in 8270) check number 7620, dated April 5, 2023, made payable to 2B Farms in the amount of $2,559,407.02.  2B Farms was given access to those funds and immediately transferred or otherwise depleted those funds.  The check, however, was subsequently dishonored by the paying bank for lack of sufficient funds and was returned to First Bank.

79.     On or about April 12, 2023, 2B Farms deposited into its account at First Bank (account number ending in 8270) check number 7621, dated April 6, 2023, made payable to 2B Farms in the amount of $2,510,991.45.  2B Farms was given access to those funds and immediately transferred or otherwise depleted those funds.  The check, however, was dishonored by the paying bank for lack of sufficient funds and was returned to First Bank.

80.     The two dishonored and returned checks total $5,070,398.47.

81.     Pursuant to the customer account agreement between 2B Farms and First Bank, First Bank charged back the amounts of the returned checks against 2B Farms' account.[34]  The customer account agreement provides that First Bank has "the right to charge back or otherwise

---

[34] *See* Exhibit R to the Chrystal Affidavit.

debit your Account or other accounts you hold with us for any deposited Item that is returned, even if you have made withdrawals against it."[35]  Further, the customer account agreement provides that 2B Farms is responsible for all overdrafts.[36]

82.    The Uniform Commercial Code ("UCC") expressly provides that where a "bank has made provisional settlement with its customer for an item and fails by reason of dishonor," the bank "may revoke the settlement given by it, charge back the amount of any credit given for the item to its customer's account, or obtain refund from its customer[.]"[37]

83.    2B Farms has breached the customer account agreement by failing to pay First Bank for the overdrafts in its account because of the dishonored and returned checks.

84.    As a result of the foregoing, other charges, and fees, the account is overdrawn in the amount of $5,274,498.61.  First Bank, therefore, has suffered monetary damages in an amount no less than $5,183,618.51 as a direct result of 2B Farms' breach of the customer account agreement.

**D.    Breach Of The Personal Guarantees**

85.    First Bank realleges all allegations set forth above, and incorporates the same as if set forth verbatim herein.

86.    The Guarantors personally guaranteed all of 2B Farms' obligations to First Bank under the Note and the Agreements.

---

[35] *See* p. 5, § 9(h).

[36] *See*, pp. 11-12, § 14.

[37] TEX. BUS. & COM. CODE § 4.214(a).

87.     The Guarantors are fully responsible for the amount owed by 2B Farms to First Bank and for all damages incurred by First Bank as a result of 2B Farms' breach of the Agreement.

88.     The Guarantors have breached the Guarantees by failing to pay to First Bank the amounts owed by 2B Farms pursuant to the Agreement.

89.     As a result of the Guarantors' breach of the Guarantees, First Bank has suffered monetary damages in the amount of $3,526,032.91.

## XI.
## PRAYER AND REQUEST FOR RELIEF

**WHEREFORE, PREMISES CONSIDERED,** First Bank and Trust prays to the Court for the following relief:

1.     2B Farms, Inc., Terry Robinson, and Rebecca Robinson be cited to appear and answer herein and served with copies of the same;

2.     First Bank be awarded damages against Defendants;

3.     First Bank be awarded attorneys' fees, costs, and expenses;

4.     Pre-judgment interest at the maximum legal rate;

5.     Post-judgment interest at the maximum legal rate running from the date of judgment herein until the date the judgment is paid in full;

6.     A temporary restraining order and temporary injunction as set forth above;

7.     Appointment of the receiver as set forth above;

8.     Issuances of the requested Writ of Sequestration;

9.     Judgment granting First Bank immediate possession of all Collateral; and

10.    First Bank be granted all other relief to which it may be entitled.

Respectfully submitted,

**STEPTOE & JOHNSON PLLC**


C. Dunham Biles
State Bar No. 24042407
500 North Akard Street, Suite 3200
Dallas, Texas 75201
214-251-8514
dunham.biles@steptoe-johnson.com
**ATTORNEYS FOR PLAINTIFF**
**FIRST BANK & TRUST**

**LOVELL, LOVELLK, ISERN &**
**FARABOUGH, LLP**


John H. Lovell
State Bar No. 12609300
112 SW 8th Ave, Suite 1000
Amarillo, TX 79101
806-373-1515
John@lovell-law.net

# EXHIBIT 1

CAUSE NO. _____

| | | |
|---|---|---|
| **FIRST BANK & TRUST,** | § | **IN THE DISTRICT COURT OF** |
| | § | |
| **PLAINTIFF,** | § | |
| | § | |
| **VS.** | § | **LUBBOCK COUNTY, TEXAS** |
| | § | |
| **2B FARMS, INC.,** | § | |
| **TERRY ROBINSON, AND** | § | |
| **REBECCA ROBINSON,** | § | |
| | § | |
| **DEFENDANTS.** | § | **____ JUDICIAL DISTRICT COURT** |

## AFFIDAVIT OF CURTIS CHRYSTAL

**STATE OF IOWA**          )
                                         )
**COUNTY OF CARROLL**  )

PERSONALLY APPEARED before me the undersigned who having been duly sworn testifies and states as follows:

1.       My name is Curtis Chrystal.  I am capable of making this affidavit.  I am over 21 years of age, and I am competent in all respects to give the testimony contained in this Affidavit. I have personal knowledge of the facts set forth herein.

2.       I am the Director of Special Assets, Senior Vice President for HTLF Bank ("HTLF").  First Bank and Trust ("First Bank") is an affiliate of HTLF.  As a result of the issues and defaults set forth below in regard to 2B Farms, Inc. ("2B Farms"), Terry "Bo" Robinson ("Bo Robinson"), and Rebecca Robinson ("Rebecca Robinson") (collectively, "Defendants"), Defendants' accounts were transferred to me as the Director of Special Assets.  I am, therefore, a custodian of First Bank's business records in regard to Defendants including documents attached hereto.

3.      The records attached hereto as Exhibits A through F and H through R are kept by First Bank in the regular course of business, and it was the regular course of business for an employee of First Bank, with knowledge of the act recorded to make the record or to transmit information thereof to be included in such record; and the record was made at or near the time reasonably soon thereafter.   Based on my review of the Agreement, Guarantees, and other company records, my role as Director of Special Assets, and my own involvement with the facts of this case, I am acquainted with, and have knowledge of, the facts contained in this Affidavit, and the same are all true and correct.

## A.      Loan And Security Agreement

1.      On June 9, 2022, 2B Farms executed a Business Loan Agreement ("Loan Agreement") and Agricultural Security Agreement ("Security Agreement") to secure financing from First Bank for the acquisition of cattle.[1]

2.      In addition, on June 9, 2022, 2B Farms executed a Promissory Note (the "Note")[2] promising to pay to First Bank so much of the principal sum of three million and five hundred thousand dollars, which has been advanced by First Bank to 2B Farms pursuant to the terms of the Agreements, together with interest on the unpaid principal balance advanced thereunder from the date of the advance until paid, at a rate of 4.750% per annum based on a year of three hundred and sixty (360) days provided, however, that the interest rate is subject to change following default.[3]

---

[1] True and correct copies of the Loan Agreement and Security Agreement, together with all exhibits, modifications, and addendums are attached as Exhibits A and B, respectively.

[2] A true and correct copy of the Note is attached as Exhibit C.   Together, the Loan Agreement, Security Agreement, and Note are referred to herein as the "Agreement."

[3] *See* Exhibit C.

### B.    2B Farms Defaults Under The Terms Of The Agreement

3.     2B Farms is in default of the Agreement for at least five reasons.

4.     First, 2B Farms, by its own admission, is insolvent. As of May 8, 2023, 2B Farms' checking account with First Bank was overdrawn in the amount of $5,274,498.61. Further, 2B Farms owes First Bank more than $3,526,032.91 pursuant to the Agreement. 2B Farms' debt presently due and owing to First Bank exceeds $8.7 million. By Defendants' own admission they are insolvent. For example, according to the financial statement submitted by Defendants to First Bank on or about April 23, 2023, even after including Guarantors' personal assets (e.g., a homestead), Defendants have a net worth of negative $1,536,684.[4]

5.     Second, 2B Farms has incurred a material adverse change in its financial condition. In particular, on April 10 and April 12, 2023, 2B Farms deposited into its account with First Bank two checks totaling $5,070,398.47. 2B Farms then immediately transferred almost all of that amount out of its account with First Bank.[5] Those two checks were subsequently dishonored by the payor's bank for insufficient funds. As a result, 2B Farms immediately had a negative balance in its account exceeding $5 million. The negative balance has now grown to $5,274,498.61. 2B Farms, through Bo Robinson, has admitted the obvious   namely, that 2B Farms cannot cure the overdrawn account. Bo Robinson informs First Bank that the $5 million in funds were transferred to purchase cattle from McClain Feedyard, but that 2B Farms does not have those cattle and, worse yet, the bounced checks were payments from McClain Farms, Inc. for cattle 2B Farms sold to McClain Farms, Inc.

---

[4] A true and correct copy of the financial statement submitted to First Bank is attached as Exhibit D.

[5] A true and correct copy of 2B Farms' account statement is attached as Exhibit E.

6.      <u>Third</u>, 2B Farms is in payment default.  In particular, given the foregoing, First Bank accelerated the debt owed under the Agreement and demanded full payment.  2B Farms and Guarantors, however, have not paid the amount demanded.

7.      <u>Fourth</u>, 2B Farms is in default because, despite demand, it has failed to turnover the Collateral to First Bank.

8.      <u>Fifth</u>, 2B Farms is in default because it has made false and misleading statements to First Bank.  2B Farms made false and misleading statements to First Bank, and those statements centered around inflated cattle inventory.  For example, in an e-mail from Bo Robinson to Rebecca Fernandez (Commercial Banking Assistant at First Bank's Snyder, Texas branch) dated February 24, 2023,  2B Farms represented in a photograph of handwritten notes that it had obtained and sold for a profit the following cattle:[6]

| Lot | Number Sold | Profit |
|-----|-------------|--------|
| 1630 | 435 | $10,892.40 |
| 1632 | 485 | $12,188.05 |
| 1633 | 343 | $8,605.87 |
| 1634 | 366 | $9,201.24 |
| 1635 | 174 | $4,390.02 |
| 1636 | 126 | $3,171.42 |
| 1637 | 270 | $6,814.80 |
| 1640 | 147 | $3,707.34 |
| 1644 | 202 | $5,088.38 |

The invoice from McClain Feedyard dated two days previously (February 22, 2023)[7] regarding cattle purchased by 2B Farms, however, shows that two of the lots (Nos. 1640 and 1644) do not

---

[6] A true and correct copy of the e-mail is attached as Exhibit F.

[7] A true and correct copy of the invoice is attached as Exhibit G.

**AFFIDAVIT OF CURTIS CHRYSTAL**                                        **PAGE 4**
16511683v7

appear on the invoice.  In the e-mail from Bo Robinson to First Bank, he represented 2B Farms'

ownership of cattle that do not appear on the McClain invoice as having been purchased.

9.      In other e-mails to First Bank, Bo Robinson did not provide any invoices to

demonstrate ownership of cattle.  Instead, he simply forwarded photographs of handwritten notes

claiming ownership.  For example, in an e-mail dated January 17, 2023,[8] Bo Robinson claimed

having sold 1,555 cattle:

| Lot | Number Sold | Profit |
|-----|-------------|--------|
| 1397 | 268 | $6,788.44 |
| 1398 | 500 | $12,610.00 |
| 1399 | 206 | $5,189.14 |
| 1400 | 149 | $3,742.88 |
| 1401 | 432 | $10,817.28 |

10.      The "ownership" of 1,555 cattle was not documented in the e-mail dated January

17, 2023.

11.      In addition, in an e-mail exchange dated April 4, 2023,[9] Bo Robinson indicated he

had made a principal payment on 2B Farms' revolving line of credit ("RLOC") and instructed First

Bank to deposit a $2,530,920.39 check into the account of 2B Farms.  Once that task was

accomplished, Bo Robinson would later inform First Bank of the amount to wire out of the account

to pay for additional cattle.

12.      In the end, 2B Farms had led First Bank to believe that 2B Farms had a cattle

inventory of approximately 4,000 head.  As it turns out, 2B Farms only had approximately 1,500

head of cattle.  Through a series of e-mails and handwritten notes, Bo Robinson on behalf of 2B

---

[8] A true and correct copy of the e-mail is attached as Exhibit H.

[9] A true and correct copy of the e-mail exchange is attached as Exhibit I.

Farms misrepresented the number of cattle owned by 2B Farms.  Those misrepresentations are an event of default under the Agreement.

13.    Despite demand, 2B Farms has failed cure the defaults.

14.    First Bank has exercised its right to accelerate the entire unpaid balance under the Promissory Note, which as of May 8, 2023, is $3,508,608.65 (the "Indebtedness").  Pursuant to the Promissory Note, interest has accrued, and continues to accrue, at a rate of 18% per annum.

## C.    The Collateral

15.    For the purpose of securing the Indebtedness, 2B Farms granted First Bank a security interest in:

> All Livestock (including all increase and supplies) and Farm Equipment
>
> All Feed Inventory
>
> The Collateral includes any and all of Grantor's present and future inventory (including consigned inventory), related equipment, goods, merchandise and other items of personal property, no matter where located, of every type and description, including without limitation any and all of Grantor's present and future raw materials, components, work-in-process, finished items, packing and shipping materials, containers, items held for sale, items held for lease, items for which Grantor is lessor, goods to be furnished under contract for services, materials used or consumed in Grantor's business, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and any and all additions thereto and substitutions or replacements therefor, and all accessories, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of Insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing. or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to

enforce any guarantees of the forgoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, Including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on accounts, chattel paper and instruments.

The Collateral includes any and all of Grantor's present and future farm products, livestock, including aquatic goods produced in aquacultural operations, poultry, agricultural commodities and other farm products of every type and description, including without limitation all replacements and substitutions therefor and additions thereto, and further including without limitation any and all offspring, unborn livestock, and other products, previously, contemporaneously and/or in the future acquired by Grantor whether by purchase, exchange, accretion or otherwise, and alt of Grantor's present and future inventory in any way derived or to be derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and all of Grantor's equipment in any way related thereto, and any and all additions thereto and substitutions and replacements therefor, and ell accessories, attachments, and accessions thereto, whether added now or later, and all other products and proceeds derived or to be derived therefrom, including without limitation all Insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing or from any insurer, whether due to judgment, settlement or other process, and any arid all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guaranties of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to any of the foregoing, Including without limitation Grantor's books, records, files, computer disks arid software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's now owned or hereafter acquired farm equipment or agricultural machinery, equipment, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions,

replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well to enforce any guaranties of the foregoing and security therefor, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation, or use of the foregoing, and any rights of Grantor with regard thereto.[10]

First Bank's security interest is perfected as evidenced by the UCC financing statement.[11]

1.    **The remaining cattle and proceeds therefrom**

16.    As set forth above, it appears that portions of First Bank's Collateral    namely, a significant number of cattle    are missing.

17.    On April 30 and May 1, 2023, First Bank (at my instruction) had an audit and valuation of the cattle collateral performed by Tom Griffin.[12]    The results are summarized below:

| Pasture/ Pen | Head Count | Estimated Value | Total Value |
|---|---|---|---|
| Gail | 143 | $1,900.00 | $271,700.00 |
| Gail | 44 | $1,800.00 | $79,200.00 |
| Allen | 89 | $2,750.00 | $244,750.00 |
| House | 3 | $1,200.00 | $3,600.00 |
| Gail | 6 | $3,750.00 | $22,500.00 |
| Denny | 4 | $2,000.00 | $8,000.00 |
| Burrow | 7 | $5,500.00 | $38,500.00 |
| Burrow | 47 | $1,800.00 | $84,600.00 |

[10] *See* Exhibit B.

[11] True and correct copies of UCC Filings are attached as Exhibits J and K, respectively.

[12] True and correct copies of the audit and appraisal report are attached as Exhibits L and M, respectively.

| | | | |
|---|---|---|---|
| Burrow | 82 | $1,530.00 | $125,460.00 |
| Burrow | 36 | $1,440.00 | $51,840.00 |
| Fenton | 195 | $1,341.25 | $261,543.75 |
| Wiggins | 68 | $1,260.00 | $85,680.00 |
| Denny | 169 | $1,500.00 | $253,500.00 |
| Denny | 50 | $1,035.00 | $51,750.00 |
| Friona (Hefner) | 126 | $1,395.00 | $175,770.00 |
| Friona (Hefner) | 125 | $1,395.00 | $174,375.00 |
| Friona (Hefner) | 142 | $1,260.00 | $178,920.00 |
| Friona (Hefner) | 196 | $1,260.00 | $246,960.00 |
| Total | 1532 | | $2,358,648.75 |

18.    The foregoing was subsequently updated by Tom Griffin as follows:[13]

**Bo Robinson (2B) Cattle Appraisal Scurry/Borden County
4/30/23**

| Pasture/Pen | Head | Type | Est Wt. | Est $/lb | Est Value | Total Est Value |
|---|---|---|---|---|---|---|
| Gail | 143 | middle aged pairs | | | $1,900.00 | $271,700.00 |
| | 44 | middle aged pairs | | | $1,800.00 | $79,200.00 |
| Allen | 89 | young registered pairs | | | $2,750.00 | $244,750.00 |
| House | 3 | open 2 year old cows | | | $1,200.00 | $3,600.00 |
| Gail | 6 | middle aged bulls | | | $3,750.00 | $22,500.00 |
| Denny | 4 | yearling bulls | | | $2,000.00 | $8,000.00 |
| Burrow | 7 | young bulls | | | $5,500.00 | $38,500.00 |
| Burrow | 47 | bred heifers | 900 | $2.00 | $1,800.00 | $84,600.00 |
| Burrow | 82 | open heifers | 900 | $1.70 | $1,530.00 | $125,460.00 |
| Burrow | 36 | open heifers | 900 | $1.60 | $1,440.00 | $51,840.00 |
| Fenton | 195 | yearling heifers | 725 | $1.85 | $1,341.25 | $261,543.75 |
| Wiggins | 68 | yearling heifers | 700 | $1.80 | $1,260.00 | $85,680.00 |
| Denny | 169 | yearling steers | 750 | $2.00 | $1,500.00 | $253,500.00 |
| Denny | 50 | yearling heifers | 575 | $1.80 | $1,035.00 | $51,750.00 |
| Headquarters | 4 | young bred cows | | | $1,500.00 | $6,000.00 |
| Headquarters | 15 | mixed yearlings calves | 700 | $1.50 | $1,050.00 | $15,750.00 |
| Friona (Hefner) | | | | | | |
| Pen 2 | 126 | yearling heifers | 775 | $1.80 | $1,395.00 | $175,770.00 |
| Pen 3 | 125 | yearling heifers | 775 | $1.80 | $1,395.00 | $174,375.00 |

---

[13] A true and correct copy of the updated appraisal received from Tom Griffin is attached as Exhibit N.

| | | | | | | |
|---|---|---|---|---|---|---|
| Pen 5 | 142 | yearling heifers | 700 | $1.80 | $1,260.00 | $178,920.00 |
| Pen 6/7 | 196 | yearling heifers | 700 | $1.80 | $1,260.00 | $246,960.00 |

**1551**                                                                     **$2,380,398.75**

2.    **Equipment**

19.    On May 5, 2023, First Bank (at my instruction) had a audit and valuation of the equipment collateral performed by Robert D. Aycock.[14]  The results are as summarized as follows:

| Year | Make/Model | VIN | Value |
|---|---|---|---|
| 1997 | John Deere 8400 MFWD Tractor | RW8400P013244 | $63,750 |
| 1993 | John Deere 4560 2WD Tractor | RW4560H001732 | $36,350 |
| 1982 | John Deere 4440 2WD Tractor | 4440H001863R | $29,500 |
| 1978 | John Deere 4440 2WD Tractor | 4440H0145962R | $28,650 |
| 1997 | New Holland 8970 MFWD Tractor | 981496006574 | $60,350 |
| 2010 | John Deere 4730 Self Propelled Sprayer W/Green Star GPS 2630 Screen | NO4730X009059 PCGU2UG57062 | $122,750 |
| 2015 | Kubota SVL 90-2 Skid Steer | JKUC0902V01516491 | $56,600 |
| 2001 | Caterpillar 928G Rubber Tire Loader | 6XR02173 | $47,900 |
| 2016 | Caterpillar 938M Rubber Tire Loader | 0938MU3R02508 | $182,500 |
| 2012 | Caterpillar 120M Road Grader | 0120MJB9N00249 | $159,650 |
| 2012 | Kenworth Day Cab Truck Single Rear Axle | 1XKDAP8X7CJ331072 | $36,750 |
| | EZ Steer GPS Screen Light Bar | G0497A0098 4510415850 | $1,850 |
| | Trimble GPS CFX Screen & Receiver Mod. 94510-00 | 5534500624 | $8,500 |
| 2010 | John Deere 2410 Chisel Plow 27 Shanks | N02410X012070 | $36,900 |
| | Big Ox 9 Shank V Ripper Plow | BO2659 | $1,100 |

---

[14] A true and correct copy of Robert Aycock's audit and valuation is attached as Exhibit O.

---

**AFFIDAVIT OF CURTIS CHRYSTAL**                                        PAGE 10

16511683v7

| Year | Make/Model | VIN | Value |
|------|-----------|-----|-------|
| 1999 | John Deere 610 Chisel Plow, 15 Shank, 3 Point | P00610X007999 | $7,500 |
| | Great Plains 6330UC-12 Chisel Plow 30 FT. | GPC10157 | $42,250 |
| | Summers Mfg. Coil Packer Mod 106 30 Ft. | 10273 | $7,500 |
| | John Deere 158 Front Loader w/Forks & Bucket | W00158X035266 | $6,250 |
| | KBH 1610 Tank Tow Fertilizer Trailer 5th Wheel Chassis With 1610 Gal. Tank | NT03722 | $6,750 |
| | Wilson 12 Ft. Box Scraper | 44316 | $2,750 |
| | John Deere 1418 Shredder 4 row | 1418T001695 | $4,500 |
| | AG Krane Hay King Lift | | $2,850 |
| | Shop Made 500 Gal. Diesel Trailer W/12v Pump | | $1,500 |
| 1973 | Lufkin Float Flatbed Trailer W/3 - 1,600 Gal. Poly Tanks | 3988 | $8,500 |
| | Big Tex HD Utility Trailer 20 Ft. | 13906050 (Partial VIN Tag Damage) | $3,500 |
| | E Z Trail Mod. 3400 Gravity Grain Cart On 1074 Chassis 4 Wheel W/Hyd. | | $8,950 |
| 2004 | Gooseneck Brand Big Haul Livestock Trailer, 1 Axle, 42 Ft. | 16G5742114B078973 | $29,850 |
| 2007 | Big Bend 24 Ft. Livestock Trailer 2 Axle | 3BUG240257T000247 | $5,900 |
| 2007 | C & C Horse Trailer 3 Horse W/Living Quarters | 1C9WG24208N643602 | $37,750 |
| 2014 | John Deere 469 Round Baler Mega Wide Plus 4,191 Bales | E100469XPDE400109 | $34,500 |
| 2008 | Massey Ferguson 1372 Swather, Heston Series W/Swivel Hitch | 1372H556459 | $22,250 |
| | Supreme Feed Mixer Model 700, Type C-3A | 5967-001-01 | $22,150 |
| | Trioliet Feed Mixer Mod. Solo Mix 2-2800 | 06520 | $42,500 |

**AFFIDAVIT OF CURTIS CHRYSTAL**                                    **PAGE 11**

| Year | Make/Model | VIN | Value |
|------|-----------|-----|-------|
| | 3 - Shop Made Cattle Self Feeders | | $3,300 |
| | Diesel Storage Tank 6,700 Gal. With Pump | | $2,500 |
| | Propane Tank 500 Gal. | | $350 |
| | 1,500 Bushel Grain Bin | | $950 |
| 2003 | Lindsay Grow Smart Center Pivot Irrigation System - 8 Tower | P-51204 | $41,250 |
| | Total of all Equipment | | $1,219,150 |

## D.     The Guarantees

20.     On June 14, 2021, Guarantors entered into commercial guarantees with First Bank (the "Guarantees") whereby the Note and all obligations thereunder were personally and individually guaranteed by Guarantors.[15]

21.     As set forth above, 2B Farms is in default under the Agreement.

22.     Pursuant to the Guarantees, Guarantors are liable to First Bank in the total amount of the Indebtedness   namely, $3,526,032.91, plus attorneys' fees, costs, and interest.

## E.     2B Farms' Fate Is Sealed When It Overdraws Its Bank Account By More Than $5 Million.

23.     On or about April 10, 2023, 2B Farms deposited into its account at First Bank (account number ending in 8270) check number 7620, dated April 5, 2023, made payable to 2B Farms in the amount of $2,559,407.02.  2B Farms was given access to those funds and immediately transferred or otherwise depleted those funds.  The check, however, was subsequently dishonored by the paying bank for lack of sufficient funds and was returned to First Bank.

---

[15] True and correct copies of the Guarantees are attached as Exhibits P and Q, respectively.

24.     On or about April 12, 2023, 2B Farms deposited into its account at First Bank (account number ending in 8270) check number 7621, dated April 6, 2023, made payable to 2B Farms in the amount of $2,510,991.45.  2B Farms was given access to those funds and immediately transferred or otherwise depleted those funds.  The check, however, was dishonored by the paying bank for lack of sufficient funds and was returned to First Bank.

25.     The two dishonored and returned checks total $5,070,398.47.

26.     Pursuant to the customer account agreement between 2B Farms and First Bank, First Bank charged back the amounts of the returned checks against 2B Farms' account.[16]  The customer account agreement provides that First Bank has "the right to charge back or otherwise debit your Account or other accounts you hold with us for any deposited Item that is returned, even if you have made withdrawals against it."  Further, the customer account agreement provides that 2B Farms is responsible for all overdrafts.

27.     2B Farms has breached the customer account agreement by failing to pay First Bank for the overdrafts in its account because of the dishonored and returned checks.

28.     As a result of the foregoing, other charges, and fees, the account is overdrawn in the amount of $5,274,498.61.

29.     2B Farms owes First Bank over $8 million, but the Collateral has an estimated value of only $3,599,548.75, minus purchase money security interests in the amount of $160,055, for a total of $3,473,448.25.  2B Farms has not turned over the Collateral to First Bank.  The cattle must be sold at the appropriate time to maximize the return and avoid additional cost.  The equipment also must be sold in an appropriate fashion.  2B Farms' continued possession of the Collateral is a

---

[16] A true and correct copy of the customer account agreement is attached as Exhibit R.

**AFFIDAVIT OF CURTIS CHRYSTAL**                                      **PAGE 13**
16511683v7

FURTHER AFFIANT SAYETH NOT.

**CURTIS CHRYSTAL**

SUBSCRIBED AND SWORN TO BEFORE ME ON _May 8_____, 2023.

Notary Public, State of Iowa

My commission expires: _4/15/26_

MARILYN A. JOHNSTON
Commission Number 752315
My Commission Expires 4/15/26



*0070*

# BUSINESS LOAN AGREEMENT (ASSET BASED)

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,500,000.00 | 06-09-2022 | 06-09-2023 | 512003093968 | 300 / 0305 | 2B   F 00 | 12948 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower: 2B FARMS
9397 CR 3114
SNYDER, TX 79549

Lender: FIRST BANK & TRUST
SNYDER
4500 COLLEGE AVE
SNYDER, TX 79549
(325) 573-9305

THIS BUSINESS LOAN AGREEMENT (ASSET BASED) dated June 9, 2022, is made and executed between 2B FARMS ("Borrower") and FIRST BANK & TRUST ("Lender") on the following terms and conditions. Borrower has received prior commercial loans from Lender or has applied to Lender for a commercial loan or loans or other financial accommodations, including those which may be described on any exhibit or schedule attached to this Agreement. Borrower understands and agrees that: (A) in granting, renewing, or extending any Loan, Lender is relying upon Borrower's representations, warranties, and agreements as set forth in this Agreement; (B) the granting, renewing, or extending of any Loan by Lender at all times shall be subject to Lender's sole judgment and discretion; and (C) all such Loans shall be and remain subject to the terms and conditions of this Agreement.

TERM. This Agreement shall be effective as of June 9, 2022, and shall continue in full force and effect until such time as all of Borrower's Loans in favor of Lender have been paid in full, including principal, interest, costs, expenses, attorneys' fees, and other fees and charges, or until such time as the parties may agree in writing to terminate this Agreement.

LINE OF CREDIT. Lender agrees to make Advances to Borrower from time to time from the date of this Agreement to the Expiration Date, provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base. Within the foregoing limits, Borrower may borrow, partially or wholly prepay, and reborrow under this Agreement as follows:

Conditions Precedent to Each Advance. Lender's obligation to make any Advance to or for the account of Borrower under this Agreement is subject to the following conditions precedent, with all documents, instruments, opinions, reports, and other items required under this Agreement to be in form and substance satisfactory to Lender:

(1)  Lender shall have received evidence that this Agreement and all Related Documents have been duly authorized, executed, and delivered by Borrower to Lender.

(2)  Lender shall have received such opinions of counsel, supplemental opinions, and documents as Lender may request.

(3)  The security interests in the Collateral shall have been duly authorized, created, and perfected with first lien priority and shall be in full force and effect.

(4)  All guaranties required by Lender for the credit facility(ies) shall have been executed by each Guarantor, delivered to Lender, and be in full force and effect.

(5)  Lender, at its option and for its sole benefit, shall have conducted an audit of Borrower's Equipment, books, records, and operations, and Lender shall be satisfied as to their condition.

(6)  Borrower shall have paid to Lender all fees, costs, and expenses specified in this Agreement and the Related Documents as are then due and payable.

(7)  There shall not exist at the time of any Advance a condition which would constitute an Event of Default under this Agreement, and Borrower shall have delivered to Lender the compliance certificate called for in the paragraph below titled "Compliance Certificate."

(8)  The Collateral Schedule (Borrowing Base Certificate) is used to confirm that the outstanding principal balance, as of the date of the Certificate, does not exceed the applicable Borrowing Base. Lender will continue to make advances up to the maximum availability as shown on the most recent Collateral Schedule (Borrowing Base Certificate) provided to the Lender. The maximum availability on the Note will be reduced to reflect the maximum availability as shown in the most recent Collateral Schedule (Borrowing Base Certificate). Borrower may provide a new Collateral Schedule (Borrowing Base Certificate) prior to the next required Collateral Schedule (Borrowing Base Certificate) to establish a higher availability.

Making Loan Advances. Advances under this credit facility, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by authorized persons. Lender may, but need not, require that all oral requests be confirmed in writing. Each Advance shall be conclusively deemed to have been made at the request of and for the benefit of Borrower (1) when credited to any deposit account of Borrower maintained with Lender or (2) when advanced in accordance with the instructions of an authorized person. Lender, at its option, may set a cutoff time, after which all requests for Advances will be treated as having been requested on the next succeeding Business Day.

Mandatory Loan Repayments. If at any time the aggregate principal amount of the outstanding Advances shall exceed the applicable Borrowing Base, Borrower, immediately upon written or oral notice from Lender, shall pay to Lender an amount equal to the difference between the outstanding principal balance of the Advances and the Borrowing Base. On the Expiration Date, Borrower shall pay to Lender in full the aggregate unpaid principal amount of all Advances then outstanding and all accrued unpaid interest, together with all other applicable fees, costs and charges, if any, not yet paid.

Loan Account. Lender shall maintain on its books a record of account in which Lender shall make entries for each Advance and such other debits and credits as shall be appropriate in connection with the credit facility. Lender shall provide Borrower with periodic statements of Borrower's account, which statements shall be considered to be correct and conclusively binding on Borrower unless Borrower notifies Lender to the contrary within thirty (30) days after Borrower's receipt of any such statement which Borrower deems to be incorrect.

COLLATERAL. To secure payment of the Primary Credit Facility and performance of all other Loans, obligations and duties owed by Borrower to Lender, Borrower (and others, if required) shall grant to Lender Security Interests in such property and assets as Lender may require. Lender's Security Interests in the Collateral shall be continuing liens and shall include the proceeds and products of the Collateral, including without limitation the proceeds of any insurance. With respect to the Collateral, Borrower agrees and represents and warrants to Lender:

Perfection of Security Interests. Borrower agrees to execute all documents perfecting Lender's Security Interest and to take whatever actions are requested by Lender to perfect and continue Lender's Security Interests in the Collateral. Upon request of Lender, Borrower will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Borrower will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. Contemporaneously with the execution of this Agreement, Borrower will execute one or more UCC financing statements and any similar statements as may be required by applicable law, and Lender will file such financing statements and all such similar statements in the appropriate location or locations. Borrower hereby appoints Lender as its irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect or to continue any Security Interest. Lender may at any time, and without further authorization from Borrower, file a carbon, photograph, facsimile, or other reproduction of any financing statement for use as a financing statement. Borrower will reimburse Lender for all expenses for the perfection, termination, and the continuation of the perfection of Lender's security interest in the Collateral. Borrower promptly will notify Lender before any change or a change involving any change to the assumed business names of Borrower. Borrower also promptly will notify Lender before any change in Borrower's Social Security Number or Employer Identification Number. Borrower further agrees to notify Lender in writing prior to any change in address or location of Borrower's principal governance office or should Borrower merge or consolidate with any other entity.

Collateral Records. Borrower does now, and at all times hereafter shall, keep correct and accurate records of the Collateral, all of which records shall be available to Lender or Lender's representative upon demand for inspection and copying at any reasonable time. With respect to the Equipment, Borrower agrees to keep and maintain such records as Lender may require, including without limitation information concerning Eligible Equipment and records itemizing and describing the kind, type, quality, and quantity of Equipment, Borrower's Equipment costs, and the daily withdrawals and additions to Equipment. Records related to Equipment are or will be located at 9397 CR 3114, SNYDER, TX 79549. The above is an accurate and complete list of all locations at which Borrower keeps or maintains business records concerning Borrower's collateral.

Collateral Schedules. Concurrently with the execution and delivery of this Agreement, Borrower shall execute and deliver to Lender

EXHIBIT A

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
(Continued)

Loan No: 512001093968                                                                 Page 2

schedules of Equipment and schedules of Eligible Equipment in form and substance satisfactory to the Lender. Thereafter supplemental schedules shall be delivered according to the following schedule: With respect to Eligible Equipment, schedules shall be delivered WITHIN (15) DAYS AFTER THE END OF EACH MONTH. CATTLE INSPECTION TO BE COMPLETED THREE (3) TIMES PER LOAN YEAR.

**Representations and Warranties Concerning Equipment.** With respect to the Equipment, Borrower represents and warrants to Lender: (1) All Equipment represented by Borrower to be Eligible Equipment for purposes of this Agreement conforms to the requirements of the definition of Eligible Equipment; (2) All Equipment values take on schedules delivered to Lender will be true and correct, subject to the immaterial variance; (3) The value of the Equipment will be determined on a consistent accounting basis; (4) Except as agreed to the contrary by Lender in writing, all Eligible Equipment is now and at all times hereafter will be in Borrower's physical possession; (5) Except as reflected in the Equipment schedules delivered to Lender, all Eligible Equipment is now and at all times hereafter will be of good merchantable quality, free from defects; (6) Eligible Equipment is not now and will not at any time hereafter be stored with a bailee, warehouseman, or similar party without Lender's prior written consent, and, in such event, Borrower will concurrently at the time of bailment cause any such bailee, warehouseman or similar party to issue and deliver to Lender, in form acceptable to Lender, warehouse receipts in Lender's name evidencing the storage of Equipment; and (7) Lender, its assigns, or agents shall have the right at any time and at Borrower's expense to inspect and examine the Equipment and to check and test the same as to quality, quantity, value, and condition.

**REPRESENTATIONS AND WARRANTIES.** Borrower represents and warrants to Lender, as of the date of this Agreement, as of the date of each disbursement of loan proceeds, as of the date of any renewal, extension or modification of any Loan, and at all times any Indebtedness exists:

**Organization.** Borrower is a partnership which is, and at all times shall be, duly organized, validly existing, and in good standing under and by virtue of the Laws of the State of Texas. Borrower is duly authorized to transact business in all other states in which Borrower is doing business, having obtained all necessary filings, governmental licenses and approvals for each state in which Borrower is doing business. Specifically, Borrower is, and at all times shall be, duly qualified as a foreign partnership in all states in which the failure to so qualify would have a material adverse effect on its business or financial condition. Borrower has the full power and authority to own its properties and to transact the business in which it is presently engaged or presently proposes to engage. Borrower maintains an office at 6397 CR 3174, SNYDER, TX, 79549. Unless Borrower has designated otherwise in writing, the principal office is the office at which Borrower keeps its books and records including its records concerning the Collateral. Borrower will notify Lender prior to any change in the location of Borrower's principal office address or any change in Borrower's name. Borrower shall do all things necessary to preserve and to keep in full force and effect its existence, rights and privileges, and shall comply with all regulations, rules, ordinances, statutes, orders and decrees of any governmental or quasi-governmental authority or court applicable to Borrower and Borrower's business activities.

**Assumed Business Names.** Borrower has filed or recorded all documents or filings required by law relating to all assumed business names used by Borrower. Excluding the name of Borrower, the following is a complete list of all assumed business names under which Borrower does business: None.

**Authorization.** Borrower's execution, delivery, and performance of this Agreement and all the Related Documents have been duly authorized by all necessary action by Borrower and do not conflict with, result in a violation of, or constitute a default under: (1) any provision of (a) Borrower's articles or agreements of partnership, or (b) any agreement or other instrument binding upon Borrower or (2) any law, governmental regulation, court decree or order applicable to Borrower or to Borrower's properties.

**Financial Information.** Each of Borrower's financial statements supplied to Lender truly and completely disclosed Borrower's financial condition as of the date of the statement, and there has been no material adverse change in Borrower's financial condition subsequent to the date of the most recent financial statement supplied to Lender. Borrower has no material contingent obligation except as disclosed in such financial statements.

**Legal Effect.** This Agreement constitutes, and any instrument or agreement Borrower is required to give under this Agreement when delivered will constitute legal, valid, and binding obligations of Borrower enforceable against Borrower in accordance with their respective terms.

**Properties.** Except as contemplated by this Agreement or as previously disclosed in Borrower's financial statements or in writing to Lender and accepted by Lender, and except for property tax liens for taxes not presently due and payable, Borrower owns and has good title to all of Borrower's properties free and clear of all Security Interests, and has not executed any security documents or financing statements relating to such properties. All of Borrower's properties are titled in Borrower's legal name, and Borrower has not used or filed a financing statement under any other name for the last five (5) years.

**Hazardous Substances.** Except as disclosed to and acknowledged by Lender in writing, Borrower represents and warrants that: (1) During the period of Borrower's ownership of the Collateral, there has been no use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance by any person on, under, about or from any of the Collateral. (2) Borrower has no knowledge of, or reason to believe that there has been (a) any breach or violation of any Environmental Laws, (b) any use, generation, manufacture, storage, treatment, disposal, release or threatened release of any Hazardous Substance on, under, about or from the Collateral by any prior owners or occupants of any of the Collateral or (c) any actual or threatened litigation or claims of any kind by any person relating to such matters. (3) Neither Borrower nor any tenant, contractor, agent or other authorized user of any of the Collateral shall use, generate, manufacture, store, treat, dispose of or release any Hazardous Substance on, under, about or from any of the Collateral; and any such activity shall be conducted in compliance with all applicable federal, state, and local laws, regulations, and ordinances, including without limitation all Environmental Laws. Borrower authorizes Lender and its agents to enter upon the Collateral to make such inspections and tests as Lender may deem appropriate to determine compliance of the Collateral with this section of the Agreement. Any inspections or tests made by Lender shall be at Borrower's expense and for Lender's purposes only and shall not be construed to create any responsibility or liability on the part of Lender to Borrower or to any other person. The representations and warranties contained herein are based on Borrower's due diligence in investigating the Collateral for hazardous waste and Hazardous Substances. Borrower hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Borrower becomes liable for cleanup or other costs under any such laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims, losses, liabilities, damages, penalties, and expenses which Lender may directly or indirectly sustain or suffer resulting from a breach of this section of the Agreement or as a consequence of any use, generation, manufacture, storage, disposal, release or threatened release of a hazardous waste or substance on the Collateral. The provisions of this section of the Agreement, including the obligation to indemnify and defend, shall survive the payment of the Indebtedness and the termination, expiration or satisfaction of this Agreement and shall not be affected by Lender's acquisition of any interest in any of the Collateral, whether by foreclosure or otherwise.

**Litigation and Claims.** No litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Borrower is pending or threatened, and no other event has occurred which may materially adversely affect Borrower's financial condition or properties, other than litigation, claims, or other events, if any, that have been disclosed to and acknowledged by Lender in writing.

**Taxes.** To the best of Borrower's knowledge, all of Borrower's tax returns and reports that are or were required to be filed, have been filed, and all taxes, assessments and other governmental charges have been paid in full, except those presently being or to be contested by Borrower in good faith in the ordinary course of business and for which adequate reserves have been provided.

**Lien Priority.** Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.

**Binding Effect.** This Agreement, the Note, all Security Agreements (if any), and all Related Documents are binding upon the signers thereof, as well as upon their successors, representatives and assigns, and are legally enforceable in accordance with their respective terms.

**AFFIRMATIVE COVENANTS.** Borrower covenants and agrees with Lender that, so long as this Agreement remains in effect, Borrower will:

**Notices of Claims and Litigation.** Promptly inform Lender in writing of (1) all material adverse changes in Borrower's financial condition, and (2) all existing and all threatened litigation, claims, investigations, administrative proceedings or similar actions affecting Borrower or any Guarantor which could materially affect the financial condition of any Guarantor.

**Financial Records.** Maintain its books and records in accordance with GAAP, applied on a consistent basis, and permit Lender to examine and audit Borrower's books and records at all reasonable times.

**Financial Statements.** Furnish Lender with the following:

**Tax Returns.** As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Borrower's Federal income tax returns, prepared by a tax professional satisfactory to Lender.

All financial reports required to be provided under this Agreement shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.

**EXHIBIT A**

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
**(Continued)**

Loan No: 512001093968

Page 3

**Additional Information.** Furnish such additional information and statements, as Lender may request from time to time.

**Insurance.** Maintain fire and other risk insurance, public liability insurance, and such other insurance as Lender may require with respect to Borrower's properties and operations, in form, amounts, and coverages reasonably acceptable to Lender and by insurance companies authorized to transact business in Texas. BORROWER MAY FURNISH THE INSURANCE REQUIRED BY THIS AGREEMENT WHETHER THROUGH EXISTING POLICIES OWNED OR CONTROLLED BY BORROWER OR THROUGH EQUIVALENT COVERAGE FROM ANY INSURANCE COMPANY AUTHORIZED TO TRANSACT BUSINESS IN TEXAS. Borrower, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days prior written notice to Lender. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Borrower or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest for the Loans, Borrower will provide Lender with such lender's loss payable or other endorsements as Lender may require.

**Insurance Reports.** Furnish to Lender, upon request of Lender, reports on each existing insurance policy showing such information as Lender may reasonably request including without limitation the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the properties insured; (5) the then current property values on the basis of which insurance has been obtained, and the manner of determining those values; and (6) the expiration date of the policy. In addition, upon request of Lender (however not more often than annually), Borrower will have an independent appraiser satisfactory to Lender determine, as applicable, the actual cash value or replacement cost of any Collateral. The cost of such appraisal shall be paid by Borrower.

**Other Agreements.** Comply with all terms and conditions of all other agreements, whether now or hereafter existing, between Borrower and any other party and notify Lender immediately in writing of any default in connection with any other such agreements.

**Loan Proceeds.** Use all Loan proceeds solely for Borrower's business operations, unless specifically consented to the contrary by Lender in writing.

**Taxes, Charges and Liens.** Pay and discharge when due all of its indebtedness and obligations, including without limitation all assessments, taxes, governmental charges, levies and liens, of every kind and nature, imposed upon Borrower or its properties, income, or profits, prior to the date on which penalties would attach, and all lawful claims that, if unpaid, might become a lien or charge upon any of Borrower's properties, income, or profits. Provided however, Borrower will not be required to pay and discharge any such assessment, tax, charge, levy, lien or claim so long as (1) the legality of the same shall be contested in good faith by appropriate proceedings, and (2) Borrower shall have established on Borrower's books adequate reserves with respect to such contested assessment, tax, charge, levy, lien, or claim in accordance with GAAP.

**Performance.** Perform and comply, in a timely manner, with all terms, conditions, and provisions set forth in this Agreement, in the Related Documents, and in all other instruments and agreements between Borrower and Lender. Borrower shall notify Lender immediately in writing of any default in connection with any agreement.

**Operations.** Maintain executive and management personnel with substantially the same qualifications and experience as the present executive and management personnel; provide written notice to Lender of any change in executive and management personnel; conduct its business affairs in a reasonable and prudent manner.

**Environmental Studies.** Promptly conduct and complete, at Borrower's expense, all such investigations, studies, samplings and testings as may be requested by Lender or any governmental authority relative to any substance, or any waste or by-product of any substance defined as toxic or a hazardous substance under applicable federal, state, or local law, rule, regulation, order or directive, at or affecting any property or any facility owned, leased or used by Borrower.

**Compliance with Governmental Requirements.** Comply with all laws, ordinances, and regulations, now or hereafter in effect, of all governmental authorities applicable to the conduct of Borrower's properties, businesses and operations, and to the use or occupancy of the Collateral, including without limitation, the Americans With Disabilities Act. Borrower may contest in good faith any such law, ordinance, or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Borrower has notified Lender in writing prior to doing so and so long as, in Lender's sole opinion, Lender's interests in the Collateral are not jeopardized. Lender may require Borrower to post adequate security or a surety bond, reasonably satisfactory to Lender, to protect Lender's interest.

**Inspection.** Permit employees or agents of Lender at any reasonable time to inspect any and all Collateral for the Loan or Loans and Borrower's other properties and to examine or audit Borrower's books, accounts, and records and to make copies and memoranda of Borrower's books, accounts, and records. If Borrower now or at any time hereafter maintains any records (including without limitation computer generated records and computer software programs for the generation of such records) in the possession of a third party, Borrower, upon request of Lender, shall notify such party to permit Lender free access to such records at all reasonable times and to provide Lender with copies of any records it may request, all at Borrower's expense.

**Environmental Compliance and Reports.** Borrower shall comply in all respects with any and all Environmental Laws; not cause or permit to exist, as a result of an intentional or unintentional action or omission on Borrower's part or on the part of any third party, on property owned and/or occupied by Borrower, any environmental activity where damage may result to the environment, unless such environmental activity is pursuant to and in compliance with the conditions of a permit issued by the appropriate federal, state or local governmental authorities; shall furnish to Lender promptly and in any event within thirty (30) days after receipt thereof a copy of any notice, summons, lien, citation, directive, letter or other communication from any governmental agency or instrumentality concerning any intentional or unintentional action or omission on Borrower's part in connection with any environmental activity whether or not there is damage to the environment and/or other natural resources.

**Additional Assurances.** Make, execute and deliver to Lender such promissory notes, mortgages, deeds of trust, security agreements, assignments, financing statements, instruments, documents and other agreements as Lender or its attorneys may reasonably request to evidence and secure the Loans and to perfect all Security Interests.

**RECOVERY OF ADDITIONAL COSTS.** If the imposition of or any change in any law, rule, regulation, guideline, or generally accepted accounting principle, or the interpretation or application of any thereof by any court, administrative or governmental authority, or standard-setting organization (including any request or policy not having the force of law) shall impose, modify or make applicable any taxes (except federal, state or local income or franchise taxes imposed on Lender), reserve requirements, capital adequacy requirements or other obligations which would (A) increase the cost to Lender for extending or maintaining the credit facilities to which this Agreement relates, (B) reduce the amounts payable to Lender under this Agreement or the Related Documents, or (C) reduce the rate of return on Lender's capital as a consequence of Lender's obligations with respect to the credit facilities to which this Agreement relates, then Borrower agrees to pay Lender such additional amounts as will compensate Lender therefor, within five (5) days after Lender's written demand for such payment, which demand shall be accompanied by an explanation of such imposition or charge and a calculation in reasonable detail of the additional amounts payable by Borrower, which explanation and calculations shall be conclusive in the absence of manifest error.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Borrower fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Borrower's failure to discharge or pay when due any amounts Borrower is required to discharge or pay under this Agreement or any Related Documents, Lender on Borrower's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on any Collateral and paying all costs for insuring, maintaining and preserving any Collateral. All such expenditures incurred or paid by Lender for such purposes will then bear interest at the Note rate from the date incurred or paid by Lender to the date of repayment by Borrower. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity.

**NEGATIVE COVENANTS.** Borrower covenants and agrees with Lender that while this Agreement is in effect, Borrower shall not, without the prior written consent of Lender:

**Indebtedness and Liens.** (1) Except for trade debt incurred in the normal course of business and indebtedness to Lender contemplated by this Agreement, create, incur or assume indebtedness for borrowed money, including capital leases, (2) sell, transfer, mortgage, assign, pledge, lease, grant a security interest in, or encumber any of Borrower's assets (except as allowed as Permitted Liens), or (3) sell with recourse any of Borrower's accounts, except to Lender.

**Continuity of Operations.** (1) Engage in any business activities substantially different than those in which Borrower is presently engaged, (2) cease operations, liquidate, merge or restructure as a legal entity (whether by division or otherwise), consolidate with or acquire any other entity, change its name, convert to another type of entity or redomesticate, dissolve or transfer or sell Collateral out of the ordinary course of business, or (3) make any distribution with respect to any capital account, whether by reduction of capital or otherwise.

**Loans, Acquisitions and Guaranties.** (1) Loan, invest in or advance money or assets to any other person, enterprise or entity, (2) purchase, create or acquire any interest in any other enterprise or entity, or (3) incur any obligation as surety or guarantor other than in

EXHIBIT A

## BUSINESS LOAN AGREEMENT (ASSET BASED)
(Continued)

Loan No: 512001093968

Page 4

the ordinary course of business.

**Agreements.** Enter into any agreement, combining any provisions which would be violated or breached by the performance of Borrower's obligations under this Agreement or in connection herewith.

**CESSATION OF ADVANCES.** If Lender has made any commitment to make any Loan to Borrower, whether under this Agreement or under any other agreement, Lender shall have no obligation to make Loan Advances or to disburse Loan proceeds if: (A) Borrower or any Guarantor is in default under the terms of this Agreement or any of the Related Documents or any other agreement that Borrower or any Guarantor has with Lender; (B) Borrower or any Guarantor dies, becomes incompetent or becomes insolvent, files a petition in bankruptcy or similar proceedings, or is adjudged a bankrupt; (C) there occurs a material adverse change in Borrower's financial condition, in the financial condition of any Guarantor, or in the value of any Collateral securing any Loan; or (D) any Guarantor seeks, claims or otherwise attempts to limit, modify or revoke such Guarantor's guaranty of the Loan or any other loan with Lender; or (E) Lender in good faith deems itself insecure, even though no Event of Default shall have occurred.

**RIGHT OF SETOFF.** To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Borrower fails to make any payment when due under the Loan.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the Loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the Indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

**Change in Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of the Loan is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Right to Cure.** If any default, other than a default on Indebtedness, is curable and if Borrower or Grantor, as the case may be, has not been given a notice of a similar default within the preceding twelve (12) months, it may be cured if Borrower or Grantor, as the case may be, after Lender sends written notice to Borrower or Grantor, as the case may be, demanding cure of such default: (1) cure the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiate steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continue and complete all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**EFFECT OF AN EVENT OF DEFAULT.** If any Event of Default shall occur, except where otherwise provided in this Agreement or the Related Documents, all commitments and obligations of Lender under this Agreement or the Related Documents or any other agreement immediately will terminate (including any obligation to make Further Loan Advances or disbursements), and, at Lender's option, all Indebtedness immediately will become due and payable, all without notice of any kind to Borrower, except that in the case of an Event of Default of the type described in the "Insolvency" subsection above, such acceleration shall be automatic and not optional. In addition, Lender shall have all the rights and remedies provided in the Related Documents or available at law, in equity, or otherwise. Except as may be prohibited by applicable law, all of Lender's rights and remedies shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Borrower or of any Grantor shall not affect Lender's right to declare a default and to exercise its rights and remedies.

**SUPERSEDE PROVISION.** BORROWER ACKNOWLEDGES THAT THIS LOAN AGREEMENT REPLACES, SUPERSEDES AND AMENDS ANY EXISTING LOAN AGREEMENTS. ALL INDEBTEDNESS OF BORROWER TO LENDER WHICH WAS HERETOFORE SUBJECT TO THE TERMS OF A PRIOR LOAN AGREEMENT SHALL HEREAFTER BE SUBJECT TO THIS LOAN AGREEMENT. NOTHING HEREIN SHALL BE CONSIDERED A NOVATION OF ANY SUCH OBLIGATION. NOTWITHSTANDING THE FOREGOING LANGUAGE, THIS LOAN AGREEMENT SHALL NOT SUPERSEDE ANY LOAN AGREEMENT WITH LENDER THAT SPECIFICALLY EXEMPTS ITSELF FROM GENERAL SUPERSEDING PROVISIONS.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Borrower agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Borrower shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Borrower also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Consent to Loan Participation.** Borrower agrees and consents to Lender's sale or transfer, whether now or later, of one or more participation interests in the Loan to one or more purchasers, whether related or unrelated to Lender. Lender may provide, without any limitation whatsoever, to any one or more purchasers, or potential purchasers, any information or knowledge Lender may have about Borrower or about any other matter relating to the Loan, and Borrower waives any rights to privacy Borrower may have with respect to such matters. Borrower additionally waives any and all notices of sale of participation interests, as well as all notices of any repurchase of such participation interests. Borrower also agrees that the purchasers of any such participation interest will be considered as the absolute owners of such interests in the Loan and will have all the rights granted under the participation agreement or agreements governing the sale of such participation interests. Borrower further waives all rights of offset or counterclaim that it may have now or later against Lender or against any purchaser of such a participation interest and unconditionally agrees that either Lender or such purchaser may enforce Borrower's obligation under the Loan irrespective of the failure or insolvency of any holder of any interest in the Loan. Borrower further agrees that the purchaser of any such participation interests may enforce its interests irrespective of any personal claims or defenses that Borrower may have against Lender.

EXHIBIT A

**BUSINESS LOAN AGREEMENT (ASSET BASED)**
(Continued)

Loan No: 512001093968                                                                                    Page 6

---

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Borrower, or between Lender and any Grantor, shall constitute a waiver of any of Lender's rights or of any of Borrower's or any Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Borrower agrees to keep Lender informed at all times of Borrower's current address. Unless otherwise provided or required by law, if there is more than one Borrower, any notice given by Lender to any Borrower is deemed to be notice given to all Borrowers.

**Payment of Interest and Fees.** Notwithstanding any other provision of this Agreement or any provision of any Related Document, Borrower does not agree or intend to pay, and Lender does not agree or intend to charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for the Loan which would in any way or event (including demand, prepayment, or acceleration) cause Lender to contract for, charge or collect more for the Loan than the maximum Lender would be permitted to charge or collect by any applicable federal or Texas state law. Any such excess interest or unauthorized fee will, instead of anything stated to the contrary, be applied first to reduce the unpaid principal balance of the Loan, and when the principal has been paid in full, be refunded to Borrower.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Subsidiaries and Affiliates of Borrower.** To the extent the context of any provisions of this Agreement makes it appropriate, including without limitation any representation, warranty or covenant, the word "Borrower" as used in this Agreement shall include all of Borrower's subsidiaries and affiliates. Notwithstanding the foregoing however, under no circumstances shall this Agreement be construed to require Lender to make any Loan or other financial accommodation to any of Borrower's subsidiaries or affiliates.

**Successors and Assigns.** All covenants and agreements by or on behalf of Borrower contained in this Agreement or any Related Documents shall bind Borrower's successors and assigns and shall inure to the benefit of Lender and its successors and assigns. Borrower shall not, however, have the right to assign Borrower's rights under this Agreement or any interest therein, without the prior written consent of Lender.

**Survival of Representations and Warranties.** Borrower understands and agrees that in extending Loan Advances, Lender is relying on all representations, warranties, and covenants made by Borrower in this Agreement or in any certificate or other instrument delivered by Borrower to Lender under this Agreement or the Related Documents. Borrower further agrees that regardless of any investigation made by Lender, all such representations, warranties and covenants will survive the extension of Loan Advances and delivery to Lender of the Related Documents, shall be continuing in nature, shall be deemed made and redated by Borrower at the time each Loan Advance is made and shall remain in full force and effect until such time as Borrower's indebtedness shall be paid in full, or until this Agreement shall be terminated in the manner provided above, whichever is the last to occur.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**Waive Jury.** All parties to this Agreement hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by any party against any other party.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code. Accounting words and terms not otherwise defined in this Agreement shall have the meanings assigned to them in accordance with generally accepted accounting principles as in effect on the date of this Agreement.

**Advance.** The word "Advance" means a disbursement of Loan funds made, or to be made, to Borrower or on Borrower's behalf under the terms and conditions of this Agreement.

**Agreement.** The word "Agreement" means this Business Loan Agreement (Asset Based), as this Business Loan Agreement (Asset Based) may be amended or modified from time to time, together with all exhibits and schedules attached to this Business Loan Agreement (Asset Based) from time to time.

**Borrower.** The word "Borrower" means 2B FARMS and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Borrowing Base.** The words "Borrowing Base" mean, as determined by Lender from time to time, the lesser of (1) $3,300,000.00 or (2) the sum of (a) 75.000% of the aggregate amount of Eligible Equipment, plus (b) 75.000% of the aggregate amount of Eligible Inventory, plus (c) 75.000% of the aggregate amount (a) not to exceed in corresponding Loan amount based on Eligible Inventory $3,300,000.00).

**Business Day.** The words "Business Day" mean a day on which commercial banks are open in the State of Texas.

**Collateral.** The word "Collateral" means all property and assets granted as collateral security for a Loan, whether real or personal property, whether granted directly or indirectly, whether granted now or in the future, and whether granted in the form of a security interest, mortgage, collateral mortgage, deed of trust, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien, charge, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever, whether created by law, contract, or otherwise. The word Collateral also includes without limitation all collateral described in the Collateral section of this Agreement.

**Eligible Equipment.** The words "Eligible Equipment" mean, at any time, all of Borrower's Equipment as defined below, except:

(1) Equipment which is not owned by Borrower free and clear of all security interests, liens, encumbrances, and claims of third parties.

(2) Equipment which Lender, in its sole discretion, deems to be obsolete, unsaleable, damaged, defective, or unfit for operation.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Equipment.** The word "Equipment" means all of Borrower's goods used or bought for use primarily in Borrower's business and which are not included in inventory, whether now or hereafter existing.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Expiration Date.** The words "Expiration Date" mean the date of termination of Lender's commitment to lend under this Agreement.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Grantor.** The word "Grantor" means each and all of the persons or entities granting a Security Interest in any Collateral for the Loan, including without limitation all Borrowers granting such a Security Interest.

## BUSINESS LOAN AGREEMENT (ASSET BASED)
### (Continued)

Loan No: 512001093968                                                                                                Page 6

**Guarantor.** The word "Guarantor" means any guarantor, surety, or accommodation party of any or all of the Loan.

**Guaranty.** The word "Guaranty" means the guaranty from Guarantor to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Borrower is responsible under this Agreement or under any of the Related Documents.

**Lender.** The word "Lender" means FIRST BANK & TRUST, its successors and assigns.

**Loan.** The word "Loan" means any and all loans and financial accommodations from Lender to Borrower whether now or hereafter existing, and however evidenced, including without limitation those loans and financial accommodations described herein or described on any exhibit or schedule attached to this Agreement from time to time.

**Note.** The word "Note" means the Note dated June 9, 2022 and executed by 2B FARMS in the principal amount of $3,500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Permitted Liens.** The words "Permitted Liens" mean (1) liens and security interests securing Indebtedness owed by Borrower to Lender; (2) liens for taxes, assessments, or similar charges either not yet due or being contested in good faith; (3) liens of materialmen, mechanics, warehousemen, or carriers, or other like liens arising in the ordinary course of business and securing obligations which are not yet delinquent; (4) purchase money liens or purchase money security interests upon or in any property acquired or held by Borrower in the ordinary course of business to secure Indebtedness outstanding on the date of this Agreement or permitted to be incurred under the paragraph of this Agreement titled "Indebtedness and Liens"; (5) liens and security interests which, as of the date of this Agreement, have been disclosed to and approved by the Lender in writing; and (6) those liens and security interests which in the aggregate constitute an immaterial and insignificant monetary amount with respect to the net value of Borrower's assets.

**Primary Credit Facility.** The words "Primary Credit Facility" mean the credit facility described in the Line of Credit section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Loan.

**Security Agreement.** The words "Security Agreement" mean and include without limitation any agreements, promises, covenants, arrangements, understandings or other agreements, whether created by law, contract, or otherwise, evidencing, governing, representing, or creating a Security Interest.

**Security Interest.** The words "Security Interest" mean, without limitation, any and all types of collateral security, present and future, whether in the form of a lien, charge, encumbrance, mortgage, deed of trust, security deed, assignment, pledge, crop pledge, chattel mortgage, collateral chattel mortgage, chattel trust, factor's lien, equipment trust, conditional sale, trust receipt, lien or title retention contract, lease or consignment intended as a security device, or any other security or lien interest whatsoever whether created by law, contract, or otherwise.

BORROWER ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS BUSINESS LOAN AGREEMENT (ASSET BASED) AND BORROWER AGREES TO ITS TERMS. THIS BUSINESS LOAN AGREEMENT (ASSET BASED) IS DATED JUNE 9, 2022.

BORROWER:

2B FARMS

By: _Rebecca Ann Robinson_                                    By: _Terry Max Robinson_
REBECCA ANN ROBINSON, Partner of 2B FARMS          TERRY MAX ROBINSON, Partner of 2B FARMS

LENDER:

FIRST BANK & TRUST

By: _____
Authorized Signer
Shawn Ragland

LaserPro, Ver. 21.3.11.003  Copr. Finastra USA Corporation 1997, 2022.  All Rights Reserved.  TX  C:\laserPro\CFILPL\C30.FC  TR-87356  PR-240

EXHIBIT A



## AGRICULTURAL SECURITY AGREEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,500,000.00 | 06-09-2022 | 06-09-2023 | 1 2001002968 | 300 / 6306 | 2B F 00 | 12948 | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "*****" has been omitted due to text length limitations.

Grantor:   2B FARMS
           9307 CR 3114
           SNYDER, TX 79549

Lender:    FIRST BANK & TRUST
           SNYDER
           4500 COLLEGE AVE
           SNYDER, TX 79549
           (325) 573-9305

---

THIS AGRICULTURAL SECURITY AGREEMENT dated June 9, 2022, is made and executed between 2B FARMS ("Grantor") and FIRST BANK & TRUST ("Lender").

GRANT OF SECURITY INTEREST. For valuable consideration, Grantor grants to Lender a security interest in the Collateral to secure the Indebtedness and agrees that Lender shall have the rights stated in this Agreement with respect to the Collateral, in addition to all other rights which Lender may have by law.

COLLATERAL DESCRIPTION. The word "Collateral" as used in this Agreement means the following described property, whether now owned or hereafter acquired, whether now existing or hereafter arising, and wherever located, in which Grantor is giving to Lender a security interest for the payment of the Indebtedness and performance of all other obligations under the Note and this Agreement:

All Livestock (including all income and supplies) and Farm Equipment

All Feed Inventory

The Collateral includes any and all of Grantor's present and future farm inventory (including consigned inventory), related equipment, goods, merchandise and other items of personal property, no matter where located, of every type and description, including without limitation any and all of Grantor's present and future raw materials, components, work-in-process, finished items, packing and shipping materials, containers, items held for sale, items held for lease, items for which Grantor is lessor, goods to be furnished under contract for services, materials used or consumed in Grantor's business, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and any and all additions thereto and substitutions or replacements therefor, and all accessions, attachments, and accessions thereto, whether added now or later, and all products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement, or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents, and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guarantee of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to the ownership, operation, use, or collection of any of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto. Inventory includes inventory temporarily out of Grantor's possession or custody and all returns on accounts, chattel paper and instruments.

The Collateral includes any and all of Grantor's present and future farm products, livestock, including aquatic goods produced in aquacultural operations, poultry, agricultural commodities and other farm products of every type and description, including without limitation all replacements and substitutions therefor and additions thereto, and further including without limitation any and all offspring, unborn livestock, and other products, previously, contemporaneously and/or in the future acquired by Grantor whether by purchase, exchange, accretion or otherwise, and all of Grantor's present and future farm inventory in any way derived or to be derived therefrom, whether held by Grantor or by others, and all documents of title, warehouse receipts, bills of lading, and other documents of every type covering all or any part of the foregoing, and all of Grantor's equipment in any way related thereto, and any and all additions thereto and substitutions and replacements therefor, and all accessions, attachments, and accessions thereto, whether added now or later, and all other products and proceeds derived or to be derived therefrom, including without limitation all insurance proceeds and refunds of insurance premiums, if any, and all sums that may be due from third parties who may cause damage to any of the foregoing or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, contract rights, chattel paper, instruments, documents and notes that may be derived from the sale, lease or other disposition of any of the foregoing, and any rights of Grantor to collect or enforce payment thereof, as well as to enforce any guarantees of the foregoing and security therefor, and all of Grantor's present and future general intangibles in any way related or pertaining to the ownership, operation, use or of the foregoing, including without limitation Grantor's books, records, files, computer disks and software, and all rights that Grantor may have with regard thereto.

The Collateral includes any and all of Grantor's now owned or hereafter acquired farm equipment or agricultural machinery, equipment, furnishings and fixtures of every type and description, and all accessories, attachments, accessions, substitutions, replacements and additions thereto, whether added now or later, and all proceeds derived or to be derived therefrom, including without limitation any equipment purchased with the proceeds, and all insurance proceeds and refunds of insurance premiums, if any, and any sums that may be due from third parties who may cause damage to any of the foregoing, or from any insurer, whether due to judgment, settlement or other process, and any and all present and future accounts, chattel paper, instruments, notes and monies that may be derived from the sale, lease or other disposition of any of the foregoing, any rights of Grantor to collect or enforce payment thereof as well to enforce any guarantees of the foregoing and security therewith, and all present and future general intangibles of Grantor in any way related or pertaining to the ownership, operation, or use of the foregoing, and any rights of Grantor with regard thereto.

FUTURE ADVANCES. In addition to the Note, this Agreement secures all future advances made by Lender to Grantor regardless of whether the advances are made a) pursuant to a commitment or b) for the same purposes.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Grantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Grantor holds jointly with someone else and all accounts Grantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Grantor authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the Indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

GRANTOR'S REPRESENTATIONS AND WARRANTIES WITH RESPECT TO THE COLLATERAL. With respect to the Collateral, Grantor represents and promises to Lender that:

Perfection of Security Interest. Grantor agrees to execute financing statements and to take whatever other actions are requested by Lender to perfect and continue Lender's security interest in the Collateral. Upon request of Lender, Grantor will deliver to Lender any and all of the documents evidencing or constituting the Collateral, and Grantor will note Lender's interest upon any and all chattel paper and instruments if not delivered to Lender for possession by Lender. This is a continuing Security Agreement and will continue in effect even though all or any part of the Indebtedness is paid in full and even though for a period of time Grantor may not be indebted to Lender.

Notices to Lender. Grantor will promptly notify Lender in writing at Lender's address shown above (or such other address as Lender may designate from time to time) prior to any (1) change in Grantor's name; (2) change in Grantor's assumed business name(s); (3) change in the ownership of the partnership, including the addition of new partners or the departure of current partners from the partnership Grantor; (4) change in the authorized signer(s); (5) change in Grantor's principal office address; (6) change in Grantor's state of organization; (7) conversion of Grantor to a new or different type of business entity; or (8) change in any other aspect of Grantor that directly or indirectly relates to any agreements between Grantor and Lender. No change in Grantor's name, state or organization, or principal office address will take effect until after Lender has received notice.

No Violation. The execution and delivery of this Agreement will not violate any law or agreement governing Grantor or to which Grantor is a party, and its partnership agreement does not prohibit any term or condition of this Agreement.

Enforceability of Collateral. To the extent the Collateral consists of accounts, chattel paper, or general intangibles, as defined by the Uniform Commercial Code, the Collateral is enforceable in accordance with its terms, is genuine, and fully complies with all applicable laws and regulations concerning form, content and manner of preparation and execution, and all persons appearing to be obligated on the

EXHIBIT B

# AGRICULTURAL SECURITY AGREEMENT
(Continued)

Loan No: 512001093968                                                                 Page 2

Collateral have authority and capacity to contract and are in fact obligated as they appear to be on the Collateral. There shall be no set-offs or counterclaims against any of the Collateral, and no agreement shall have been made under which any deductions or discounts may be claimed concerning this Collateral except those disclosed to Lender in writing.

**Location of the Collateral.** Except in the ordinary course of Grantor's business, Grantor agrees to keep the Collateral at Grantor's address shown above or at such other locations as are acceptable to Lender. Upon Lender's request, Grantor will deliver to Lender in form satisfactory to Lender a schedule of real properties and Collateral locations relating to Grantor's operations, including without limitation the following: (1) all real property Grantor owns or is purchasing; (2) all real property Grantor is renting or leasing; (3) all storage facilities Grantor owns, rents, leases, or uses; and (4) all other properties where Collateral is or may be located. Grantor promptly shall procure the execution, acknowledgement, and delivery of such subordinations, consents, waiver, estoppel, and other agreements as Lender shall require by holders of any encumbrances upon or by owners of such lands where Collateral is or will be located. Grantor consents to Lender's rights of access for care of livestock upon such terms as Lender may deem satisfactory.

**Removal of the Collateral.** Except in the ordinary course of Grantor's business, including the sales of Inventory, Grantor shall not remove the Collateral from its existing location without Lender's prior written consent. To the extent that the Collateral consists of vehicles, or other titled property, Grantor shall not take or permit any action which would require application for certificates of title for the vehicles outside the State of Texas, without Lender's prior written consent. Grantor shall, whenever requested, advise Lender of the exact location of the Collateral.

**Transactions Involving Collateral.** Except for Inventory sold or accounts collected in the ordinary course of Grantor's business, or as otherwise provided for in this Agreement, Grantor shall not sell, offer to sell, or otherwise transfer or dispose of the Collateral. While Grantor is not in default under this Agreement, Grantor may sell Inventory, but only in the ordinary course of its business and only to buyers who qualify as a buyer in the ordinary course of business. A sale in the ordinary course of Grantor's business does not include a transfer in partial or total satisfaction of a debt or any bulk sale. Grantor shall not pledge, mortgage, encumber or otherwise permit the Collateral to be subject to any lien, security interest, encumbrance, or charge, other than the security interest provided for in this Agreement, without the prior written consent of Lender. This includes security interests even if junior in right to the security interests granted under this Agreement. Unless waived by Lender, all proceeds from any disposition of the Collateral (for whatever reason) shall be held in trust for Lender and shall not be commingled with any other funds; provided however, this requirement shall not constitute consent by Lender to any sale or other disposition. Upon receipt, Grantor shall immediately deliver any such proceeds to Lender.

**Sale of Collateral.** The following provisions relate to any sale, consignment, lease, license, exchange, transfer, or other disposition of livestock included as all or a part of the Collateral.

(1)   To induce Lender to extend the credit or other financial accommodations secured by this Agreement, Grantor represents and warrants to Lender that Grantor will sell, consign, lease, license, exchange, or transfer the Collateral only to those persons whose names and addresses have been set forth on sales schedules delivered to Lender. Each schedule shall be in such form as Lender may require, including identification of each type of Collateral.

(2)   Grantor agrees to provide the Lender a written list or schedule of the buyers, commission merchants, and selling agents to or through an individual including the entity name, contact name and address to whom or through whom the livestock may be sold, consigned or transferred. All such schedules and notifications shall be in writing and shall be delivered to Lender not less than fourteen (14) days prior to any such sale, consignment or transfer of the livestock. Also, the Grantor agrees to provide any updates or amendments to these schedules or lists to the Lender.

(3)   All proceeds of any sale, consignment, lease, license, exchange, transfer, or other disposition shall be made immediately available to Lender in a form jointly payable to Grantor and Lender. If Grantor does not receive such proceeds immediately upon delivery, Grantor will timely file any financing statement at other documents necessary to perfect and maintain perfection of Grantor's agricultural lien in the Collateral pursuant to the Texas Property Code so as to also protect Lender's security interest in the Collateral. No provisions in this Agreement shall be interpreted to authorize any sale or disposition of Collateral unless authorized by the Lender in writing. All chattel paper, contracts, warehouse receipts, documents, and other evidences of ownership or obligations relating to the Collateral, whether issued by a co-op, grain elevator, warehouse, marketing entity, or buyer, and all accounts and other proceeds of the Collateral shall be immediately endorsed, assigned and delivered by Grantor to Lender as security for the Indebtedness. At any time before or after the occurrence of an Event of Default, Lender may collect all proceeds of the Collateral without notice to Grantor. All proceeds of the Collateral, when received by Lender, may at Lender's sole discretion be applied to the Indebtedness. Grantor grants Lender a limited power of attorney to sign or endorse Grantor's name on all writings described in this section.

(4)   Grantor acknowledges that if the livestock are sold, consigned, or transferred to any person not listed on a schedule delivered to Lender as provided above, at least seven (7) days prior to such sale, consignment, or transfer, and if Lender has not received an accounting (including the proceeds) of such sale, consignment or transfer within ten (10) days of the sale, consignment or transfer, then under federal law, Grantor shall be subject to a fine which is the greater of $5,000 or 15% of the value of benefit received from the sale, consignment or transfer to an unlisted buyer, consignee or transferee.

**Care and Preservation of Livestock.** Grantor shall (1) At seasonable and proper times and in accordance with the best practices of good animal husbandry feed, care for, attend to, maintain, water, and perform, or cause to be performed, all other acts appropriate or necessary to care for, maintain, preserve, and protect the livestock; (2) Milk, shear, and perform, or cause to be performed, such other acts as are related to the livestock or to the products of the livestock, including without limitation grooming, preserving, protecting, and storing such products; (3) Not commit or suffer to be committed any damage to or destruction of the livestock; (4) Permit Lender and any of its employees and agents to enter upon the premises where the livestock is located at any reasonable time and from time to time for the purpose of examining and inspecting the livestock; and (5) Promptly give Lender written notice of any sickness or disease affecting, any damage to, any destruction of, or any depreciation in the value of the livestock or the produce of the livestock.

**Title.** Grantor represents and warrants to Lender that Grantor holds good and marketable title to the Collateral, free and clear of all liens and encumbrances except for the lien of this Agreement. No financing statement covering any of the Collateral is on file in any public office other than those which reflect the security interest created by this Agreement or to which Lender has specifically consented. Grantor shall defend Lender's rights in the Collateral against the claims and demands of all other persons.

**Repairs and Maintenance.** Grantor agrees to keep and maintain, and to cause others to keep and maintain, the Collateral in good order, repair and condition at all times while this Agreement remains in effect. Grantor further agrees to pay when due all claims for work done on, or services rendered or material furnished in connection with the Collateral so that no lien or encumbrance may ever attach to or be filed against the Collateral.

**Inspection of Collateral.** Lender and Lender's designated representatives and agents shall have the right at all reasonable times to examine and inspect the Collateral wherever located.

**Taxes, Assessments and Liens.** Grantor will pay when due all taxes, assessments and liens upon the Collateral, its use or operation, upon this Agreement, upon any promissory note or notes evidencing the Indebtedness, or upon any of the other Related Documents. Grantor may withhold any such payment or may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized in Lender's sole opinion. In any contest Grantor shall defend itself and Lender and shall satisfy any final adverse judgment before enforcement against the Collateral. Grantor shall name Lender as an additional obligee under any surety bond furnished in the contest proceedings. Grantor further agrees to furnish Lender with evidence that such taxes, assessments, and governmental and other charges have been paid in full and in a timely manner. Grantor may withhold any such payment and may elect to contest any lien if Grantor is in good faith conducting an appropriate proceeding to contest the obligation to pay and so long as Lender's interest in the Collateral is not jeopardized.

**Compliance with Governmental Requirements.** Grantor shall comply promptly with all laws, ordinances, rules and regulations of all governmental authorities, now or hereafter in effect, applicable to the ownership, production, disposition, or use of the Collateral, including all laws or regulations relating to the undue erosion of highly-erodible land or relating to the conversion of wetlands for the production of an agricultural product or commodity. Grantor may contest in good faith any such law, ordinance or regulation and withhold compliance during any proceeding, including appropriate appeals, so long as Lender's interest in the Collateral, in Lender's opinion, is not jeopardized.

**Hazardous Substances.** Grantor represents and warrants that the Collateral never has been, and never will be so long as this Agreement remains a lien on the Collateral, used in violation of any Environmental Laws or for the generation, manufacture, storage, transportation, treatment, disposal, release or threatened release of any Hazardous Substance. The representations and warranties contained herein are based on Grantor's due diligence in investigating the Collateral for Hazardous Substances. Grantor hereby (1) releases and waives any future claims against Lender for indemnity or contribution in the event Grantor becomes liable for cleanup or other costs under any Environmental Laws, and (2) agrees to indemnify, defend, and hold harmless Lender against any and all claims and losses resulting from a breach of this provision of this Agreement. This obligation to indemnify and defend shall survive the payment of the Indebtedness and the satisfaction of this Agreement.

**Maintenance of Casualty Insurance.** Grantor shall procure and maintain all risks insurance, including without limitation fire, theft and

EXHIBIT B

## AGRICULTURAL SECURITY AGREEMENT
### (Continued)

Loan No: 5120001093968                                                                 Page 3

liability coverage together with such other insurance as Lender may require with respect to the Collateral, in form, amounts, coverages and basis reasonably acceptable to Lender. Grantor, upon request of Lender, will deliver to Lender from time to time the policies or certificates of insurance in form satisfactory to Lender, including stipulations that coverages will not be cancelled or diminished without at least ten (10) days' prior written notice to Lender and not including any disclaimer of the insurer's liability for failure to give such a notice. Each insurance policy also shall include an endorsement providing that coverage in favor of Lender will not be impaired in any way by any act, omission or default of Grantor or any other person. In connection with all policies covering assets in which Lender holds or is offered a security interest, Grantor will provide Lender with such loss payable or other endorsements as Lender may require. If Grantor at any time fails to obtain or maintain any insurance as required under this Agreement, Lender may (but shall not be obligated to) obtain such insurance as Lender deems appropriate, including if Lender so chooses "single interest insurance," which will cover only Lender's interest in the Collateral.

**Application of Insurance Proceeds.** Grantor shall promptly notify Lender of any loss or damage to the Collateral, whether or not such casualty or loss is covered by insurance. Lender may make proof of loss if Grantor fails to do so within fifteen (15) days of the casualty. All proceeds of any insurance on the Collateral, including accrued proceeds thereon, shall be held by Lender as part of the Collateral. If Lender consents to repair or replacement of the damaged or destroyed Collateral, Lender shall, upon satisfactory proof of expenditure, pay or reimburse Grantor from the proceeds for the reasonable cost of repair or restoration. If Lender does not consent to repair or replacement of the Collateral, Lender shall retain a sufficient amount of the proceeds to pay all of the Indebtedness, and shall pay the balance to Grantor. Any proceeds which have not been disbursed within six (6) months after their receipt and which Grantor has not committed to the repair or restoration of the Collateral shall be used to prepay the Indebtedness.

**Insurance Reserves.** Lender may require Grantor to maintain with Lender reserves for payment of insurance premiums, which reserves shall be created by monthly payments from Grantor of a sum estimated by Lender to be sufficient to produce, at least fifteen (15) days before the premium due date, amounts at least equal to the insurance premiums to be paid. If fifteen (15) days before payment is due, the reserve funds are insufficient, Grantor shall upon demand pay any deficiency to Lender. The reserve funds shall be held by Lender as a general deposit and shall constitute a non-interest-bearing account which Lender may satisfy by payment of the insurance premiums required to be paid by Grantor as they become due. Lender does not hold the reserve funds in trust for Grantor, and Lender is not the agent of Grantor for payment of the insurance premiums required to be paid by Grantor. The responsibility for the payment of premiums shall remain Grantor's sole responsibility.

**Insurance Reports.** Grantor, upon request of Lender, shall furnish to Lender reports on each existing policy of insurance showing such information as Lender may reasonably request including the following: (1) the name of the insurer; (2) the risks insured; (3) the amount of the policy; (4) the property insured; (5) the then current value on the basis of which insurance has been obtained and the manner of determining that value; and (6) the expiration date of the policy. In addition, Grantor shall upon request by Lender (however, not more often than annually) have an independent appraiser satisfactory to Lender determine, as applicable, the cash value or replacement cost of the Collateral.

**Financing Statements.** Grantor authorizes Lender to file a UCC financing statement, or alternatively, a copy of this Agreement to perfect Lender's security interest. At Lender's request, Grantor additionally agrees to sign all other documents that are necessary to perfect, protect, and continue Lender's security interest in the Property. Grantor will pay all filing fees, title transfer fees, and other fees and costs involved in unless prohibited by law or unless Lender is required by law to pay such fees and costs. Grantor irrevocably appoints Lender to execute documents necessary to transfer title if there is a default. Lender may file a copy of this Agreement as a financing statement. Grantor will promptly notify Lender of any change to Grantor's name or the name of any individual Grantor. Any individual who is a partner for a Grantor, and any individual who is a trustee or trustor for a Grantor under this Agreement. Grantor will also promptly notify Lender of any change to the name that appears on the most recently issued, unexpired driver's license or state-issued identification card, any expiration of the most recently issued driver's license or state-issued identification card for Grantor or any individual for whom Grantor is required to provide notice regarding name changes.

**GRANTOR'S RIGHT TO POSSESSION.** Until default, Grantor may have possession of the tangible personal property and beneficial use of all the Collateral and may use it in any lawful manner not inconsistent with this Agreement or the Related Documents, provided that Grantor's right to possession and beneficial use shall not apply to any Collateral where possession of the Collateral by Lender is required by law to perfect Lender's security interest in such Collateral. If Lender at any time has possession of any Collateral, whether before or after an Event of Default, Lender shall be deemed to have exercised reasonable care in the custody and preservation of the Collateral if Lender takes such action for that purpose as Grantor shall request or as Lender, in Lender's sole discretion, shall deem appropriate under the circumstances, but failure to honor any request by Grantor shall not of itself be deemed to be a failure to exercise reasonable care. Lender shall not be required to take any steps necessary to preserve any rights in the Collateral against prior parties, nor to protect, preserve or maintain any security interest given to secure the Indebtedness. Grantor agrees to pursue and conduct diligently Grantor's farming, agricultural and other business operations for so long as this Agreement remains in effect. Grantor further agrees that Lender may from time to time enter upon Grantor's premises for the purpose of ascertaining whether Grantor is properly and prudently conducting Grantor's farming, agricultural and other business operations. Grantor shall promptly pay when due all costs and expenses associated with Grantor's farming operations, including without limitation Farm Products / Livestock.

**LENDER'S EXPENDITURES.** If any action or proceeding is commenced that would materially affect Lender's interest in the Collateral or if Grantor fails to comply with any provision of this Agreement or any Related Documents, including but not limited to Grantor's failure to discharge or pay when due any amounts Grantor is required to discharge or pay under this Agreement or any Related Documents, Lender on Grantor's behalf may (but shall not be obligated to) take any action that Lender deems appropriate, including but not limited to discharging or paying all taxes, liens, security interests, encumbrances and other claims, at any time levied or placed on the Collateral and paying all costs for insuring, maintaining and preserving the Collateral. All such expenditures paid by Lender for such purposes will then bear interest at the Note rate from the date paid by Lender to the date of repayment by Grantor. To the extent permitted by applicable law, all such expenses will become a part of the Indebtedness and, at Lender's option, will (A) be payable on demand; (B) be added to the balance of the Note and be apportioned among and be payable with any installment payments to become due during either (1) the term of any applicable insurance policy; or (2) the remaining term of the Note; or (C) be treated as a balloon payment which will be due and payable at the Note's maturity. The Agreement also will secure payment of these amounts. Such right shall be in addition to all other rights and remedies to which Lender may be entitled upon the occurrence of any Event of Default.

**DEFAULT.** Each of the following shall constitute an Event of Default under this Agreement:

**Payment Default.** Grantor fails to make any payment when due under the Indebtedness.

**Other Defaults.** Grantor fails to comply with or to perform any other term, obligation, covenant or condition contained in this Agreement or in any of the Related Documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Grantor.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Grantor or on Grantor's behalf under this Agreement or the Related Documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Defective Collateralization.** This Agreement or any of the Related Documents ceases to be in full force and effect (including failure of any collateral document to create a valid and perfected security interest or lien) at any time and for any reason.

**Insolvency.** The dissolution or termination of Grantor's existence as a going business or the death of any partner, the insolvency of Grantor, the appointment of a receiver for any part of Grantor's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Grantor.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Grantor or by any governmental agency against any collateral securing the Indebtedness. This includes a garnishment of any of Grantor's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Grantor as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Grantor gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the Indebtedness or guarantor, endorser, surety, or accommodation party dies or becomes incompetent or revokes or disputes the validity of, or liability under, any Guaranty of the Indebtedness.

**Adverse Change.** A material adverse change occurs in Grantor's financial condition, or Lender believes the prospect of payment or performance of the Indebtedness is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**Cure Provisions.** If any default, other than a default in payment, is curable and if Grantor has not been given a notice of a breach of the

EXHIBIT B

## AGRICULTURAL SECURITY AGREEMENT
### (Continued)

Loan No: 512001093968                                                 Page 4

same provision of this Agreement within the preceding twelve (12) months, it may be cured if Grantor, after Lender sends written notice to Grantor demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**RIGHTS AND REMEDIES ON DEFAULT.** If an Event of Default occurs under this Agreement, at any time thereafter, Lender shall have all the rights of a secured party under the Texas Uniform Commercial Code. In addition and without limitation, Lender may exercise any one or more of the following rights and remedies:

**Accelerate Indebtedness.** Lender may declare the entire Indebtedness immediately due and payable, without notice of any kind to Grantor.

**Assemble Collateral.** Lender may require Grantor to deliver to Lender all or any portion of the Collateral and any and all certificates of title and other documents relating to the Collateral. Lender may require Grantor to assemble the Collateral and make it available to Lender at a place to be designated by Lender. Lender also shall have full power to enter, provided Lender does so without a breach of the peace or a trespass, upon the property of Grantor to take possession of and remove the Collateral. If the Collateral contains other goods not covered by this Agreement at the time of repossession, Grantor agrees Lender may take such other goods, provided that Lender makes reasonable efforts to return to Grantor after repossession.

**Possession of the Livestock.** Lender may enter upon the premises where any Collateral consisting of livestock is located and, using any and all of Grantor's equipment, machinery, tools, farming implements, and supplies, and improvements located on the premises: (1) Feed, care for, attend to, inoculate, water, and perform, or cause to be performed, all other acts appropriate or necessary to care for, maintain, preserve, and protect the livestock (using any water located in, on or adjacent to the premises); (2) Milk, shear, and perform, or cause to be performed, such other acts as are related to the livestock or to any products of the livestock, including without limitation processing, preserving, and protecting such products; (3) Remove the livestock and any products of the livestock from the premises upon which the livestock and the products are located; and (4) Appraise, store, prepare for public or private sale, exhibit, market and sell the livestock and any products of the livestock; provided that Grantor hereby agrees that if Grantor is the owner of record of the premises upon which the livestock and any products of the livestock are located, Lender shall not be responsible or liable for returning the premises to their condition immediately preceding the use of the premises as provided herein or for doing such acts as may be necessary to permit future livestock to be maintained on the premises.

**Sell the Collateral.** Lender shall have full power to sell, lease, transfer, or otherwise deal with the Collateral or proceeds thereof in Lender's own name or that of Grantor. Lender may sell the Collateral at public auction or private sale. Unless the Collateral threatens to decline speedily in value or is of a type customarily sold on a recognized market, Lender will give Grantor, and other persons as required by law, reasonable notice of the time and place of any public sale, or the time after which any private sale or any other disposition of the Collateral is to be made. However, no notice need be provided to any person who, after Event of Default occurs, enters into and authenticates an agreement waiving that person's right to notification of sale. The requirements of reasonable notice shall be met if that such notice is given at least ten (10) days before the time of the sale or disposition. All expenses relating to the disposition of the Collateral, including without limitation the expenses of retaking, holding, insuring, preparing for sale and selling the Collateral, shall become a part of the Indebtedness secured by this Agreement and shall be payable on demand, with interest at the Note rate from date of expenditure until repaid.

**Appoint Receiver.** Lender shall have the right to have a receiver appointed to take possession of all or any part of the Collateral, with the power to protect and preserve the Collateral, to operate the Collateral preceding foreclosure or sale, and to collect the rents from the Collateral and apply the proceeds, over and above the cost of the receivership, against the Indebtedness. The receiver may serve without bond if permitted by law. Lender's right to the appointment of a receiver shall exist whether or not the apparent value of the Collateral exceeds the Indebtedness by a substantial amount. Employment by Lender shall not disqualify a person from serving as a receiver.

**Collect Revenues, Apply Accounts.** Lender, either itself or through a receiver, may collect the payments, rents, income, and revenues from the Collateral. Lender may at any time in Lender's discretion transfer any Collateral into Lender's own name or that of Lender's nominee and receive the payments, rents, income, and revenues therefrom and hold the same as security for the Indebtedness or apply it to payment of the Indebtedness in such order of preference as Lender may determine. Insofar as the Collateral consists of accounts, general intangibles, insurance policies, instruments, chattel paper, choses in action, or similar property, Lender may demand, collect, receipt for, settle, compromise, adjust, sue for, foreclose, or realize on the Collateral as Lender may determine, whether or not Indebtedness or Collateral is then due. For these purposes, Lender may, on behalf of and in the name of Grantor, receive, open and dispose of mail addressed to Grantor; change any address to which mail and payments are to be sent; and endorse notes, checks, drafts, money orders, documents of title, instruments and items pertaining to payment, shipment, or storage of any Collateral. To facilitate collection, Lender may notify account debtors and obligors on any Collateral to make payments directly to Lender.

**Obtain Deficiency.** If Lender chooses to sell any or all of the Collateral, Lender may obtain a judgment against Grantor for any deficiency remaining on the Indebtedness due to Lender after application of all amounts received from the exercise of the rights provided in this Agreement. Grantor shall be liable for a deficiency even if the transaction described in this subsection is a sale of accounts or chattel paper.

**Other Rights and Remedies.** Lender shall have all the rights and remedies of a secured creditor under the provisions of the Uniform Commercial Code, as may be amended from time to time. In addition, Lender shall have and may exercise any or all other rights and remedies it may have available at law, in equity, or otherwise.

**Election of Remedies.** Except as may be prohibited by applicable law, all of Lender's rights and remedies, whether evidenced by this Agreement, the Related Documents, or by any other writing, shall be cumulative and may be exercised singularly or concurrently. Election by Lender to pursue any remedy shall not exclude pursuit of any other remedy, and an election to make expenditures or to take action to perform an obligation of Grantor under this Agreement, after Grantor's failure to perform, shall not affect Lender's right to declare a default and exercise its remedies.

**CHOICE OF VENUE.** IF THERE IS A LAWSUIT, GRANTOR AGREES UPON LENDER'S REQUEST TO SUBMIT TO THE JURISDICTION OF THE COURTS OF LUBBOCK COUNTY, TEXAS. THE PARTIES AGREE THAT LUBBOCK COUNTY, TEXAS IS THE SOLE AND EXCLUSIVE VENUE FOR ANY LAWSUIT ARISING OUT OF THIS TRANSACTION.

**MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Agreement:

**Amendments.** This Agreement, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Agreement. No alteration of or amendment to this Agreement shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

**Attorneys' Fees; Expenses.** Grantor agrees to pay upon demand all of Lender's costs and expenses, including Lender's reasonable attorneys' fees and Lender's legal expenses, incurred in connection with the enforcement of this Agreement. Lender may hire or pay someone else to help enforce this Agreement, and Grantor shall pay the costs and expenses of such enforcement. Costs and expenses include Lender's reasonable attorneys' fees and legal expenses whether or not there is a lawsuit, including Lender's reasonable attorneys' fees and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Grantor also shall pay all court costs and such additional fees as may be directed by the court.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Governing Law.** This Agreement will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Agreement has been accepted by Lender in the State of Texas.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Agreement unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Agreement shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Agreement. No prior waiver by Lender, nor any course of dealing between Lender and Grantor, shall constitute a waiver of any of Lender's rights or of any of Grantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Agreement, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Notices.** Any notice required to be given under this Agreement shall be given in writing, and shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Agreement. Any party may change its address for notices under this Agreement by giving formal written notice to the other parties, specifying that the purpose of the notice is to change the party's address. For notice purposes, Grantor agrees

EXHIBIT B

## AGRICULTURAL SECURITY AGREEMENT
### (Continued)

Loan No: 512001093986                                                                 Page 5

to keep Lender informed at all times of Grantor's current address. Unless otherwise provided or required by law, if there is more than one Grantor, any notice given by Lender to any Grantor is deemed to be notice given to all Grantors.

**Power of Attorney.** Grantor hereby appoints Lender as Grantor's irrevocable attorney-in-fact for the purpose of executing any documents necessary to perfect, amend, or to continue the security interest granted in this Agreement or to demand termination of filings of other secured parties. Lender may at any time, and without further authorization from Grantor, file a carbon, photographic or other reproduction of any financing statement or of this Agreement for use as a financing statement. Grantor will reimburse Lender for all expenses for the perfection and the continuation of the perfection of Lender's security interest in the Collateral.

**Severability.** If a court of competent jurisdiction finds any provision of this Agreement to be illegal, invalid, or unenforceable as to any circumstance, that finding shall not make the offending provision illegal, invalid, or unenforceable as to any other circumstance. If feasible, the offending provision shall be considered modified so that it becomes legal, valid and enforceable. If the offending provision cannot be so modified, it shall be considered deleted from this Agreement. Unless otherwise required by law, the illegality, invalidity, or unenforceability of any provision of this Agreement shall not affect the legality, validity or enforceability of any other provision of this Agreement.

**Successors and Assigns.** Subject to any limitations stated in this Agreement on transfer of Grantor's interest, this Agreement shall be binding upon and inure to the benefit of the parties, their successors and assigns. If ownership of the Collateral becomes vested in a person other than Grantor, Lender, without notice to Grantor, may deal with Grantor's successors with reference to this Agreement and the Indebtedness by way of forbearance or extension without releasing Grantor from the obligations of this Agreement or liability under the Indebtedness.

**Survival of Representations and Warranties.** All representations, warranties, and agreements made by Grantor in this Agreement shall survive the execution and delivery of this Agreement, shall be continuing in nature, and shall remain in full force and effect until such time as Grantor's Indebtedness shall be paid in full.

**Time is of the Essence.** Time is of the essence in the performance of this Agreement.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Agreement. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Agreement shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Agreement.** The word "Agreement" means this Agricultural Security Agreement, as this Agricultural Security Agreement may be amended or modified from time to time, together with all exhibits and schedules attached to this Agricultural Security Agreement from time to time.

**Borrower.** The word "Borrower" means 2B FARMS and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**Collateral.** The word "Collateral" means all of Grantor's right, title and interest in and to all the Collateral as described in the Collateral Description section of this Agreement.

**Environmental Laws.** The words "Environmental Laws" mean any and all state, federal and local statutes, regulations and ordinances relating to the protection of human health or the environment, including without limitation the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as amended, 42 U.S.C. Section 9601, et seq. ("CERCLA"), the Superfund Amendments and Reauthorization Act of 1986, Pub. L. No. 99-499 ("SARA"), the Hazardous Materials Transportation Act, 49 U.S.C. Section 1801, et seq., the Resource Conservation and Recovery Act, 42 U.S.C. Section 6901, et seq., or other applicable state or federal laws, rules, or regulations adopted pursuant thereto.

**Event of Default.** The words "Event of Default" mean any of the events of default set forth in this Agreement in the default section of this Agreement.

**Grantor.** The word "Grantor" means 2B FARMS.

**Guaranty.** The word "Guaranty" means the guaranty from guarantor, endorser, surety, or accommodation party to Lender, including without limitation a guaranty of all or part of the Note.

**Hazardous Substances.** The words "Hazardous Substances" mean materials that, because of their quantity, concentration or physical, chemical or infectious characteristics, may cause or pose a present or potential hazard to human health or the environment when improperly used, treated, stored, disposed of, generated, manufactured, transported or otherwise handled. The words "Hazardous Substances" are used in their very broadest sense and include without limitation any and all hazardous or toxic substances, materials or waste as defined by or listed under the Environmental Laws. The term "Hazardous Substances" also includes, without limitation, petroleum and petroleum by-products or any fraction thereof and asbestos.

**Indebtedness.** The word "Indebtedness" means the indebtedness evidenced by the Note or Related Documents, including all principal and interest together with all other indebtedness and costs and expenses for which Grantor is responsible under this Agreement or under any of the Related Documents. Specifically, without limitation, Indebtedness includes the future advances set forth in the Future Advances provision of this Agreement together with all interest thereon.

**Lender.** The word "Lender" means FIRST BANK & TRUST, its successors and assigns.

**Note.** The word "Note" means the Note dated June 9, 2022 and executed by 2B FARMS in the principal amount of $3,500,000.00, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of, and substitutions for the note or credit agreement.

**Property.** The word "Property" means all of Grantor's right, title and interest in and to all the Property as described in the "Collateral Description" section of this Agreement.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

GRANTOR HAS READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS AGRICULTURAL SECURITY AGREEMENT AND AGREES TO ITS TERMS. THIS AGREEMENT IS DATED JUNE 9, 2022.

GRANTOR:

2B FARMS

By: _Rebecca Ann Robinson_          By: _Terry Max Robinson_
REBECCA ANN ROBINSON, Partner of 2B FARMS          TERRY MAX ROBINSON, Partner of 2B FARMS

LENDER:

FIRST BANK & TRUST

x _____
Authorized Signer

## PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $3,500,000.00 | 06-09-2022 | 06-09-2023 | 512001093968 | 300 /0300 | 29 | F-00 | 12948 |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

Borrower: 28 FARMS
9397 CR 3114
SNYDER, TX 79549

Lender: FIRST BANK & TRUST
SNYDER
4300 COLLEGE AVE
SNYDER, TX 79549
(325) 573-9306

---

**Principal Amount: $3,500,000.00**          **Date of Note: June 9, 2022**

**PROMISE TO PAY.** 28 FARMS ("Borrower") promises to pay to FIRST BANK & TRUST ("Lender"), or order, in lawful money of the United States of America, the principal amount of Three Million Five Hundred Thousand & 00/100 Dollars ($3,500,000.00) or so much as may be outstanding, together with interest on the unpaid outstanding principal balance of each advance, calculated as described in the "INTEREST CALCULATION METHOD" paragraph using an interest rate of 4.780% per annum based on a year of 360 days. Interest shall be calculated from the date of each advance until repayment of each advance or maturity, whichever occurs first. The interest rate may change under the terms and conditions of the "INTEREST AFTER DEFAULT" section.

**CHOICE OF USURY CEILING AND INTEREST RATE.** The interest rate on this Note has been implemented under the "Weekly Ceiling" as referred to in Sections 303.002 and 303.003 of the Texas Finance Code.

**PAYMENT.** Borrower will pay this loan in one payment of all outstanding principal plus all accrued unpaid interest on June 9, 2023. In addition, Borrower will pay regular semiannual payments of all accrued unpaid interest due as of each payment date, beginning July 9, 2022, with all subsequent interest payments to be due on the same day of each half-year after that. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing. Notwithstanding any other provision of this Note, Lender will not charge interest on any undisbursed loan proceeds. No scheduled payment, whether of principal or interest or both, will be due unless sufficient loan funds have been disbursed by the scheduled payment date to justify the payment.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/360 basis; that is, by applying the ratio of the interest rate over a year of 360 days, multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding, unless such calculation would result in a usurious rate, in which case interest shall be calculated on a per diem basis of a year of 365 or 366 days, as the case may be. All interest payable under this Note is computed using this method. This calculation method results in a higher effective interest rate than the numeric interest rate stated in this Note.

**PREPAYMENT.** Borrower may pay without penalty all or a portion of the amount owed earlier than it is due. Prepayment in full shall consist of payment of the remaining unpaid principal balance together with all accrued and unpaid interest and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, and in no event will Borrower ever be required to pay any unearned interest. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments of accrued unpaid interest. Rather, early payments will reduce the principal balance due. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: FIRST BANK & TRUST, SNYDER, 4300 COLLEGE AVE, SNYDER, TX 79549.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, including failure to pay final maturity, the interest rate on this Note shall be increased to 18.000% per annum based on a year of 360 days. However, in no event will the interest rate exceed the maximum interest rate limitations under applicable law.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

    **Payment Default.** Borrower fails to make any payment when due under this Note.

    **Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

    **False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrowers behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

    **Death or Insolvency.** The dissolution or termination of Borrower's existence as a going business or the death of any partner, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

    **Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

    **Events Affecting Guarantor.** Any of the preceding events occurs with respect to any guarantor, endorser, surety, or accommodation party of any of the indebtedness or any guarantor, endorser, surety, or accommodation party dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

    **Events Affecting General Partner of Borrower.** Any of the preceding events occurs with respect to any general partner of Borrower or any general partner dies or becomes incompetent.

    **Change In Ownership.** The resignation or expulsion of any general partner with an ownership interest of twenty-five percent (25%) or more in Borrower.

    **Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

    **Insecurity.** Lender in good faith believes itself insecure.

    **Cure Provisions.** If any default, other than a default in payment, is curable and if Borrower has not been given a notice of a breach of the same provision of this Note within the preceding twelve (12) months, it may be cured if Borrower, after Lender sends written notice to Borrower demanding cure of such default: (1) cures the default within thirty (30) days; or (2) if the cure requires more than thirty (30) days, immediately initiates steps which Lender deems in Lender's sole discretion to be sufficient to cure the default and thereafter continues and completes all reasonable and necessary steps sufficient to produce compliance as soon as reasonably practical.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire indebtedness, including the unpaid principal balance under this Note, all accrued unpaid interest, and all other amounts, costs and expenses for which Borrower is responsible under this Note or any other agreement with Lender pertaining to this loan, immediately due, without notice, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire an attorney to help collect this Note should Borrower not pay, and Borrower will pay Lender's reasonable attorneys' fees. Borrower also will pay Lender all other amounts Lender actually incurs as court costs, lawful fees for filing, recording, releasing to any public office any instrument securing this Note; the reasonable cost actually expended for repossessing, storing, preparing for sale, and selling any security; and fees for noting a lien on or transferring a certificate of title to any motor vehicle offered as

EXHIBIT C

PROMISSORY NOTE
(Continued)

Loan No: 512001093968                                                                                    Page 2

security for this Note, or premiums or identifiable charges received in connection with the sale of authorized insurance.

JURY WAIVER. Lender and Borrower hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Borrower against the other.

GOVERNING LAW. This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of Texas.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Borrower's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Borrower holds jointly with someone else and all accounts Borrower may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Borrower authorizes Lender, to the extent permitted by applicable law, to charge or setoff all sums owing on the indebtedness against any and all such accounts, and, at Lender's option, to administratively freeze all such accounts to allow Lender to protect Lender's charge and setoff rights provided in this paragraph.

COLLATERAL. Borrower acknowledges this Note is secured by INCLUDING BUT NOT LIMITED TO A SECURITY AGREEMENT DATED 06/09/2022 AND AN ASSIGNMENT OF LIFE INSURANCE AS COLLATERAL DATED 06/09/2022 FROM TERRY MAX ROBINSON.

LINE OF CREDIT. Borrower acknowledges this Note evidences a revolving line of credit. Advances under this Note, as well as directions for payment from Borrower's accounts, may be requested orally or in writing by Borrower or by an authorized person. Lender may, but need not, require that all oral requests be confirmed in writing. Borrower agrees to be liable for all sums either: (A) advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender. The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs. Lender will have no obligation to advance funds under this Note if: (A) Borrower or any guarantor is in default under the terms of this Note or any agreement that Borrower or any guarantor has with Lender, including any agreement made in connection with the signing of this Note; (B) Borrower or any guarantor ceases doing business or is insolvent; (C) any guaranty ceases, claims or otherwise attempts to limit, modify or revoke such guarantor's guarantee of this Note or any other loan with Lender; (D) Borrower has applied funds provided pursuant to this Note for purposes other than those authorized by Lender; or (E) Lender in good faith believes itself insecure. This revolving line of credit shall not be subject to Ch. 346 of the Texas Finance Code.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT. To help the government fight the funding of terrorism and money laundering activities, U.S. Federal law requires financial institutions to obtain, verify, and record information that identifies each person (individuals and businesses) who opens an account. What this means for you: When you open an account, we will ask for your name, address, date of birth and other information that will allow us to identify you. We may also ask for your driver's license or other identifying documents.

ERRORS AND OMISSIONS AGREEMENT. The undersigned Borrower, for and in consideration of Lender funding the closing of this loan, agrees to the following terms and conditions:

1. If any loan document, including but not limited to the Note, Mortgage, Security Agreement, Assignment of Rents, and/or Business Loan Agreement, is lost, misplaced, inaccurate, or missing signatures, Borrower agrees to execute, acknowledge, initial, and deliver to Lender any item necessary to replace and/or correct the documents.

2. Borrower agrees to deliver the corrected loan documents within ten (10) days after receipt.

3. If Borrower fails or refuses to execute, acknowledge, initial, and/or deliver the documents within ten (10) days after being requested to do so, Borrower agrees to be liable for all costs which Lender sustains, including but not limited to all reasonable attorney fees.

The undersigned Borrower hereby agrees to comply with the terms and conditions of this agreement.

CHOICE OF VENUE. IF THERE IS A LAWSUIT, BORROWER AGREES UPON LENDER'S REQUEST TO SUBMIT TO THE JURISDICTION OF THE COURTS OF LUBBOCK COUNTY, TEXAS. THE PARTIES AGREE THAT LUBBOCK COUNTY, TEXAS IS THE SOLE AND EXCLUSIVE VENUE FOR ANY LAWSUIT ARISING OUT OF THIS TRANSACTION.

ADDITIONAL PROVISION.
PERSONAL COMMERCIAL GUARANTIES EXECUTED BY REBECCA ANN ROBINSON AND TERRY MAX ROBINSON DATED 06/14/2021.

THIS LOAN IS SUBJECT TO AN ASSET BASED BUSINESS LOAN AGREEMENT DATED 06/09/2022.

SUCCESSOR INTERESTS. The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

GENERAL PROVISIONS. NOTICE: Under no circumstances (and notwithstanding any other provisions of this Note) shall the interest charged, collected, or contracted for on this Note exceed the maximum rate permitted by law. The term "maximum rate permitted by law" as used in this Note means the greater of (a) the maximum rate of interest permitted under federal or other law applicable to the indebtedness evidenced by this Note, or (b) the higher, as of the date of this Note, of the "Weekly Ceiling" or the "Quarterly Ceiling" as referred to in Sections 303.002, 303.003 and 303.006 of the Texas Finance Code. If any part of this Note cannot be enforced, this fact will not affect the rest of the Note. Borrower does not agree or intend to pay, and Lender does not agree or intend to contract for, charge, collect, take, reserve or receive (collectively referred to herein as "charge or collect"), any amount in the nature of interest or in the nature of a fee for this loan, which would in any way or event (including demand, prepayment, or acceleration) cause Lender to charge or collect more for this loan than the maximum amount Lender would be permitted to charge or collect by federal law or the law of the State of Texas (as applicable). Any such excess interest or unauthorized fee shall, instead of anything stated to the contrary, be applied first to reduce the principal balance of this loan, and when the principal has been paid in full, be refunded to Borrower. The right to accelerate maturity of sums due under this Note does not include the right to accelerate any interest which has not otherwise accrued on the date of such acceleration, and Lender does not intend to charge or collect any unearned interest in the event of acceleration. All sums paid or agreed to be paid to Lender for the use, forbearance or detention of sums due hereunder shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of the loan evidenced by this Note until payment in full so that the rate or amount of interest on account of this loan evidenced hereby does not exceed the applicable usury ceiling. Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them. Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive presentment, demand for payment, notice of dishonor, notice of intent to accelerate the maturity of this Note, and notice of acceleration of the maturity of this Note. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability. All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party, partner, or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral without the consent of or notice to anyone. All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made. The obligations under this Note are joint and several.

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE. BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:

2B FARMS

By: _Rebecca Ann Robinson_____          By: _Terry Max Robinson_____
REBECCA ANN ROBINSON, Partner of 2B FARMS              TERRY MAX ROBINSON, Partner of 2B FARMS

EXHIBIT C

**PROMISSORY NOTE**
**(Continued)**

Loan No: 512001093988

Page 3

LENDER:

FIRST BANK & TRUST

X _____
Authorized Signer

LaserPro, Ver. 9.5.10.003  Copr. Harland Financial Solutions, Inc. 1997, 2020.  All Rights Reserved.  - TX  G:\LaserPro\CFI\LPL\D20.FC  TR-41269  PR-88

EXHIBIT C

FINANCIAL STATEMENT
SUBMITTED TO
FBT

DATE: 4/23/2024

| NAME: | Terry M. Robinson | SPOUSE: | Rebecca Ann Robinson |
|---|---|---|---|
| ADDRESS: | 9397 CR 3114 | PHONE: | 325 207 2794 |
| SSN#: | 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 | SSN#: | 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 |

| - ASSETS - | | - LIABILITIES - | |
|---|---|---|---|
| Prosperity | 5000 | FBT Livestock Loan | 3492000 |
| | | Kabota | 1,500 |
| FBT  2B farms checking | (5,308,000) | First Finicial F 350 | 70,000 |
| Robinson Fresh Water Checking | 26,000 | GM motors 2022 2500 High country | 47,000 |
| Cattle | 2,000,000 | Angie's cattle note | 200,000 |
| Bo and Becky Robinson | 2500 | | |
| Stock Market | 698000 | | |
| Robinson Family Partnership | 25000 | | |
| | | | |
| TOTAL CURRENT ASSETS: | (2,549,500) | TOTAL CURRENT LIABILITIES: | 3,810,500 |
| | | | |
| - NON CURRENT ASSETS - | | - NON CURRENT LIABILITIES - | |
| Equipment | 965,000 | | |
| VEHICLES: | | EQUIPMENT LIENS: | |
| 2020 3500 ford | 65,000 | John Deere 8370 | 90,000 |
| 2016 3/4 ford | 20,000 | FBT 938 Loader | 60,000 |
| 2021 Chev Tahoo | 65,000 | Vermeer | 5000 |
| 2022 High country | 75,000 | Ag Direct | 5055 |
| | | Ag Direct | |
| | | | |
| OTHER: | | | |
| lease on ranch | 35,000 | | |
| | | | |
| | | Total Equipment Leins | 160,055 |
| REAL ESTATE: | | | |
| 243 acres allen | 360,000 | REAL ESTATE LIENS: | |
| Personal Resident | 175,000 | Lubbock Knoxville | 204,294 |
| 320 acres (home) | 480,000 | Lubbock 11th st | 197,335 |
| Barns and Pens | 80,000 | | |
| 160 acres (smith) | 240,000 | | |
| 158 acres(dickey) | 235,000 | | |
| 320 acres(golden) | 480,000 | | |
| New House-Homestead | 700,000 | | |
| 320 acres burrow | 480,000 | | |
| 161 acres(hays) | 240,000 | | |
| Rent House dickey | 65,000 | TOTAL NON CURRENT LIABILITIES: | 401,629 |
| Robinson Fresh Water LLC | 50,000 | | |
| Lubbock house Knoxville | 300,000 | TOTAL LIABILITIES: | 4,372,184 |
| Lubbock house 11th st | 275,000 | | |
| TOTAL NON CURRENT ASSETS: | 5,385,000 | NET WORTH: | (1,536,684) |
| | | | |
| TOTAL ASSETS: | 2,835,500 | TOTAL LIABILITIES & NET WORTH: | 2,835,500 |

FINANCIAL STATEMENT
FINANCIAL STATEMENT
SUBMITTED TO
FBT

DATE: 4/23/2023

| NAME: | Terry M. Robinson | SPOUSE: | Rebecca Ann Robinson |
|---|---|---|---|
| ADDRESS: | 9012 C.R. 3114 | PHONE: | 325-573-4883 |
| SSN#: | 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 | SSN#: | 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 |

EXHIBIT D

1

First Bank & Trust

**T E X A S**

1301 Central Avenue | Dubuque, IA 52001

*Statement Ending 04/30/2023*

Page 1 of 6

**ADDRESS SERVICE REQUESTED**

2B FARMS
DBA 2 B FARMS
9397 COUNTY ROAD 3114
SNYDER TX 79549-1379

### *Managing Your Accounts*

|  |  |  |
|---|---|---|
| 🏛 |  | First Bank & Trust |
| 👤 | Customer Care Center: | 877-280-1864 |
| ✉ | Mailing: | 9816 Slide Road Lubbock, TX 79424 |
| 💻 | Website: | www.FirstBankTexas.com |

## *Summary of Accounts*

| Account Type | Account Number | Ending Balance |
|---|---|---|
| BUSINESS CHECKING | XXXXXX8270 | -$5,274,498.61 |

## BUSINESS CHECKING-XXXXXX8270

### Account Summary

| Date | Description | Amount |
|---|---|---|
| 04/01/2023 | **Beginning Balance** | **$155,521.72** |
|  | 14 Credit(s) This Period | $30,146,689.18 |
|  | 68 Debit(s) This Period | $35,576,709.51 |
| 04/30/2023 | **Ending Balance** | **-$5,274,498.61** |
|  | Service Charges | $105.00 |

### Deposits

| Date | Description | Amount |
|---|---|---|
| 04/03/2023 | DEPOSIT | $2,551,704.09 |
| 04/04/2023 | DEPOSIT | $2,530,920.39 |
| 04/05/2023 | DEPOSIT | $2,559,407.02 |
| 04/06/2023 | DEPOSIT | $2,510,991.45 |
| 04/10/2023 | DEPOSIT | $2,530,920.39 |
| 04/10/2023 | DEPOSIT | $2,559,407.02 |
| 04/11/2023 | DEPOSIT | $147,643.37 |
| 04/12/2023 | DEPOSIT | $2,510,991.45 |
|  | 8 item(s) totaling | $17,901,985.18 |

### Other Credits

| Date | Description | Amount |
|---|---|---|
| 04/03/2023 | LOAN ADVANCE 512001093968 | $2,500,000.00 |
| 04/04/2023 | LOAN ADVANCE 512001093968 | $2,500,000.00 |
| 04/05/2023 | LOAN ADVANCE 512001093968 | $2,500,000.00 |
| 04/06/2023 | LOAN ADVANCE 512001093968 | $2,440,000.00 |
| 04/14/2023 | LOAN ADVANCE 512001093968 | $2,270,000.00 |
| 04/26/2023 | FSA TREAS 310 | $34,704.00 |
|  | *MISC PAY* |  |
|  | *NTE*FOR COMBINED FSA CCC PROGR* |  |
|  | 6 item(s) totaling | $12,244,704.00 |

877.280.1864 | FirstBankTexas.com        🏠 EQUAL HOUSING LENDER  |  MEMBER FDIC

**EXHIBIT E**

## FOR A CHANGE OF NAME OR ADDRESS PLEASE COMPLETE THE FORM BELOW

NAME _____

ADDRESS _____

CITY _____ STATE _____ ZIP _____

SOCIAL SECURITY _____

SIGNATURE _____ DATE _____

### HOW TO BALANCE YOUR ACCOUNT

1. Subtract from your check register any service, miscellaneous, or automatic charge(s) posted on this statement, and add to your register any interest posted on this statement.
2. Mark (✓) your register after each check listed on front of statement.
3. Check off deposits shown on the statement against those shown in your check register.
4. Complete the form at right.
5. The final "balance" in the form to the right should agree with your check register balance. If it does not, read 'HINTS FOR FINDING DIFFERENCES" below.

### HINTS FOR FINDING DIFFERENCES

Recheck all additions and subtractions or corrections.

Verify the carryover balance from page to page in your check register.

Make sure you have subtracted the service or miscellaneous charge(s) from your check register balance, and added the current interest.

---

### This section applies exclusively to electronic fund transfers governed by Regulation E

In case of errors or questions about electronic transfers, telephone us or write to us at the address printed on this statement as soon as you can, if you think your statement or receipt is wrong or if you need more information about a transfer on the statement or receipt. We must hear from you no later than 60 days after we sent you the FIRST statement on which the error or problem appeared.

1. Tell us your name and account number (if any).
2. Describe the error or the transfer you are unsure about, and explain as clearly as you can why you believe there is an error or why you need more information.
3. Tell us the dollar amount of the suspected error.

We will investigate your complaint and will correct any error promptly. If we take more than 10 business days to do this, we will recredit your account for the amount you think is in error, so that you will have use of the money during the time it takes us to complete our investigation.

---

| NEW BALANCE TRANSFER AMOUNT FROM OTHER SIDE | $ |
|---|---|
| **ADD** | |
| DEPOSITS MADE SINCE ENDING DATE ON A STATEMENT | |
| **SUBTOTAL** | |

| CHECKS NOT LISTED ON THIS OR PRIOR STATEMENTS | |
|---|---|
| NUMBER | AMOUNT |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

| TOTAL CHECKS NOT LISTED | - - - - - → |
|---|---|
| SUBTRACT TOTAL CHECKS NOT LISTED FROM SUBTOTAL ABOVE | **BALANCE** |

THIS SHOULD AGREE WITH YOUR CHECK REGISTER BALANCE

**Balance subject to interest rate.**
Average daily balance method (including current transactions): We figure the interest charge on your account by applying the periodic rate to the "average daily balance" of your account. To get the "average daily balance" we take the beginning balance of your account each day, add any new (purchases/advances/fees), and subtract (any unpaid interest or other finance charges and) any payments or credits. This gives us the daily balance. Then, we add up all the daily balances for the billing cycle and divide the total by the number of days in the billing cycle. This gives us the "average daily balance".

---

### This section applies exclusively to information pertaining to credit extended primarily for personal, family, or household purposes.
### WHAT TO DO IF YOU THINK YOU FIND A MISTAKE ON YOUR STATEMENT

If you think there is an error on your statement, write to us at the address printed on this statement.

In your letter, give us the following information:
• Account information: Your name and account number.
• Dollar amount: The dollar amount of the suspected error.
• Description of the Problem: If you think there is an error on your bill, describe what you believe is wrong and why you believe it is a mistake.

You must contact us within 60 days after the error appeared on your statement.

You must notify us of any potential errors in writing. You may call us, but if you do we are not required to investigate any potential errors and you

may have to pay the amount in question.

While we investigate whether or not there has been an error, the following are true:

• We cannot try to collect the amount in question, or report you as delinquent on that amount.
• The charge in question may remain on your statement, and we may continue to charge you interest on that amount. But, if we determine that we made a mistake, you will not have to pay the amount in question or any interest or other fees related to that amount.
• While you do not have to pay the amount in question, you are responsible for the remainder of your balance.
• We can apply any unpaid amount against your credit limit.

⌂ EQUAL HOUSING LENDER  |  MEMBER FDIC

EXHIBIT E

## BUSINESS CHECKING-XXXXXX8270 (continued)

### Other Debits

| Date | Description | Amount |
|------|-------------|-------:|
| 04/03/2023 | WIRE OUT MCCLAIN FEED YARD INC #60258 | $2,494,292.97 |
| 04/03/2023 | PRINCIPAL PAY LN 512001093968 | $1,600,000.00 |
| 04/04/2023 | IB TFR TO 512001093968 | $1,060,000.00 |
| | 063029028157 | |
| 04/04/2023 | WIRE OUT MCCLAIN FEED YARD INC #60118 | $2,473,847.58 |
| 04/04/2023 | PRINCIPAL PAY LN 512001093968 | $1,500,000.00 |
| 04/04/2023 | PRINCIPAL PAY LN 512001093968 | $1,057,000.00 |
| 04/05/2023 | WIRE OUT MCCLAIN FEED YARD INC #60148 | $2,499,037.72 |
| 04/05/2023 | PRINCIPAL PAY LN 512001093968 | $1,450,000.00 |
| 04/05/2023 | PRINCIPAL PAY LN 512001093968 | $1,049,000.00 |
| 04/06/2023 | WIRE OUT MCCLAIN FEED YARD INC #60148 | $2,486,071.62 |
| 04/06/2023 | PRINCIPAL PAY LN 512001093968 | $1,450,000.00 |
| 04/06/2023 | PRINCIPAL PAY LN 512001093968 | $1,071,814.00 |
| 04/07/2023 | CHARGEBACK FEE | $15.00 |
| 04/07/2023 | CHARGEBACK ITEM | $2,530,920.39 |
| 04/10/2023 | CHARGEBACK FEE | $15.00 |
| 04/10/2023 | CAPITAL ONE CRCARDPMT | $5,258.41 |
| | *BO ROBINSON* | |
| | *3REGC0G0ACYJM3D* | |
| 04/10/2023 | CHARGEBACK ITEM | $2,559,407.02 |
| 04/10/2023 | OVERDRAFT FEE | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/10/2023 | OVERDRAFT FEE 000000000002532 #2532 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/11/2023 | CHARGEBACK FEE | $15.00 |
| 04/11/2023 | CHARGEBACK ITEM | $2,510,991.45 |
| 04/12/2023 | IB TFR TO 512001093968 | $147,000.00 |
| | *FUNDS TRANSFER VIA ONLINE* | |
| 04/12/2023 | OVERDRAFT FEE | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/13/2023 | CHARGEBACK FEE | $15.00 |
| 04/13/2023 | CHARGEBACK FEE | $15.00 |
| 04/13/2023 | CHARGEBACK ITEM | $2,559,407.02 |
| 04/13/2023 | CHARGEBACK ITEM | $2,530,920.39 |
| 04/14/2023 | OVERDRAFT FEE | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/14/2023 | OVERDRAFT FEE | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/17/2023 | CHARGEBACK FEE | $15.00 |
| 04/17/2023 | CHARGEBACK ITEM | $2,510,991.45 |
| 04/17/2023 | OVERDRAFT FEE 000000000009594 #9594 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/17/2023 | OVERDRAFT FEE 000000000009597 #9597 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/17/2023 | OVERDRAFT FEE 000000000009599 #9599 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/18/2023 | OVERDRAFT FEE | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/18/2023 | OVERDRAFT FEE 000000000002533 #2533 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/18/2023 | OVERDRAFT FEE 000000000009595 #9595 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/18/2023 | OVERDRAFT FEE 000000000009601 #9601 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/19/2023 | OVERDRAFT FEE 000000000009592 #9592 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/19/2023 | OVERDRAFT FEE 000000000009598 #9598 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/19/2023 | OVERDRAFT FEE 000000000009600 #9600 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/19/2023 | OVERDRAFT FEE 000000000009602 #9602 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/20/2023 | KUBOTA CREDIT PAYMENT | $361.40 |

EXHIBIT E

## BUSINESS CHECKING-XXXXXX8270 (continued)

### Other Debits (continued)

| Date | Description | Amount |
|------|-------------|-------:|
| | *ROBINSON TERRY* | |
| | *70348925* | |
| 04/21/2023 | OVERDRAFT FEE | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/21/2023 | OVERDRAFT FEE 000000000002534 #2534 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/28/2023 | RETURNED ITEM FEE #9586 | $35.00 |
| | *NONSUFFICIENT FUNDS* | |
| 04/28/2023 | SERVICE FEE | $105.00 |

47 item(s) totaling $35,547,181.42

### Checks Cleared

| Check Nbr | Date | Amount | Check Nbr | Date | Amount | Check Nbr | Date | Amount |
|----------:|------|-------:|----------:|------|-------:|----------:|------|-------:|
| 2528 | 04/04/2023 | $63.00 | 9587 | 04/04/2023 | $2,304.00 | 9595 | 04/17/2023 | $94.41 |
| 2531* | 04/03/2023 | $3.97 | 9588 | 04/10/2023 | $1,037.60 | 9597* | 04/14/2023 | $7,050.66 |
| 2532 | 04/07/2023 | $1,100.00 | 9589 | 04/04/2023 | $1,128.40 | 9598 | 04/18/2023 | $1,616.80 |
| 2533 | 04/17/2023 | $4,850.00 | 9590 | 04/04/2023 | $1,481.32 | 9599 | 04/14/2023 | $255.04 |
| 2534 | 04/20/2023 | $1,950.00 | 9591 | 04/03/2023 | $1,400.00 | 9600 | 04/18/2023 | $300.00 |
| 9584* | 04/03/2023 | $1,100.00 | 9592 | 04/18/2023 | $57.00 | 9601 | 04/17/2023 | $1,400.00 |
| 9586* | 04/28/2023 | $722.40 | 9594* | 04/14/2023 | $190.00 | 9602 | 04/18/2023 | $1,423.49 |

* Indicates skipped check number

21 item(s) totaling $29,528.09

### Daily Balances

| Date | Amount | Date | Amount | Date | Amount |
|------|-------:|------|-------:|------|-------:|
| 03/31/2023 | $155,521.72 | 04/10/2023 | $42,504.08 | 04/18/2023 | -$5,305,818.81 |
| 04/03/2023 | $1,110,428.87 | 04/11/2023 | -$2,320,859.00 | 04/19/2023 | -$5,305,958.81 |
| 04/04/2023 | $45,524.96 | 04/12/2023 | $43,097.45 | 04/20/2023 | -$5,308,270.21 |
| 04/05/2023 | $106,894.26 | 04/13/2023 | -$5,047,259.96 | 04/21/2023 | -$5,308,340.21 |
| 04/06/2023 | $50,000.09 | 04/14/2023 | -$2,784,825.66 | 04/26/2023 | -$5,273,636.21 |
| 04/07/2023 | -$2,482,035.30 | 04/17/2023 | -$5,302,281.52 | 04/28/2023 | -$5,274,498.61 |

### Service Charge Summary

| Description | Amount |
|-------------|-------:|
| Monthly Maintenance | $5.00 |
| Wire Out Domestic-Re | $100.00 |
| Service Chg Waived | $5.00 |

EXHIBIT E

Case 23-50096-rlj12    Doc 30-2    Filed 07/13/23    Entered 07/13/23 21:19:40    Desc
Plaintiffs Original Petition    Page 63 of 140



EXHIBIT E

**Archived:** Monday, May 8, 2023 2:48:59 PM
**From:** Fernandez, Rebecca
**Sent:** Tuesday, May 2, 2023 2:56:55 PM
**To:** Larson, D. Steven
**Subject:** FW: [EXTERNAL] Mc
**Importance:** Normal
**Sensitivity:** None

---

**From:** Fernandez, Rebecca
**Sent:** Friday, February 24, 2023 10:10 AM
**To:** Bo Robinson <bobeck3354@yahoo.com>
**Subject:** RE: [EXTERNAL] Mc

I will take care of this for you.

Thank you!



---

**From:** Bo Robinson <bobeck3354@yahoo.com>
**Sent:** Friday, February 24, 2023 10:05 AM
**To:** Fernandez, Rebecca <RFernandez@firstbanktexas.com>
**Subject:** [EXTERNAL] Mc

**EXTERNAL EMAIL:** Do not click any links, open any attachments or reply unless you trust the sender and the content is safe.

Text me when it's done I call it in

LOT 1644-202
profit 5088.38
int 31.13
cost 197600.28
total 202719.79

LOT 1640-147
profit 3707.34
int 31.95
cost 145787.50
total 149526.79

LOT 1632-485

LOT 1633-343

EXHIBIT F

| | | | | | |
|---|---|---|---|---|---|
| profit | | | profit | | 8,005.87 |
| int | 147.19 | | int | 106.55 | |
| cost | 467,167.49 | | cost | 338182.90 | |
| total | 479,502.73 | | total | 346,895.32 | |
| | | | | | |
| LOT | 1435-174 | | LOT | 1436-126 | |
| profit | 4390.02 | | profit | 3171.42 | |
| int | 52.52 | | int | 38.86 | |
| cost | 166695.00 | | cost | 123345.66 | |
| total | 171137.54 | | total | 126,555.94 | |

Total - 2,536,427.5

EXHIBIT F

EXHIBIT F

Sent from Yahoo Mail for iPhone

EXHIBIT F

# MCCLAIN FEEDYARD

# INVOICE

824 MULLINS LANE

BENTON KY 42025

| INVOICE # | DATE |
|---|---|
| | 2/22/2023 |

| BILL TO |
|---|
| BO ROBINSON |

| CUSTOMER ID | TERMS |
|---|---|
| | Due Upon Receipt |

| DESCRIPTION | | QTY | UNIT PRICE | AMOUNT |
|---|---|---|---|---|
| 435 H 248994# @166.72 | LOT 1630 | 248994 | 1.6672 | 415,122.80 |
| 345 H 200997# @166.52 | LOT 1631 | 200997 | 1.6652 | 334,700.20 |
| 485 H 280379# @166.62 | LOT 1632 | 280379 | 1.6662 | 467,167.49 |
| 343 H 203296# @166.35 | LOT 1633 | 203296 | 1.6635 | 338,182.90 |
| 366 H 214293# @166.47 | LOT 1634 | 214293 | 1.6647 | 356,733.56 |
| 174 H 100015# @166.67 | LOT 1635 | 100015 | 1.6667 | 166,695.00 |
| 126 H 74126# @166.40 | LOT 1636 | 74126 | 1.6640 | 123,345.66 |
| 270 H 156681# @166.58 | LOT 1637 | 156681 | 1.6658 | 260,999.21 |

*Thank you for your business!*

| SUBTOTAL | 2,462,946.82 |
|---|---|
| CHECK OFF | |
| TOTAL | $   2,462,946.82 |

IF YOU HAVE ANY QUESTIONS ABOUT THIS INVOICE, PLEASE CONTACT
MEAGAN GOAD AT 270-703-1295 OR MCCLAINFARMS@GMAIL.COM

EXHIBIT G

**Archived:** Monday, May 8, 2023 2:50:36 PM
**From:** Fernandez, Rebecca
**Sent:** Tuesday, May 2, 2023 2:45:24 PM
**To:** Larson, D. Steven
**Subject:** FW: [EXTERNAL] Mc
**Importance:** Normal
**Sensitivity:** None

---

**From:** Fernandez, Rebecca
**Sent:** Tuesday, January 17, 2023 11:16 AM
**To:** Bo Robinson <bobeck5354@yahoo.com>
**Subject:** RE: [EXTERNAL] Mc

I will take care of this for you 

Thank you!

Rebecca Fernandez
Commercial Banking Assistant I
rfernandez@firstbanktexas.com
(325) 673-5035
(725) 574-5176 Direct

4400 College Ave
Snyder, Tx 79549

---

**From:** Bo Robinson <bobeck5354@yahoo.com>
**Sent:** Tuesday, January 17, 2023 11:13 AM
**To:** Fernandez, Rebecca <RFernandez@firstbanktexas.com>
**Subject:** [EXTERNAL] Mc

**EXTERNAL EMAIL:** Do not click any links, open any attachments or reply unless you trust the sender and the content is safe.

Same way Thanks



LOT 1397-268          LOT 1398-500          LO
profit 6788.44        profit 12,610.00      p
int 243.31            int 456.81            i
cost 257,414.64       cost 483,296.15       c
total 264,446.39      total 496,342.96      t

LOT 1400-149          LOT 1401-432

EXHIBIT H

| profit |  | profit |  |
|--------|--------|--------|--------|
| int | 136.99 | int | 391.17 |
| cost | 144,929.35 | cost | 413,848.01 |
| total | 148,809.22 | total | 425,056.46 |

Total - 1,540.

EXHIBIT H

EXHIBIT H

EXHIBIT H

Sent from Yahoo Mail for iPad

**Archived:** Monday, May 8, 2023 11:01:27 AM
**From:** Fernandez, Rebecca
**Sent:** Tue, 2 May 2023 20:00:55
**To:** Larson, D. Steven
**Subject:** FW: [EXTERNAL] Re: Principal Pay
**Importance:** Normal
**Sensitivity:** None

---

**From:** Fernandez, Rebecca
**Sent:** Tuesday, April 4, 2023 9:17 AM
**To:** Bo Robinson <bobeck5354@yahoo.com>
**Subject:** RE: [EXTERNAL] Re: Principal Pay

I will take care of this for you 🙂
Your welcome!

Thank you!



Rebecca Fernandez
Commercial Banking Assistant II
rfernandez@firstbanktexas.com
(325) 573-9305
(325) 574-1126 Direct

4500 College Ave.
Snyder, Tx 79549

**From:** Bo Robinson <bobeck5354@yahoo.com>
**Sent:** Tuesday, April 4, 2023 8:54 AM
**To:** Fernandez, Rebecca <RFernandez@firstbanktexas.com>
**Subject:** [EXTERNAL] Re: Principal Pay

**EXTERNAL EMAIL:** Do not click any links, open any attachments or reply unless you trust the sender and the content is safe.

Total-2,530.920.39 This is the amount to make check out for I'll send you the amount of wire thanks for all you do

Sent from Yahoo Mail for iPad

On Tuesday, April 4, 2023, 8:37 AM, Fernandez, Rebecca <RFernandez@firstbanktexas.com> wrote:

Thank you for taking care of the additional pay on the RLOC, I was going to do that this morning 🙂

**Thank you!**

EXHIBIT I

**Rebecca Fernandez**
Commercial Banking Assistant
rfernandez@firstbanktexas.com
(325) 573-9305
(325) 574-1126 Direct

4900 College Ave
Snyder, Tx 79549



EXHIBIT I

UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

**A. NAME & PHONE OF CONTACT AT FILER (optional)**
CSC

**B. E-MAIL CONTACT AT FILER (optional)**

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**
Corporation Service Company
251 LITTLE FALLS DRIVE
Wilmington, DE 19808
USA

**FILING NUMBER:** 22-0037540205
**FILING DATE:** 07/29/2022    10:58 AM
**DOCUMENT NUMBER:** 1165745960001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **2B FARMS** | | | | |

OR

| 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **9397 CR 3114** | **SNYDER** | **TX** | **79549** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|

OR

| 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **First Bank and Trust** | | | | |

OR

| 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
|---|---|---|---|---|

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **4500 COLLEGE AVE** | **SNYDER** | **TX** | **79549** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
ALL LIVESTOCK (INCLUDING ALL INCREASE AND SUPPLIES) AND FARM EQUIPMENT; WHETHER ANY OF THE FOREGOING IS OWNED NOW OR ACQUIRED LATER; WHETHER ANY OF THE FOREGOING IS NOW EXISTING OR HEREAFTER BORN; ALL ACCESSIONS, ADDITIONS, REPLACEMENTS, AND SUBSTITUTIONS RELATING TO ANY OF THE FOREGOING (INCLUDING ALL ENTITLEMENTS, RIGHTS TO PAYMENT, AND PAYMENTS, IN WHATEVER FORM RECEIVED, INCLUDING BUT NOT LIMITED TO, PAYMENTS UNDER ANY GOVERNMENTAL AGRICULTURAL DIVERSION PROGRAMS, GOVERNMENTAL AGRICULTURAL ASSISTANCE PROGRAMS, THE FARM SERVICES AGENCY WHEAT FEED GRAIN PROGRAM, AND ANY OTHER SUCH PROGRAM OF THE UNITED STATES DEPARTMENT OF AGRICULTURE, OR ANY OTHER GENERAL INTANGIBLES OR PROGRAMS); ALL RECORDS OF ANY KIND RELATING TO ANY OF THE FOREGOING.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:                                                           6b. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility    ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
:FBT:512001093968 [236773788]

FILING OFFICE COPY

EXHIBIT J

UCC FINANCING STATEMENT
FOLLOW INSTRUCTIONS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| CSC |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| |

**C. SEND ACKNOWLEDGMENT TO: (Name and Address)**

Corporation Service Company
251 LITTLE FALLS DRIVE
Wilmington, DE 19808
USA

**FILING NUMBER:** 22-0037541458
**FILING DATE:** 07/29/2022      11:03 AM
**DOCUMENT NUMBER:** 1165748790001
**FILED: Texas Secretary of State**
**IMAGE GENERATED ELECTRONICALLY FOR XML FILING**
**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME - Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **2B FARMS** | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **9397 CR 3114** | **SNYDER** | **TX** | **79549** | **USA** |

2. DEBTOR'S NAME - Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY) - Provide only one Secured Party name (3a or 3b)

| 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|
| **First Bank and Trust** | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
| **4500 COLLEGE AVE** | **SNYDER** | **TX** | **79549** | **USA** |

4. COLLATERAL: This financing statement covers the following collateral:
ALL FEED INVENTORY; WHETHER ANY OF THE FOREGOING IS OWNED NOW OR ACQUIRED LATER;
ALL ACCESSIONS, ADDITIONS, REPLACEMENTS, AND SUBSTITUTIONS RELATING TO ANY OF
THE FOREGOING; ALL RECORDS OF ANY KIND RELATING TO ANY OF THE FOREGOING.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative
6a. Check only if applicable and check only one box:                6b. Check only if applicable and check only one box.
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility        ☐ Agricultural Lien ☐ Non-UCC Filing
7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor
8. OPTIONAL FILER REFERENCE DATA:
:FBT:512001093968 [236774173]

**FILING OFFICE COPY**

**EXHIBIT K**

| Pasture/Pen | Head | Type | Est Wt. | Est $/lb | Est Value | Total Est Value |
|---|---|---|---|---|---|---|
| Gail | 143 | middle aged pairs | | | $1,900.00 | $271,700.00 |
| | 44 | middle aged pairs | | | $1,800.00 | $79,200.00 |
| Allen | 89 | young registered pairs | | | $2,750.00 | $244,750.00 |
| House | 3 | open 2 year old cows | | | $1,200.00 | $3,600.00 |
| Gail | 6 | middle aged bulls | | | $3,750.00 | $22,500.00 |
| Denny | 4 | yearling bulls | | | $2,000.00 | $8,000.00 |
| Burrow | 7 | young bulls | | | $5,500.00 | $38,500.00 |
| Burrow | 47 | bred heifers | 900 | $2.00 | $1,800.00 | $84,600.00 |
| Burrow | 82 | open heifers | 900 | $1.70 | $1,530.00 | $125,460.00 |
| Burrow | 36 | open heifers | 900 | $1.60 | $1,440.00 | $51,840.00 |
| Fenton | 195 | yearling heifers | 725 | $1.85 | $1,341.25 | $261,543.75 |
| Wiggins | 68 | yearling heifers | 700 | $1.80 | $1,260.00 | $85,680.00 |
| Denny | 169 | yearling steers | 750 | $2.00 | $1,500.00 | $253,500.00 |
| Denny | 50 | yearling heifers | 575 | $1.80 | $1,035.00 | $51,750.00 |
| <u>Friona (Hefner)</u> | | | | | | |
| Pen 2 | 126 | yearling heifers | 775 | $1.80 | $1,395.00 | $175,770.00 |
| Pen 3 | 125 | yearling heifers | 775 | $1.80 | $1,395.00 | $174,375.00 |
| Pen 5 | 142 | yearling heifers | 700 | $1.80 | $1,260.00 | $178,920.00 |
| Pen 6/7 | 196 | yearling heifers | 700 | $1.80 | $1,260.00 | $246,960.00 |

**1532**                                **$2,358,648.75**

EXHIBIT L

On Sunday, April 30, 2023, I drove with Bo Robinson and looked at his cattle located at the headquarters, pens, fields and pastures in Scurry County and Borden County.

On Monday, May 1, 2023, I drove through the JT Cattle Company, (Hefner Cattle) feed yard located in Friona, TX with Tommy Hefner and his daughter and viewed the cattle located there.

The counts matched the numbers on both of the yard sheets.  The estimated weights and values are in the attached excel spreadsheet, as well as some photos I took of different pens and pastures for a visual sample.

The cattle were healthy and had plenty of grazing/feed.  I have estimated, to the best of my knowledge and research, their values according to type, weight, age, sex and quality.  I spoke with other ranchers and cattle raisers and buyers, along with checking current market prices.

My estimated value for these cattle is: **$2,358,648.75**


Thank you,


Tom Griffin

EXHIBIT M

| Pasture/Pen | Head | Type | Est Wt. | Est $/lb | Est Value | Total Est Value |
|---|---|---|---|---|---|---|
| Gail | 143 | middle aged pairs | | | $1,900.00 | $271,700.00 |
| | 44 | middle aged pairs | | | $1,800.00 | $79,200.00 |
| Allen | 89 | young registered pairs | | | $2,750.00 | $244,750.00 |
| House | 3 | open 2 year old cows | | | $1,200.00 | $3,600.00 |
| Gail | 6 | middle aged bulls | | | $3,750.00 | $22,500.00 |
| Denny | 4 | yearling bulls | | | $2,000.00 | $8,000.00 |
| Burrow | 7 | young bulls | | | $5,500.00 | $38,500.00 |
| Burrow | 47 | bred heifers | 900 | $2.00 | $1,800.00 | $84,600.00 |
| Burrow | 82 | open heifers | 900 | $1.70 | $1,530.00 | $125,460.00 |
| Burrow | 36 | open heifers | 900 | $1.60 | $1,440.00 | $51,840.00 |
| Fenton | 195 | yearling heifers | 725 | $1.85 | $1,341.25 | $261,543.75 |
| Wiggins | 68 | yearling heifers | 700 | $1.80 | $1,260.00 | $85,680.00 |
| Denny | 169 | yearling steers | 750 | $2.00 | $1,500.00 | $253,500.00 |
| Denny | 50 | yearling heifers | 575 | $1.80 | $1,035.00 | $51,750.00 |
| Headquarters | 4 | young bred cows | | | $1,500.00 | $6,000.00 |
| Headquarters | 15 | mixed yearlings calves | 700 | $1.50 | $1,050.00 | $15,750.00 |
| Friona (Hefner) | | | | | | |
| Pen 2 | 126 | yearling heifers | 775 | $1.80 | $1,395.00 | $175,770.00 |
| Pen 3 | 125 | yearling heifers | 775 | $1.80 | $1,395.00 | $174,375.00 |
| Pen 5 | 142 | yearling heifers | 700 | $1.80 | $1,260.00 | $178,920.00 |
| Pen 6/7 | 196 | yearling heifers | 700 | $1.80 | $1,260.00 | $246,960.00 |

| 1551 | $2,380,398.75 |
|---|---|

EXHIBIT N

DocuSign Envelope ID: BB58287E-356F-4104-A249-950F609A57A9

Appraisal By :        Ag Appraisals
                      Robert D. (Bob) Aycock          bobaycock@ymail.com
                      3258 Woodhollow Circle          940-864-4659
                      Abilene, Texas 79606


Terry M. (Bo) Robinson  2B Farms Equipment          May 5, 2023




Total Of All Equipment In This Report              $1,219,150




I, ROBERT AYCOCK, HEREBY CERTIFY THAT I HAVE PERSONALLY SEEN THE EQUIPMENT
DESCRIBED BELOW, THAT SUCH ARE IDENTIFIED AS INDICATED.  I AM NOT RELATED TO
THE APPLICANT AND HAVE NO INTEREST, FINANCIAL OR OTHERWISE, IN THE LOAN OR
SUBJECT PROPERTY, EITHER DIRECTLY OR INDRECTLY.  I FURTHER CERTIFY THAT THE
EVALUATION IS NOT BASED ON A REQUESTED MINIMUM VALUATION OR SPECIFIC
VALUATION FOR APPROVAL OF A LOAN.  THE VALUE PLACED ON THIS EQUIPMENT IS
MY OPINION OF THE FAIR MARKET VALUE ON THIS DATE.

                              DocuSigned by:
                              *ROBERT D. AYCOCK*      5/6/2023
                              8AE0360A911F484...

Terry M. (Bo) Robinson  2B Farms         325-207-2794
9397 C R 3114
Snyder, Texas 79549



Documentation:  Tractorhouse, Fastline, Machinery Trader, Truck Paper, Trailers
                Market.com, Equipment Experts.com, Dealer Confirmation,
                Machinery Pete And General Internet Searches



Location:   Equipment – 9012 C R 3114 Snyder Texas   N32°64'188"  W101°05'423"
            Pivot –  North of C R 3114  N32°64'567"  W101°02'196"
            Equipment  C R 3114  N32°64'225"  W101°06'925"


EXHIBIT O

Terry M. (Bo) Robinson  2B Farms  Equipment                    May 5, 2023

Letters On Right Side Of Page Indicate Condition
VG =- Very Good,  G = Good,  A = Average  And P = Poor

| | | |
|---|---|---|
| 1997 John Deere 8400 MFWD Tractor  7,065 Hrs. sn RW8400P013244 | $63,750 | VG |
| Duals, 3 Outlets, Good Tires, New Paint Job, Good Interior | | |
| 1993 John Deere 4560 2WD Tractor 14,347 Hrs. sn RW4560H001732 | $36,350 | A |
| 3 Outlets, Fair Tires,  Fair Interior | | |
| 1982 John Deere 4440 2WD Tractor 10,050 Hrs. sn 4440H001863R | $29,500 | G |
| 3 Outlets, New Tires New Paint Job, Good Interior | | |
| 1978 John Deere 4440 2WD Tractor 13,903 Hrs. sn 4440H0145962R | $28,650 | G |
| 3 Outlets, Clean Interior, New Paint Job, Good Tires | | |
| 1997 New Holland 8970 MFWD Tractor 6,320 Hrs. sn 98149600657 | $60,350 | G |
| 4 Outlets , Duals, Fair Interior | | |
| 2010 John Deere 4730 Self Propelled Sprayer 2,706 Hrs. | $122,750 | VG |
| sn NO4730X009059 , 1000 Gal. Stainless Tank, Good Tires | | |
| W/Green Star GPS  2630 Screen sn PCGU2UG57062 | | |
| 2015 Kubota SVL 90-2 Skid Steer 1,513 Hrs. sn JKUC0902V01S16491 | $56,600 | VG |
| Rubber Tracks,  Clean Apperance | | |
| 2001 Caterpillar 928G Rubber Tire Loader 12,056 Hrs. sn 6XR02173 | $47,900 | G |
| 2016 Caterpillar 938M Rubber Tire Loader 2,492 Hrs. sn 0938MLJ3R02508 | $182,500 | VG |
| Very Clean Machine Good Paint And Interior | | |
| 2012 Caterpillar 120M Road Grader  5,510 Hrs. sn 0120MJB9N00249 | $159,650 | VG |
| Good Paint Good Interior  Fair Tires | | |
| 2012 Kenworth Day Cab Truck Single Rear Axle 423,993 Mi. | $36,750 | VG |
| VIN 1XKDAP8X7CJ331072 Good Condition Inside & Out | | |
| EZ Steer GPS Screen sn G0497A0098 & Light Bar sn 4510415850 | $1,850 | VG |
| On 4560 Tractor | | |
| Trimble  GPS  CFX Screen & Receiver Mod. 94510-00 sn 5534500624 | $8,500 | VG |
| On 8400 Tractor | | |
| 2010 John Deere 2410 Chisel Plow 27 Shanks sn N02410X012070 | $36,900 | VG |
| Good Conditions, No Welds | | |
| Big Ox 9 Shank V Ripper Plow  sn BO2659 | $1,100 | G |

EXHIBIT O

DocuSign Envelope ID: BB58287E-356F-4104-A249-950F609A57A9

| | | |
|---|---|---|
| 1999 John Deere 610 Chisel Plow, 15 Shank, 3 Point sn P00610X007999 | $7,500 | G |
| Great Plains 6330UC-12 Chisel Plow 30 FT. sn GPC10157 | $42,250 | VG |
| Summers Mfg. Coil Packer Mod 106  30 Ft. sn I0273 | $7,500 | VG |
| John Deere 158 Front Loader sn W00158X035266 w/Forks & Bucket | $6,250 | VG |
| KBH 1610 Tank Tow Fertilizer Trailer sn NT03722  5th Wheel Chassis With 1610 Gal. Tank | $6,750 | VG |
| Wilson 12 Ft. Box Scraper  sn Stamped  44316 Faded Paint | $2,750 | G |
| John Deere 1418 Shredder  4 row sn 1418T001695 | $4,500 | G |
| AG Krane Hay King Lift  no sn Could Be Found | $2,850 | VG |
| Shop Made 500 Gal.Diesel Trailer W/12v Pump   No SN | $1,500 | G |
| 1973 Lufkin Float Flatbed Trailer  W/3 – 1,600 Gal. Poly Tanks VIN 3988 | $8,500 | G |
| Big Tex HD Utility Trailer 20 Ft. VIN 13906050 (Partial VIN Tag Damage) | $3,500 | VG |
| E Z Trail Mod. 3400 Gravity Grain Cart On 1074 Chassis 4 Wheel W/Hyd. Auger And Roll Over Tarp   Slightly Used No SN | $8,950 | VG |
| 2004 Gooseneck Brand Big Haul Livestock Trailer, 1 Axle, 42 Ft. VIN 16G5742114B078973  Nice Trailer Good Paint | $29,850 | VG |
| 2007 Big Bend 24 Ft. Livestock Trailer 2 Axle VIN 3BUG240257T000247 Stout Built,  Paint Good | $5,900 | VG |
| 2007 C & C Horse Trailer  3 Horse W/Living Quarters VIN 1C9WG24208N643602 | $37,750 | VG |
| 2014 John Deere 469 Round Baler Mega Wide Plus  4,191 Bales sn E100469XPDE400109  With Monitor | $34,500 | VG |
| 2008 Massey Ferguson 1372 Swather, Heston Series W/Swivel Hitch sn 1372HS56459 | $22,250 | G |
| Supreme Feed Mixer Model 700, Type C-3A  sn 5967-001-01 | $22,150 | G |
| Trioliet Feed Mixer  Mod. Solo Mix 2- 2800  sn 06520 | $42,500 | VG |
| 3 - Shop Made Cattle Self Feeders  $1,100 Each | $3,300 | G |

EXHIBIT O

DocuSign Envelope ID: BB58287E-356F-4104-A249-950F609A57A9

| | | |
|---|---|---|
| Diesel Storage Tank  6,700 Gal. With Pump | $2,500 | G |
| Propane Tank  500 Gal. | $350 | G |
| 1,500 Bushel Grain Bin | $950 | G |
| 2003 Lindsay Grow Smart Center Pivot Irrigation System<br>8 Tower  sn P-51204 | $41,250 | VG |

|  |  |
|---|---|
| **Total Of All Equipment In this Report** | **$1,219,150** |

EXHIBIT O



·0220·

## COMMERCIAL GUARANTY

| Borrower: | 7D FARMS | Lender: | FIRST BANK & TRUST |
|---|---|---|---|
| | 9397 CR 3114 | | SNYDER |
| | SNYDER, TX 79549 | | 4500 COLLEGE AVE |
| | | | SNYDER, TX 79549 |
| | | | (325) 573-9305 |
| Guarantor: | TERRY MAX ROBINSON | | |
| | 9397 CR 3114 | | |
| | SNYDER, TX 79549 | | |

**CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE.** For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

**INDEBTEDNESS.** The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, all of Lender's attorneys' fees assessed by the court, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether: voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other unterminated guaranties.

**CONTINUING GUARANTY.** THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

**DURATION OF GUARANTY.** This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

**GUARANTOR'S AUTHORIZATION TO LENDER.** Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

**GUARANTOR'S REPRESENTATIONS AND WARRANTIES.** Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information which will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

**GUARANTOR'S FINANCIAL STATEMENTS.** Guarantor agrees to furnish Lender with the following:

Tax Returns. As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

EXHIBIT P



Loan No: 512218475

## COMMERCIAL GUARANTY
### (Continued)

Page 2

Additional Requirements.

AGRICULTURAL FINANCIAL STATEMENTS. AS SOON AS AVAILABLE, BUT IN NO EVENT LATER THAN (90) DAYS AFTER THE ANNIVERSARY DATE OF THE EXISTING AGRICULTURAL FINANCIAL STATEMENT, GUARANTOR'S AGRICULTURAL FINANCIAL STATEMENTS, PREPARED BY BORROWER SATISFACTORY TO LENDER.

PERSONAL FINANCIAL STATEMENTS. GUARANTOR WILL PROVIDE ANNUAL PERSONAL FINANCIAL STATEMENTS WITHIN (90) DAYS OF THE ANNIVERSARY DATE OF THE EXISTING FINANCIAL STATEMENT.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

GUARANTOR'S WAIVERS. Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including all of Lender's attorneys' fees assessed by the court and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include all of Lender's attorneys' fees assessed by the court and legal expenses whether or not there is a lawsuit, including all of Lender's attorneys' fees assessed by the court and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty, Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

Interpretation. In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices. Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the



EXHIBIT P

DocuSign Envelope ID: F0F86752-4CAD-43DB-9F04-D951C80E68E1

## COMMERCIAL GUARANTY
### (Continued)

| Loan No: 512218475 | | Page 3 |

purpose of the notice is to change the party's address.  For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address.  Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.**  Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender.  No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right.  A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty.  No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions.  Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.**  Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.**  Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**CHOICE OF VENUE.**  IF THERE IS A LAWSUIT, GUARANTOR AGREES UPON LENDER'S REQUEST TO SUBMIT TO THE JURISDICTION OF THE COURTS OF LUBBOCK COUNTY, TEXAS.  THE PARTIES AGREE THAT LUBBOCK COUNTY, TEXAS IS THE SOLE AND EXCLUSIVE VENUE FOR ANY LAWSUIT ARISING OUT OF THIS GUARANTY.

**DEFINITIONS.**  The following capitalized words and terms shall have the following meanings when used in this Guaranty.  Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America.  Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require.  Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.**  The word "Borrower" means 2B FARMS and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.**  The word "GAAP" means generally accepted accounting principles.

**Guarantor.**  The word "Guarantor" means everyone signing this Guaranty, including without limitation TERRY MAX ROBINSON, and in each case, any signer's successors and assigns.

**Guaranty.**  The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.**  The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.**  The word "Lender" means FIRST BANK & TRUST, its successors and assigns.

**Note.**  The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.**  The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS.  IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY".  NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE.  THIS GUARANTY IS DATED JUNE 14, 2021.

GUARANTOR:

X _____
 TERRY MAX ROBINSON

**EXHIBIT P**

DocuSign Envelope ID: F0F86752-4CAD-43DB-9F04-DA5CED6E98E1



`0220`

## COMMERCIAL GUARANTY

| Borrower: | 2B FARMS | Lender: | FIRST BANK & TRUST |
| | 9397 CR 3114 | | SNYDER |
| | SNYDER, TX 79549 | | 4500 COLLEGE AVE |
| | | | SNYDER, TX 79549 |
| | | | (325) 573-9305 |

Guarantor: REBECCA ANN ROBINSON
9397 CR 3114
SNYDER, TX 79549

CONTINUING GUARANTEE OF PAYMENT AND PERFORMANCE. For good and valuable consideration, Guarantor absolutely and unconditionally guarantees full and punctual payment and satisfaction of the Indebtedness of Borrower to Lender, and the performance and discharge of all Borrower's obligations under the Note and the Related Documents. This is a guaranty of payment and performance and not of collection, so Lender can enforce this Guaranty against Guarantor even when Lender has not exhausted Lender's remedies against anyone else obligated to pay the Indebtedness or against any collateral securing the Indebtedness, this Guaranty or any other guaranty of the Indebtedness. Guarantor will make any payments to Lender or its order, on demand, in legal tender of the United States of America, in same-day funds, without set-off or deduction or counterclaim, and will otherwise perform Borrower's obligations under the Note and Related Documents. Under this Guaranty, Guarantor's liability is unlimited and Guarantor's obligations are continuing.

INDEBTEDNESS. The word "Indebtedness" as used in this Guaranty means all of the principal amount outstanding from time to time and at any one or more times, accrued unpaid interest thereon and all collection costs and legal expenses related thereto permitted by law, all of Lender's attorneys' fees assessed by the court, arising from any and all debts, liabilities and obligations of every nature or form, now existing or hereafter arising or acquired, that Borrower individually or collectively or interchangeably with others, owes or will owe Lender. "Indebtedness" includes, without limitation, loans, advances, debts, overdraft indebtedness, credit card indebtedness, lease obligations, liabilities and obligations under any interest rate protection agreements or foreign currency exchange agreements or commodity price protection agreements, other obligations, and liabilities of Borrower, and any present or future judgments against Borrower, future advances, loans or transactions that renew, extend, modify, refinance, consolidate or substitute these debts, liabilities and obligations whether voluntarily or involuntarily incurred; due or to become due by their terms or acceleration; absolute or contingent; liquidated or unliquidated; determined or undetermined; direct or indirect; primary or secondary in nature or arising from a guaranty or surety; secured or unsecured; joint or several or joint and several; evidenced by a negotiable or non-negotiable instrument or writing; originated by Lender or another or others; barred or unenforceable against Borrower for any reason whatsoever; for any transactions that may be voidable for any reason (such as infancy, insanity, ultra vires or otherwise); and originated then reduced or extinguished and then afterwards increased or reinstated.

If Lender presently holds one or more guaranties, or hereafter receives additional guaranties from Guarantor, Lender's rights under all guaranties shall be cumulative. This Guaranty shall not (unless specifically provided below to the contrary) affect or invalidate any such other guaranties. Guarantor's liability will be Guarantor's aggregate liability under the terms of this Guaranty and any such other undetermined guaranties.

CONTINUING GUARANTY. THIS IS A "CONTINUING GUARANTY" UNDER WHICH GUARANTOR AGREES TO GUARANTEE THE FULL AND PUNCTUAL PAYMENT, PERFORMANCE AND SATISFACTION OF THE INDEBTEDNESS OF BORROWER TO LENDER, NOW EXISTING OR HEREAFTER ARISING OR ACQUIRED, ON AN OPEN AND CONTINUING BASIS. ACCORDINGLY, ANY PAYMENTS MADE ON THE INDEBTEDNESS WILL NOT DISCHARGE OR DIMINISH GUARANTOR'S OBLIGATIONS AND LIABILITY UNDER THIS GUARANTY FOR ANY REMAINING AND SUCCEEDING INDEBTEDNESS EVEN WHEN ALL OR PART OF THE OUTSTANDING INDEBTEDNESS MAY BE A ZERO BALANCE FROM TIME TO TIME.

DURATION OF GUARANTY. This Guaranty will take effect when received by Lender without the necessity of any acceptance by Lender, or any notice to Guarantor or to Borrower, and will continue in full force until all of the Indebtedness incurred or contracted before receipt by Lender of any notice of revocation shall have been fully and finally paid and satisfied and all of Guarantor's other obligations under this Guaranty shall have been performed in full. If Guarantor elects to revoke this Guaranty, Guarantor may only do so in writing. Guarantor's written notice of revocation must be mailed to Lender, by certified mail, at Lender's address listed above or such other place as Lender may designate in writing. Written revocation of this Guaranty will apply only to new Indebtedness created after actual receipt by Lender of Guarantor's written revocation and Lender's written acknowledgment of receipt. For this purpose and without limitation, the term "new Indebtedness" does not include the Indebtedness which at the time of notice of revocation is contingent, unliquidated, undetermined or not due and which later becomes absolute, liquidated, determined or due. For this purpose and without limitation, "new Indebtedness" does not include all or part of the Indebtedness that is: incurred by Borrower prior to revocation; incurred under a commitment that became binding before revocation; any renewals, extensions, substitutions, and modifications of the Indebtedness. This Guaranty shall bind Guarantor's estate as to the Indebtedness created both before and after Guarantor's death or incapacity, regardless of Lender's actual notice of Guarantor's death. Subject to the foregoing, Guarantor's executor or administrator or other legal representative may terminate this Guaranty in the same manner in which Guarantor might have terminated it and with the same effect. Release of any other guarantor or termination of any other guaranty of the Indebtedness shall not affect the liability of Guarantor under this Guaranty. A revocation Lender receives from any one or more Guarantors shall not affect the liability of any remaining Guarantors under this Guaranty. It is anticipated that fluctuations may occur in the aggregate amount of the Indebtedness covered by this Guaranty, and Guarantor specifically acknowledges and agrees that reductions in the amount of the Indebtedness, even to zero dollars ($0.00), shall not constitute a termination of this Guaranty. This Guaranty is binding upon Guarantor and Guarantor's heirs, successors and assigns so long as any of the Indebtedness remains unpaid and even though the Indebtedness may from time to time be zero dollars ($0.00).

GUARANTOR'S AUTHORIZATION TO LENDER. Guarantor authorizes Lender, either before or after any revocation hereof, without notice or demand and without lessening or otherwise affecting Guarantor's liability under this Guaranty, from time to time: (A) prior to revocation as set forth above, to make one or more additional secured or unsecured loans to Borrower, to lease equipment or other goods to Borrower, or otherwise to extend additional credit to Borrower; (B) to alter, compromise, renew, extend, accelerate, or otherwise change one or more times the time for payment or other terms of the Indebtedness or any part of the Indebtedness, including increases and decreases of the rate of interest on the Indebtedness; extensions may be repeated and may be for longer than the original loan term; (C) to take and hold security for the payment of this Guaranty or the Indebtedness, and exchange, enforce, waive, subordinate, fail or decide not to perfect, and release any such security, with or without the substitution of new collateral; (D) to release, substitute, agree not to sue, or deal with any one or more of Borrower's sureties, endorsers, or other guarantors on any terms or in any manner Lender may choose; (E) to determine how, when and what application of payments and credits shall be made on the Indebtedness; (F) to apply such security and direct the order or manner of sale thereof, including without limitation, any nonjudicial sale permitted by the terms of the controlling security agreement or deed of trust, as Lender in its discretion may determine; (G) to sell, transfer, assign or grant participations in all or any part of the Indebtedness; and (H) to assign or transfer this Guaranty in whole or in part.

GUARANTOR'S REPRESENTATIONS AND WARRANTIES. Guarantor represents and warrants to Lender that (A) no representations or agreements of any kind have been made to Guarantor which would limit or qualify in any way the terms of this Guaranty; (B) this Guaranty is executed at Borrower's request and not at the request of Lender; (C) Guarantor has full power, right and authority to enter into this Guaranty; (D) the provisions of this Guaranty do not conflict with or result in a default under any agreement or other instrument binding upon Guarantor and do not result in a violation of any law, regulation, court decree or order applicable to Guarantor; (E) Guarantor has not and will not, without the prior written consent of Lender, sell, lease, assign, encumber, hypothecate, transfer, or otherwise dispose of all or substantially all of Guarantor's assets, or any interest therein; (F) upon Lender's request, Guarantor will provide to Lender financial and credit information in form acceptable to Lender, and all such financial information which currently has been, and all future financial information will be provided to Lender is and will be true and correct in all material respects and fairly present Guarantor's financial condition as of the dates the financial information is provided; (G) no material adverse change has occurred in Guarantor's financial condition since the date of the most recent financial statements provided to Lender and no event has occurred which may materially adversely affect Guarantor's financial condition; (H) no litigation, claim, investigation, administrative proceeding or similar action (including those for unpaid taxes) against Guarantor is pending or threatened; (I) Lender has made no representation to Guarantor as to the creditworthiness of Borrower; and (J) Guarantor has established adequate means of obtaining from Borrower on a continuing basis information regarding Borrower's financial condition. Guarantor agrees to keep adequately informed from such means of any facts, events, or circumstances which might in any way affect Guarantor's risks under this Guaranty, and Guarantor further agrees that, absent a request for information, Lender shall have no obligation to disclose to Guarantor any information or documents acquired by Lender in the course of its relationship with Borrower.

GUARANTOR'S FINANCIAL STATEMENTS. Guarantor agrees to furnish Lender with the following:

Tax Returns. As soon as available, but in no event later than thirty (30) days after the applicable filing date for the tax reporting period ended, Guarantor's Federal and other governmental tax returns, prepared by a tax professional satisfactory to Lender.

# EXHIBIT Q

## COMMERCIAL GUARANTY
### (Continued)

Loan No: 512218475 | | Page 2

Additional Requirements.
AGRICULTURAL FINANCIAL STATEMENTS. AS SOON AS AVAILABLE, BUT IN NO EVENT LATER THAN (90) DAYS AFTER THE ANNIVERSARY DATE OF THE EXISTING AGRICULTURAL FINANCIAL STATEMENT, GUARANTOR'S AGRICULTURAL FINANCIAL STATEMENTS, PREPARED BY BORROWER SATISFACTORY TO LENDER.

PERSONAL FINANCIAL STATEMENTS. GUARANTOR WILL PROVIDE ANNUAL PERSONAL FINANCIAL STATEMENTS WITHIN (90) DAYS OF THE ANNIVERSARY DATE OF THE EXISTING FINANCIAL STATEMENT.

All financial reports required to be provided under this Guaranty shall be prepared in accordance with GAAP, applied on a consistent basis, and certified by Guarantor as being true and correct.

GUARANTOR'S WAIVERS. Except as prohibited by applicable law, Guarantor waives any right to require Lender (A) to continue lending money or to extend other credit to Borrower; (B) to make any presentment, protest, demand, or notice of any kind, including notice of any nonpayment of the Indebtedness or of any nonpayment related to any collateral, or notice of any action or nonaction on the part of Borrower, Lender, any surety, endorser, or other guarantor in connection with the Indebtedness or in connection with the creation of new or additional loans or obligations; (C) to resort for payment or to proceed directly or at once against any person, including Borrower or any other guarantor; (D) to proceed directly against or exhaust any collateral held by Lender from Borrower, any other guarantor, or any other person; (E) to give notice of the terms, time, and place of any public or private sale of personal property security held by Lender from Borrower or to comply with any other applicable provisions of the Uniform Commercial Code; (F) to pursue any other remedy within Lender's power; or (G) to commit any act or omission of any kind, or at any time, with respect to any matter whatsoever.

Guarantor waives all rights of Guarantor under Chapter 43 of the Texas Civil Practice and Remedies Code. Guarantor also waives any and all rights or defenses based on suretyship or impairment of collateral including, but not limited to, any rights or defenses arising by reason of (A) any "one action" or "anti-deficiency" law or any other law which may prevent Lender from bringing any action, including a claim for deficiency, against Guarantor, before or after Lender's commencement or completion of any foreclosure action, either judicially or by exercise of a power of sale; (B) any election of remedies by Lender which destroys or otherwise adversely affects Guarantor's subrogation rights or Guarantor's rights to proceed against Borrower for reimbursement, including without limitation, any loss of rights Guarantor may suffer by reason of any law limiting, qualifying, or discharging the Indebtedness; (C) any disability or other defense of Borrower, of any other guarantor, or of any other person, or by reason of the cessation of Borrower's liability from any cause whatsoever, other than payment in full in legal tender, of the Indebtedness; (D) any right to claim discharge of the Indebtedness on the basis of unjustified impairment of any collateral for the Indebtedness; (E) any statute of limitations, if at any time any action or suit brought by Lender against Guarantor is commenced, there is outstanding Indebtedness which is not barred by any applicable statute of limitations; or (F) any defenses given to guarantors at law or in equity other than actual payment and performance of the Indebtedness. If payment is made by Borrower, whether voluntarily or otherwise, or by any third party, on the Indebtedness and thereafter Lender is forced to remit the amount of that payment to Borrower's trustee in bankruptcy or to any similar person under any federal or state bankruptcy law or law for the relief of debtors, the Indebtedness shall be considered unpaid for the purpose of the enforcement of this Guaranty.

Guarantor further waives and agrees not to assert or claim at any time any deductions to the amount guaranteed under this Guaranty for any claim of setoff, counterclaim, counter demand, recoupment or similar right, whether such claim, demand or right may be asserted by the Borrower, the Guarantor, or both.

GUARANTOR'S UNDERSTANDING WITH RESPECT TO WAIVERS. Guarantor warrants and agrees that each of the waivers set forth above is made with Guarantor's full knowledge of its significance and consequences and that, under the circumstances, the waivers are reasonable and not contrary to public policy or law. If any such waiver is determined to be contrary to any applicable law or public policy, such waiver shall be effective only to the extent permitted by law or public policy.

RIGHT OF SETOFF. To the extent permitted by applicable law, Lender reserves a right of setoff in all Guarantor's accounts with Lender (whether checking, savings, or some other account). This includes all accounts Guarantor holds jointly with someone else and all accounts Guarantor may open in the future. However, this does not include any IRA or Keogh accounts, or any trust accounts for which setoff would be prohibited by law. Guarantor authorizes Lender, to the extent permitted by applicable law, to hold these funds if there is a default, and Lender may apply the funds in these accounts to pay what Guarantor owes under the terms of this Guaranty.

SUBORDINATION OF BORROWER'S DEBTS TO GUARANTOR. Guarantor agrees that the Indebtedness, whether now existing or hereafter created, shall be superior to any claim that Guarantor may now have or hereafter acquire against Borrower, whether or not Borrower becomes insolvent. Guarantor hereby expressly subordinates any claim Guarantor may have against Borrower, upon any account whatsoever, to any claim that Lender may now or hereafter have against Borrower. In the event of insolvency and consequent liquidation of the assets of Borrower, through bankruptcy, by an assignment for the benefit of creditors, by voluntary liquidation, or otherwise, the assets of Borrower applicable to the payment of the claims of both Lender and Guarantor shall be paid to Lender and shall be first applied by Lender to the Indebtedness. Guarantor does hereby assign to Lender all claims which it may have or acquire against Borrower or against any assignee or trustee in bankruptcy of Borrower; provided however, that such assignment shall be effective only for the purpose of assuring to Lender full payment in legal tender of the Indebtedness. If Lender so requests, any notes or credit agreements now or hereafter evidencing any debts or obligations of Borrower to Guarantor shall be marked with a legend that the same are subject to this Guaranty and shall be delivered to Lender. Guarantor agrees, and Lender is hereby authorized, in the name of Guarantor, from time to time to file financing statements and continuation statements and to execute documents and to take such other actions as Lender deems necessary or appropriate to perfect, preserve and enforce its rights under this Guaranty.

MISCELLANEOUS PROVISIONS. The following miscellaneous provisions are a part of this Guaranty:

Amendments. This Guaranty, together with any Related Documents, constitutes the entire understanding and agreement of the parties as to the matters set forth in this Guaranty. No alteration of or amendment to this Guaranty shall be effective unless given in writing and signed by the party or parties sought to be charged or bound by the alteration or amendment.

Attorneys' Fees; Expenses. Guarantor agrees to pay upon demand all of Lender's costs and expenses, including all of Lender's attorneys' fees assessed by the court and Lender's legal expenses, incurred in connection with the enforcement of this Guaranty. Lender may hire or pay someone else to help enforce this Guaranty, and Guarantor shall pay the costs and expenses of such enforcement. Costs and expenses include all of Lender's attorneys' fees assessed by the court and legal expenses whether or not there is a lawsuit, including all of Lender's attorneys' fees assessed by the court and legal expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), appeals, and any anticipated post-judgment collection services. Guarantor also shall pay all court costs and such additional fees as may be directed by the court.

Caption Headings. Caption headings in this Guaranty are for convenience purposes only and are not to be used to interpret or define the provisions of this Guaranty.

Governing Law. This Guaranty will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of Texas without regard to its conflicts of law provisions.

Integration. Guarantor further agrees that Guarantor has read and fully understands the terms of this Guaranty; Guarantor has had the opportunity to be advised by Guarantor's attorney with respect to this Guaranty; the Guaranty fully reflects Guarantor's intentions and parol evidence is not required to interpret the terms of this Guaranty. Guarantor hereby indemnifies and holds Lender harmless from all losses, claims, damages, and costs (including Lender's attorneys' fees) suffered or incurred by Lender as a result of any breach by Guarantor of the warranties, representations and agreements of this paragraph.

Interpretation. In all cases where there is more than one Borrower or Guarantor, then all words used in this Guaranty in the singular shall be deemed to have been used in the plural where the context and construction so require; and where there is more than one Borrower named in this Guaranty or when this Guaranty is executed by more than one Guarantor, the words "Borrower" and "Guarantor" respectively shall mean all and any one or more of them. The words "Guarantor," "Borrower," and "Lender" include the heirs, successors, assigns, and transferees of each of them. If a court finds that any provision of this Guaranty is not valid or should not be enforced, that fact by itself will not mean that the rest of this Guaranty will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Guaranty even if a provision of this Guaranty may be found to be invalid or unenforceable. If any one or more of Borrower or Guarantor are corporations, partnerships, limited liability companies, or similar entities, it is not necessary for Lender to inquire into the powers of Borrower or Guarantor or of the officers, directors, partners, managers, or other agents acting or purporting to act on their behalf, and any indebtedness made or created in reliance upon the professed exercise of such powers shall be guaranteed under this Guaranty.

Notices. Any notice required to be given under this Guaranty shall be given in writing, and, except for revocation notices by Guarantor, shall be effective when actually delivered, when actually received by telefacsimile (unless otherwise required by law), when deposited with a nationally recognized overnight courier, or, if mailed, when deposited in the United States mail, as first class, certified or registered mail postage prepaid, directed to the addresses shown near the beginning of this Guaranty. All revocation notices by Guarantor shall be in writing and shall be effective upon delivery to Lender as provided in the section of this Guaranty entitled "DURATION OF GUARANTY." Any party may change its address for notices under this Guaranty by giving formal written notice to the other parties, specifying that the

**EXHIBIT Q**

DocuSign Envelope ID: F0F86752-4CAB-43DB-8F04-D3E1CB06E9E1

**COMMERCIAL GUARANTY**
(Continued)

Loan No: 512218475                                                                                                  Page 3

purpose of the notice is to change the party's address. For notice purposes, Guarantor agrees to keep Lender informed at all times of Guarantor's current address. Unless otherwise provided or required by law, if there is more than one Guarantor, any notice given by Lender to any Guarantor is deemed to be notice given to all Guarantors.

**No Waiver by Lender.** Lender shall not be deemed to have waived any rights under this Guaranty unless such waiver is given in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right shall operate as a waiver of such right or any other right. A waiver by Lender of a provision of this Guaranty shall not prejudice or constitute a waiver of Lender's right otherwise to demand strict compliance with that provision or any other provision of this Guaranty. No prior waiver by Lender, nor any course of dealing between Lender and Guarantor, shall constitute a waiver of any of Lender's rights or of any of Guarantor's obligations as to any future transactions. Whenever the consent of Lender is required under this Guaranty, the granting of such consent by Lender in any instance shall not constitute continuing consent to subsequent instances where such consent is required and in all cases such consent may be granted or withheld in the sole discretion of Lender.

**Successors and Assigns.** Subject to any limitations stated in this Guaranty on transfer of Guarantor's interest, this Guaranty shall be binding upon and inure to the benefit of the parties, their successors and assigns.

**Waive Jury.** Lender and Guarantor hereby waive the right to any jury trial in any action, proceeding, or counterclaim brought by either Lender or Guarantor against the other.

**CHOICE OF VENUE.** IF THERE IS A LAWSUIT, GUARANTOR AGREES UPON LENDER'S REQUEST TO SUBMIT TO THE JURISDICTION OF THE COURTS OF LUBBOCK COUNTY, TEXAS. THE PARTIES AGREE THAT LUBBOCK COUNTY, TEXAS IS THE SOLE AND EXCLUSIVE VENUE FOR ANY LAWSUIT ARISING OUT OF THIS GUARANTY.

**DEFINITIONS.** The following capitalized words and terms shall have the following meanings when used in this Guaranty. Unless specifically stated to the contrary, all references to dollar amounts shall mean amounts in lawful money of the United States of America. Words and terms used in the singular shall include the plural, and the plural shall include the singular, as the context may require. Words and terms not otherwise defined in this Guaranty shall have the meanings attributed to such terms in the Uniform Commercial Code:

**Borrower.** The word "Borrower" means 2B FARMS and includes all co-signers and co-makers signing the Note and all their successors and assigns.

**GAAP.** The word "GAAP" means generally accepted accounting principles.

**Guarantor.** The word "Guarantor" means everyone signing this Guaranty, including without limitation REBECCA ANN ROBINSON, and in each case, any signer's successors and assigns.

**Guaranty.** The word "Guaranty" means this guaranty from Guarantor to Lender.

**Indebtedness.** The word "Indebtedness" means Borrower's indebtedness to Lender as more particularly described in this Guaranty.

**Lender.** The word "Lender" means FIRST BANK & TRUST, its successors and assigns.

**Note.** The word "Note" means and includes without limitation all of Borrower's promissory notes and/or credit agreements evidencing Borrower's loan obligations in favor of Lender, together with all renewals of, extensions of, modifications of, refinancings of, consolidations of and substitutions for promissory notes or credit agreements.

**Related Documents.** The words "Related Documents" mean all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Indebtedness.

**EACH UNDERSIGNED GUARANTOR ACKNOWLEDGES HAVING READ ALL THE PROVISIONS OF THIS GUARANTY AND AGREES TO ITS TERMS. IN ADDITION, EACH GUARANTOR UNDERSTANDS THAT THIS GUARANTY IS EFFECTIVE UPON GUARANTOR'S EXECUTION AND DELIVERY OF THIS GUARANTY TO LENDER AND THAT THE GUARANTY WILL CONTINUE UNTIL TERMINATED IN THE MANNER SET FORTH IN THE SECTION TITLED "DURATION OF GUARANTY". NO FORMAL ACCEPTANCE BY LENDER IS NECESSARY TO MAKE THIS GUARANTY EFFECTIVE. THIS GUARANTY IS DATED JUNE 14, 2021.**

GUARANTOR:

X _Rebecca Robinson_
REBECCA ANN ROBINSON

LaserPro, Ver. 20.2.0.043  Copr. Finastra USA Corporation 1997, 2021.  All Rights Reserved.  - TX  C:\HARLAND\CFI\LPL\E20FC.FC  TR-55515  PR-3503

**EXHIBIT Q**



# Agreements, Disclosures and Account Terms

## Business Deposit Accounts

### Effective February 22, 2021

This booklet contains information regarding your FirstBank & Trust consumer deposit accounts. Please spend some time reviewing the agreements, disclosures and account terms that will govern your accounts effective February 22, 2021. Contact your Banker or the Customer Care Center at 877.280.1864 with questions or concerns.

EQUAL HOUSING LENDER  |  MEMBER FDIC

EXHIBIT R

# Business Deposit Accounts

## Table of Contents

ACCOUNT CONVERSION TABLE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . PAGE 1

TRUTH IN SAVINGS DISCLOSURES. . . . . . . . . . . . . . . . . . . . . . . . . PAGE 2

BUSINESS AND MISCELLANEOUS FEE SCHEDULE . . . . . . . . . . . . . PAGE 8

BUSINESS DEPOSIT ACCOUNT AGREEMENT  . . . . . . . . . . . . . . . .  PAGE 9

REGULATION CC FUNDS AVAILABILITY DISCLOSURE  . . . . . . . . . . PAGE 31

SUBSTITUTE CHECK POLICY DISCLOSURE . . . . . . . . . . . . . . . . . . PAGE 32

EXHIBIT R



## ACCOUNT CONVERSION TABLE

| EXISTING AIMBANK PRODUCT | | NEW FIRSTBANK & TRUST PRODUCT |
|---|---|---|

### CHECKING ACCOUNTS

| Aim Small Business Checking<br>Aim Small Business Checking Repo | → | Business Checking<br>product 412 |
|---|---|---|
| Aim Commercial Checking | → | Business Analysis Checking<br>(Non Interest Bearing)<br>product 200 |
| Aim Public Funds Bid | → | Business Interest Checking<br>product 330 |
| Aim Business Interest Checking<br>Aim Business Interest Checking Repo<br>Aim Muleshoe Interest Checking<br>Aim Platinum Interest Checking | → | Small Business Interest<br>Checking  product 240 |

### SAVINGS ACCOUNTS

| AimHigh Savings<br>AimHigh Savings Repo<br>AimElite Savings<br>AimElite Savings Repo<br>Premier Business Savings | → | High Yield Savings<br>product 687 |
|---|---|---|

### MONEY MARKET ACCOUNTS

| Aim Business Money Market | → | Business Premium<br>Money Market<br>product 287 |
|---|---|---|

EXHIBIT R

c



EXISTING AIMBANK PRODUCT

*Aim Small Business Checking | Aim Small Business Checking Repo*

*converts to*

# Business Checking (212/312/412)

| | | |
|---|---|---|
| **Balance Information** | Minimum Deposit to Open Account | $100.00 |
| | Minimum Balance to Avoid the Maintenance Fee | Average Daily Balance[1] of $1,500 |

| | | | |
|---|---|---|---|
| **Account Fees** | **Maintenance** | Monthly Maintenance Fee | $5.00 |
| | | Paper Statement Fee[2], per account | $5.00 |
| | **Items Processed[3]** | 0 – 100 | $0 |
| | | 101 – 250 | $0.10 per item or $0 with $10,000 Average Daily Balance[1] |
| | | 251 – 400 | $0.25 per item or $0 with $25,000 Average Daily Balance[1] |
| | | Over 400 | $0.40 per item |
| | | Canadian Deposited Items | $6.00 |
| | **Cash Processing** | $0.00 - $10,000.00 | $0 |
| | | $10,000.01 + | $0.15 per additional $100 |

| | |
|---|---|
| **Account Features** | Check images are provided with both the paper and eStatement |
| **Overdraft Privilege Limit** | $750.00 |

[1]The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

[2]No fee will be charged if this account is enrolled with eStatements within the first 30 days of account opening, or account conversion. If eStatements are discontinued then a Paper Statement Fee would apply.

[3]All debits, credits, and deposited items are counted. Debits include checks, drafts, and all forms of electronic or preauthorized debits.

Refer to our **Business and Commercial Miscellaneous Fee Schedule and Treasury Management Fee Schedule** for other account and service fees.



**EXISTING AIMBANK PRODUCT**

*Aim Commercial Checking*
*converts to*

**Business Analysis Checking** (200)
**Public Funds Analysis Checking** (300)

| Balance Information | Minimum Deposit to Open Account | $100 |
|---|---|---|
| | Minimum Balance to Avoid the Monthly Maintenance Fee | N/A |

| Account Fees | Monthly Maintenance Fee | | $20.00 |
|---|---|---|---|
| | Deposit/Credit Fee | | $.50 |
| | Check/Debit Fee | | $.20 |
| | ACH Credit/Debit Fee | | $.18 |
| | Deposited Items | On-Us Deposited Items | $.10 |
| | | Local/Other Deposit Items | $.12 |
| | | Canadian Deposited Items | $6.00 |
| | Cash Processing | | $.10/$100 |
| | *Deposit Protection Assessment.* This fee is charged monthly based on the average collected balance. | | $.07/$1000 |
| | *Borrowed Funds Fee.* This fee is charged each month the account has a negative collected balance at any time during the cycle month and is calculated using the National Prime Rate plus 2% (with a floor of 7.50%). | | |

| Earnings Credit | This is an analyzed account. We will apply an earnings credit rate to your positive average daily collected balance less any applicable reserve requirement shown below. This earnings credit will be used to offset analyzed service charges. If the earnings credit applied to your account is insufficient to cover your analyzed service charges, your account will be assessed a charge for the net amount due on the 15th of the month following the month in which the services were used. Excess earnings credit does not roll over to the following service charge period. If you have multiple analyzed accounts, you may direct us to offset fees from multiple accounts to a single lead account. Non analyzed service charges are assessed at the time of service to the account that incurred the charge. Non analyzed service charges include overdraft, uncollected and non sufficient funds fees. All service charges are disclosed in the Bank's current fee schedule. The Bank reserves the right to modify service charges and earnings credit rates at any time. |  |
|---|---|---|
| | Reserve Requirement | 0.00% |

| Account Features | Overdraft Privilege available; $750.00 limit<br>See fee schedule for applicable fees<br>See the Business Deposit Account Agreement for Overdraft Privilege details. |
|---|---|

Refer to our Business and Commercial Miscellaneous Fee Schedule and Treasury Management Fee Schedule for other account and service fees.

EXHIBIT R

FirstBank & Trust

## EXISTING AIMBANK PRODUCT

*Aim Public Funds Bid*

*converts to*

# Business Interest Checking (230)
# Public Funds Interest Checking (330)

| Rate Information | **Interest Rate** | | **Annual Percentage Yield (APY)** |
|---|---|---|---|
| | **.01%** | | **.01%** |
| | *Rate Accurate as of (date):* January 13, 2021 | | |
| | The interest rate and APY may change at any time at the bank's discretion. | | |
| **Compounding & Crediting of Interest** | Interest will be compounded and credited to the account monthly. | | |

| Balance Information | We use the daily-balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the account each day. | |
|---|---|---|
| | Interest begins to accrue no later than the business day we receive credit for the deposit of noncash items (for example, checks). | |
| | Minimum Deposit to Open Account | $100 |
| | Minimum Balance to Avoid Monthly Maintenance Fee | N/A |
| | Minimum Daily Balance to Obtain APY Disclosed | $.01 |

| Account Fees | Monthly Maintenance Fee | | $20.00 |
|---|---|---|---|
| | Deposit/Credit Fee | | $.50 |
| | Check/Debit Fee | | $.20 |
| | ACH Credit/Debit Fee | | $.18 |
| | Deposited Items | On-Us Deposited Items | $.10 |
| | | Local/Other Deposited Items | $.12 |
| | | Canadian Deposited Items | $6.00 |
| | Cash Processing | | $.10/$100 |
| | *Deposit Protection Assessment.* This fee is charged monthly based on the average collected balance. | | $.07/$1000 |
| | *Borrowed Funds Fee.* This fee is charged each month the account has a negative collected balance at any time during the cycle month and is calculated using the National Prime Rate plus 2% (with a floor of 7.50%). | | |

| Account Features | Overdraft Privilege available; $750.00 limit<br>See fee schedule for applicable fees<br>See the Business Deposit Account Agreement for Overdraft Privilege details. |
|---|---|

Refer to our Business and Commercial Miscellaneous Fee Schedule and Treasury Management Fee Schedule for other account and service fees.

EXHIBIT R

# EXISTING AIMBANK PRODUCT

*Aim Business Interest Checking | Aim Business Interest Checking Repo*
*Aim Muleshoe Interest Checking | Aim Platinum Interest Checking*

converts to

## Small Business Interest Checking (240)
## Public Funds Small Business Interest Checking (340)

| Rate Information | Interest Rate | Annual Percentage Yield (APY) |
|---|---|---|
| | .01% | .01% |
| | *Rate Accurate as of (date):* January 13, 2021 | |
| | The interest rate and APY may change at any time at the bank's discretion. | |

| Compounding & Crediting of Interest | Interest will be compounded and credited to the account monthly. | |
|---|---|---|

| Balance Information | We use the daily-balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the account each day. | |
|---|---|---|
| | Interest begins to accrue no later than the business day we receive credit for the deposit of noncash items (for example, checks). | |
| | Minimum Deposit to Open Account | $100 |
| | Minimum Balance to Avoid the Monthly Maintenance Fee | $2,500 minimum daily balance or average daily balance[1] of $5,000 for the cycle month |
| | Minimum Daily Balance to Obtain APY Disclosed | $0.01 |

| Account Fees | Monthly Maintenance Fee | $10.00 | |
|---|---|---|---|
| | Number of free transactions[2] | 100 | |
| | Per-item charge for each transaction[2] over 100 (regardless of the balances maintained) | $.40 | |
| | Cash Processing | $0.00 - $10,000.00 | $0 |
| | | $10,000.01 + | $0.15 per additional $100 |

| Account Features | Overdraft Privilege available; $750.00 limit
See fee schedule for applicable fees
See the Business Deposit Account Agreement for Overdraft Privilege details. |
|---|---|

[1] The average daily balance is calculated by adding the principal in the account for each day of the period and dividing that figure by the number of days in the period.

[2] The term "transaction" includes all debits, credits and deposited items. Debits include checks, drafts and all forms of electronic or pre-authorized transactions.

Refer to our Business and Commercial Miscellaneous Fee Schedule and Treasury Management Fee Schedule for other account and service fees.

EXHIBIT R

FirstBank & Trust

**EXISTING AIMBANK PRODUCT**

*AimHigh Savings | AimHigh Savings Repo | AimElite Savings*
*AimElite Savings Repo | Premier Business Savings*

converts to

# Business High Yield Savings (687)
# Public Funds High Yield Savings (787)

| Product Description | This account offers higher interest rates for larger balances and the security of an FDIC-insured account up to applicable limits. |
|---|---|

| Rate Information | Tiers | Interest Rate | Annual Percentage Yield (APY) |
|---|---|---|---|
| | Up to $9,999.99 | .01% | .01% |
| | $10,000 - $24,999.99 | .01% | .01% |
| | $25,000 - $49,999.99 | .01% | .01% |
| | $50,000 - $99,999.99 | .05% | .05% |
| | $100,000+ | .05% | .05% |

*Rate Accurate as of (date):* January 13, 2021

The interest rate and APY may change at any time at the bank's discretion.

| Compounding & Crediting of Interest | Interest will be compounded and credited to the account monthly. |
|---|---|

| Balance Information | We use the daily-balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the account each day. Interest begins to accrue no later than the business day we receive credit for the deposit of noncash items (for example, checks). | |
|---|---|---|
| | Minimum Deposit to Open Account | $10,000 |
| | Minimum Daily Balance to Avoid Monthly Maintenance Fee | $10,000 |
| | Minimum Daily Balance to Obtain APY disclosed | $0.01 |

| Transaction Limitations | Six transfers and/or withdrawals per monthly statement cycle or similar 4 week period. Transfers and/or withdrawals made by mail, messenger, ATM, or in person are unlimited. **See fee schedule for Excessive Withdrawal fee details.** |
|---|---|

| Account Fees | Monthly Maintenance Fee | $10.00 |
|---|---|---|
| | Deposited Items Fee | First 25 deposited items are free, then $0.50 per item[1] |

| Account Features | • ATM access via business debit card (with checking account) |
|---|---|
| | • Monthly statement |

[1] This fee applies regardless of the balances maintained in the account.

Refer to our Business and Commercial Miscellaneous Fee Schedule and Treasury Management Fee Schedule for other account and service fees.

EXHIBIT R

FirstBank & Trust

**EXISTING AIMBANK PRODUCT**

*Aim Business Money Market*

*converts to*

# Business Premium Money Market Account
(287) Business (387) Public Funds

| Product Description | Perfect for business owners seeking a competitive rate of return for their excess cash, this product offers tiered interest rates and no minimum balance or monthly maintenance fee. Limited check writing privileges provides convenient account access. |
|---|---|

| Rate Information | Tiers | Interest Rate | Annual Percentage Yield (APY) |
|---|---|---|---|
| | Up to $24,999.99 | .01% | .01% |
| | $25,000 - $49,999.99 | .01% | .01% |
| | $50,000 - $99,999.99 | .01% | .01% |
| | $100,000 - $249,999.99 | .05% | .05% |
| | $250,000 - $999,999.99 | .05% | .05% |
| | $1,000,000 - $4,999,999.99 | .05% | .05% |
| | $5,000,000 - $9,999,999.99 | .05% | .05% |
| | $10,000,000+ | .05% | .05% |
| | *Rate Accurate as of (date):* January 13, 2021 The interest rate and APY may change at any time at the bank's discretion. | | |

| Compounding & Crediting of Interest | Interest will be compounded and credited to the account monthly. |
|---|---|

| Balance Information | We use the daily-balance method to calculate the interest on your account. This method applies a daily periodic rate to the principal in the account each day. Interest begins to accrue no later than the business day we receive credit for the deposit of noncash items (for example, checks). | |
|---|---|---|
| | Minimum Deposit to Open Account | $25,000 |
| | Minimum Balance to Avoid Monthly Maintenance Fee | N/A |
| | Minimum Daily Balance to Obtain APY disclosed | $0.01 |

| Transaction Limitations | Six transfers and/or withdrawals per monthly statement cycle or similar 4 week period. Transfers and/or withdrawals made by mail, messenger, ATM, or in person are unlimited. **See fee schedule for Excessive Withdrawal fee details.** |
|---|---|

| Account Fees | Deposited Items Fee | First 25 deposited items are free, then $0.50 per item[1] |
|---|---|---|

| Account Features | • Liquidity of a savings account |
|---|---|
| | • Check writing privileges |
| | • ATM access via business debit card (with checking account) |

[1]This fee applies regardless of the balances maintained in the account.

Refer to our Business and Commercial Miscellaneous Fee Schedule and Treasury Management Fee Schedule for other account and service fees.

EXHIBIT R

Business and Commercial
Miscellaneous Fee Schedule
Effective 9.15.20

| | |
|---|---|
| Account Closing (Within 90 days of opening) | $25.00 |
| Inactive Acct (after 6 months) if balance is less than $100 | N/A |
| Account Research/Balancing - per 30 min. | $12.50 |
| Account Research/Item Copy | $5.00 |
| Account Transfers - Manual Loan Payment | $10.00 |
| Account Transfers - Manual | No Charge |
| Account Transfers - Telephone Banking | No Charge |
| Analysis Statement | No Charge |
| Additional/Duplicate Statement | $5.00 |
| ATM Non Proprietary Usage (Exempt if in Network) | $2.50 |
| Canadian Deposited Items | $6.00 |
| Cashiers Check Purchase | $10.00 |
| Chargeback Fee - Canadian | $15.00 |
| Chargeback Fee | $12.00 |
| Collection Items - Incoming/Outgoing | $27.50 |
| Copy Machine Use - per page | $2.00 |
| Counter Checks - each | $1.00 |
| Coupon Collection Per Envelope | $20.00 |
| Debit Card Replacement | $12.00 |
| Debit Card Rush Order | $75.00 |
| Dormant Account | N/A |
| Escheatment/Abandoned Account | N/A |
| Excessive Withdrawal Fee Per Item | $15.00 |
| External Transfer Cancellation | $5.00 |
| External Transfer Change | $5.00 |
| External Transfer Set Up | $5.00 |
| Fax - Incoming/Outgoing - per page | $2.00 |
| Foreign Check Collection Fee | $50.00 |
| Foreign Currency - per order | $22.00 |
| Foreign Currency Exchange-Customers Only (Plus Postage) | $22.00 |
| Foreign Draft | $50.00 |
| Garnishment/Levy Fee | $150.00 |
| International Service Assesment Fee with currency conversion (All Cards) | 3.00% |
| International Service Assesment Fee without currency conversion (All Cards) | 3.00% |
| Medallion/Signature Guarantee | $25.00 |
| Mobile Remote Dep Credit Fee<br>Additional Message and Data Rates May Apply | $0.50 |
| Overdraft Fees<br>  • Overdraft Fee - Nonsufficient Funds<br>  • Returned Item Fee - Nonsufficient Funds per item per presentment | $35.00 |

Fees apply to transactions created by check, in-person withdrawal, recurring debit card transactions, or other electronic means. Overdraft fees will not be imposed on ATM withdrawals or one-time debit card items unless the customer has opted in"

Overdraft Privilege: The total of the discretionary overdraft privilege (negative) balance, including any and all bank fees and charges, and interest charges is due and payable upon demand. Approval of payment of overdrafts by the bank on consumer accounts in good standing is only a discretionary courtesy, and not a right or obligation.

| | |
|---|---|
| Overdraft Transfer (via another deposit account) | $10.00 |
| Returned Item Instructions | $10.00 |
| Returned Statement (per month) | $10.00 |
| Safe Deposit Box - Drilling/Pulling (minimum) | $150.00 |
| Safe Deposit Inventory (hour) | $50.00 |
| Safe Deposit Box - Late Payment Fee | $10.00 |

| | |
|---|---|
| Safe Deposit Box - Replacement Key | $25.00 |
| Snapshot Statement | $5.00 |
| Statements-Special Cut | $10.00 |
| Statements- Special Delivery | $10.00 |
| Stop Payment | $20.00 |
| Subpoena Responses (per hour) | N/A |
| **Business Solutions** | |
| Online and Mobile Banking | No Charge |
| Online Retail Bill Pay | No Charge |
| Account Transfers Online Banking | No Charge |
| Account and Transaction Alerts | No Charge |
| Additional User Name, Each | $2.00 |
| ACH Block Monthly Per Account | $5.00 |
| Mobile Remote Dep Credit Fee<br>Additional Message and Data Rates May Apply | $0.50 |
| **Wire Transfers: Walk In/Call In** | |
| Wire In-Domestic | $12.00 |
| Wire In-International USD | $15.00 |
| Wire In-International FX | $15.00 |
| Wire Out Domestic-Repetitive | $25.00 |
| Wire Out Domestic-Non Rep | $30.00 |
| Wire Out Intl-Repetitive USD | $40.00 |
| Wire Out Intl-NonRep USD | $50.00 |
| Wire Out Intl-Repetitive FX | $35.00 |
| Wire Out Intl-NonRep FX | $45.00 |
| Wire Drawdown | $25.00 |

**Night Deposit**: Please contact us regarding available services.

Member FDIC

EXHIBIT R

FirstBank & Trust

## BUSINESS DEPOSIT ACCOUNT AGREEMENT AND DISCLOSURE

This Business Deposit Account Agreement and Disclosure contains information about terms, conditions, fees and interest rates for one or more accounts you open with us (each individually or collectively referred to as your "Account").

As used in this document, the term "Agreement" means: (i) this Deposit Account Agreement and Disclosure, (ii) any related application you submit ("Application"), (iii) any rate and fee schedules we provide to you (each a "Schedule"), (iv) the Regulation CC Funds Availability Disclosure; and (v) all related agreements. As used in the Agreement, "you" and "your" refers to each depositor agreeing to the terms and conditions of the Agreement and "we," "us" and "our" refer to First Bank & Trust Company.

Your Account is subject to the general terms and conditions of the Agreement and any specific terms and conditions that may be provided in the Agreement for specific types of accounts if your Account is that type of account. If you open multiple Accounts, you may receive Schedule information for each Account, but the Agreement will cover all your Accounts. By signing a Signature Card for your Account or by opening or continuing to hold your Account, you acknowledge receipt of the Agreement, and you agree to the terms and conditions set forth in the Agreement, as amended from time to time.

Please read the Agreement carefully. You should keep a copy of the Agreement and any information we give you regarding changes to the Agreement for your records as long as you have your Account with us. You can get a current copy of the documents that make up the Agreement at any of our branches.

1. **Business Account.** You are opening your Account as a "business account," meaning that it is not a "consumer account" (accounts that are used for personal, family or household purposes) and that it is being opened in the name of a "business," meaning a corporation, partnership or other business entity. Business accounts are offered only to businesses validly existing in the United States and that can form legally binding contracts under applicable law. You may not use your Account for personal, family or household purposes. By signing a Signature Card for your Account or by opening or continuing to hold your Account, you represent that you meet these requirements. You must notify us in writing of any changes to the form of ownership.

2. **Opening Your Account.**

   a. <u>Credit Verification</u>. You authorize us to request and obtain one or more credit reports about you from one or more credit reporting agencies for the purposes of opening your Account, reviewing or collecting any Account opened for you, or for any other legitimate business purpose. You authorize us to disclose information about your account to a credit reporting agency if your Account was closed because you have abused it.

   b. <u>Evidence of Authority</u>. You must provide us with evidence satisfactory to us regarding the authority of the individual(s) signing the Signature Card submitted for your Account to act on behalf of the person(s) owning the funds in the Account (each an "Owner" or "Co-Owner") , such as a resolution or certificate of authority.

   c. <u>IDENTIFICATION NOTICE</u>. To help the government fight the funding of terrorism and money laundering activities, federal law requires us to obtain, verify and record information that identifies each person who opens an account.

      1) *New Customers*. When you open an account, we will ask for your business name, tax identification number and business address and other documents that will allow us to verify your business and any other information we deem necessary to open your Account. For each person signing a Signature Card,

EXHIBIT R

we will ask that person's name, address, date of birth, social security number and other information that will allow us to verify each person's identity, such as your driver's license or other identifying documents.

2) *Existing Customers*. Even if you are already a customer of ours, we may ask you to provide this kind of information and documentation because we may not have collected it from you in the past or we may need to update our records.

3) *Failure to Provide*. If you are unable to provide the information outlined above, we may block or close your Account.

3. **Tax Identification Number.** Federal law requires us to obtain a Tax Identification Number ("TIN") for most accounts opened with us. To avoid backup withholding tax, you must provide us with an Internal Revenue Service ("IRS") Form W-9 or Form W-8BEN. U.S. citizens or other U.S. persons, including resident alien individuals, must appear as the primary Owner of your Account and must provide a signed Form W-9 (or substitute Form W-9). Nonresident aliens must provide a signed Form W-8BEN. We may also require other forms. Until we have received the completed and signed Form(s) W-9 or W-8BEN and supporting information or documentation, we may either: (1) not pay interest on your Account; or (2) pay interest and comply with the IRS backup withholding requirements. If, at any time, we receive information indicating that someone other than you is using the same TIN that you certified as your TIN on Form W-9 (or substitute Form W-9), and we are not able to determine that you are the rightful Owner of the TIN, we may, without notifying you, either: (1) stop paying interest on your Account; or (2) continue paying interest but comply with the IRS backup withholding requirements. We may also take any other action which we consider reasonable. If you own your Account as a sole proprietor, upon your death we must be provided with your estate's or your beneficiary's TIN, as applicable. If this is not provided, we may either: (1) stop paying interest on your Account after the date of your death; or (2) withhold a portion of the interest that has been earned on your Account since the date of your death.

4. **Contacting You.**

   a. <u>Your Authorization</u>. In addition to mailing notices to the mailing address reflected on our records for your Account (your "Mailing Address"), you authorize us to contact you in connection with your Account and for other purposes at: (i) telephone numbers you provide to us or use to contact us, including home landline telephones and personal mobile phones and other wireless devices and (ii) any electronic address you provide us or use to contact us, including email addresses. We may contact you by placing voice telephone calls (including the use of automatic telephone dialing systems and prerecorded voice messaging) to your telephone numbers or, in the case of mobile telephones or other wireless device, by sending email or automated Short Message Service ("SMS") text messages. These calls or messages may cause you to incur fees from your cellular provider or other service provider. Your authorization extends to our vendors and third party service providers and any party to whom we transfer your Account.

   b. <u>Method of Notice</u>. If we are required to provide any notice to you under the Agreement, we may notify you in any of the following ways: (a) sending written notice to you at your Mailing Address; (b) including a message with an account statement for your Account (a "Statement") ; or (c) providing notice to you in electronic form, if authorized.

5. **Contacting Us.** Any notice you provide to us will not be effective until we actually receive it and we have had reasonable opportunity to act on it.

   a. You may send us written notices at the following address:

   First Bank & Trust Company
   9816 Slide Road
   Lubbock, TX 79424

   b. You may call us at: 806-788-0800. Unless otherwise provided, telephone calls to us will not constitute legal notice under the Agreement.

EXHIBIT R

6. **Fees and Charges.**

   a. <u>Schedules</u>. Subject to applicable law, you agree to pay us the fees and charges shown in the Schedules that are applicable to your Account or for other services performed by us and which are provided to you.

   b. <u>Debit Balances</u>. You will be liable to us for debit balances in your Account (including without limitation overdrafts and Account charges and promise to pay, upon demand, any and all debit balances, all fees and charges and our reasonable attorneys' fees and costs and expenses of collection, including those incurred at trial and on any appeal).

   c. <u>Your Authorization</u>. You authorize us to charge your Account or any other accounts you hold with us for the payment of any fees and charges related to your Account and any other amounts you owe us under the Agreement, whether or not the charge, along or together with other charges to your Account, results in an overdraft of your account. Unless otherwise provided by applicable law, we may do this without notifying you in advance and we will not be liable to you for refusing to honor withdrawals or pay "Items" (meaning: (i) all orders and instructions for the payment, transfer or withdrawal of funds from your Account, whether issued or unissued; (ii) all deposits to your Account, even if returned unpaid; (iii) any Holds we put on your Account and (iv) any other debits or credits to your Account) if you do not have enough funds in your Account because of these fees and charges.

   d. <u>Changes</u>. We may, in our sole discretion, make changes, additions or deletions to any applicable Schedules and the fees we charge from time to time. We will notify you of the changes, to the extent required by applicable law. You may obtain a copy of any current Schedules and information on other fees at any of our branches. Existing and future charges may be based upon the overall costs of providing account services and may or may not be based upon the direct cost or expense associated with providing the particular service involved. The charges may be based on consideration of profit, competitive position, deterrence of misuse of account privileges by customers, and the safety and soundness of the financial institution.

7. **Available Balance.**

   a. <u>Determining Your Available Balance</u>. Your "Available Balance" (the funds in your Account that are available to you to withdraw or transfer; to pay checks and other Items; and for all other uses permitted under the Agreement) is the most current record we have about the funds that are available from your Account. To determine your Available Balance, we will consider all transactions that have posted to your Account (see the section entitled "Posting" for more details), any "Holds" (meaning any restrictions we may place on any withdrawals from, payment of Items drawn against or processing of further debit transactions to an Account) that may be in place on your Account, and pending transactions that we have authorized but not yet posted to your Account. Deposits may affect your Available Balance as described in the Regulation CC Funds Availability Disclosure.

   b. <u>Withdrawals</u>. At any given time your Available Balance may not reflect all of your withdrawals and other debit transactions, such as your outstanding checks, recurring debit transactions, transactions from using any card we issue to you that you may use to access your Account (each a "Card"), or other debit transactions that you have authorized but that have not yet been paid from your Account.

   c. <u>Deposits</u>. At any given time, your Available Balance may not reflect the most recent deposits to your Account, and deposits may not become part of your Available Balance immediately even if we have collected or received credit for the deposit. The Regulation CC Funds Availability Disclosure provided to you reflects our policies relating to the availability of deposited funds and when deposits are credited to your Account. We may change the Regulation CC Funds Availability Disclosure from time to time. If we do so, we will notify you to the extent required by applicable law.

   d. <u>Reductions in Available Balance</u>. As well as being reduced by withdrawals and other debit transactions, your Available Balance may be reduced by the amount of: (i) any Hold we put on your Account; (ii) any lien on or security interest in your Account; (iii) any setoff we may exercise against your Account; (iv) any deduction we

EXHIBIT R

may make from your Account because of a dispute, legal process, reversed deposit or other reason; (v) any Item is returned to us at the time we will be in the process of payment or collection against your Account; (vi) any checks we certify; or (vii) any other deduction to your Account is permitted by the Agreement.

8. **Posting.** The order of when transactions are posted to your Account impacts your Available Balance and may impact whether you incur overdrafts and the amount of overdraft fees you incur. Transactions may not be posted to your Account in the order in which they actually occurred, the order we received them or the order in which transactions appear in your Account history (including on your Statements). We often do not receive or post debit transactions on the same day you conduct them.

   a. <u>Order of Posting</u>. We have the right to post transactions to your Account in any order we decide. After the end of each business day, we assign each transaction received for that day to a "category." We generally post all transactions within a category (using the posting order or orders that apply to that category) before we post any transactions assigned to the next category. The following is a summary of the order in which we generally post transactions to your Account:

      1) *Deposits.* Deposits and other credits we receive prior to our identified cutoff times (please refer to the Regulation CC Funds Availability Disclosure for more details) will be posted to your Account before we post any withdrawals or other debits to your Account.

      2) *Non-Check Withdrawals.* Each category of non-check withdrawals and debits will be posted to your Account in order of the date and time associated with each transaction, from earliest to latest. A date and time (if one is available) will be assigned to each transaction based on either when the transaction was preauthorized or, for transactions for which there is no pre-authorization, when the transaction was processed by us. If a date and time is not available, these transactions will be posted to your Account after all other transactions in that category that do have a valid date and time are posted, and will be posted in order of the amount of the transactions, from lowest to highest. Non-check withdrawals and debits are generally posted in the following order: (i) ATM transactions; (ii) debit Card transactions; (iii) wire transfers and other Items that cannot be returned or recalled; and (iv) transactions made through the Automated Clearing House ("ACH") electronic payments network.

      3) *Check Withdrawals.* Each category of checks drawn against your Account will be posted to your Account in check number order, from lowest check number to highest check number. If a check number is not available, these checks will be posted to your Account after all other checks in that category that do have a check number are posted, and will be posted in order of the amount of the check, from lowest to highest. We generally post checks in the following category order: (i) checks payable from funds on deposit with us (sometimes referred to as "on-us" checks) presented to us for cash payment and (ii) other checks.

   b. <u>Notice Regarding Order of Posting</u>. The description of posting order above is intended to be representative of the most common types of transactions within each category, and other Items may be processed to your Account even if they are not specifically listed above. We may change the way we process and post transactions at any time regardless of any request or instruction you give us, and we may do so in our sole discretion and without notifying you.

9. **Deposits to Your Account.** The following terms apply to deposits and other credits to your Account:

   a. <u>Making Deposits</u>. You may make deposits in person at one of our branches, by mail or by any other means we make available to you. You are liable to us for all Items that we cash for you or accept for deposit to your Account.

   b. <u>Accepting Deposits</u>. You authorize us to accept all transfers, checks and other Items for deposit to your Account from anyone and at any time if they are made payable to you or to your order. We are not responsible for a deposit until we have received, verified and accepted it. We may refuse to accept all or any part of any deposit in our sole discretion at any time, even after we initially accept it, or we may impose conditions on any deposit. Any deposit receipts we issue are subject to our verification of the Items deposited.

EXHIBIT R

c.    Notice of Deposits. We will not have to notify you of any order, deduction or credit to your Account other than the
notice you receive in your statements.

d.    Your Warranties.  In addition to any other warranties you provide to us under applicable law or under the
Agreement regarding Items you deposit or cash, for each Item that you deposit or cash you warrant that:
1)    All signatures on the Item are authentic and authorized;
2)    You have the right to enforce the Item;
3)    The Item has not been changed or altered;
4)    The Item is valid; and
5)    There is no other claim or problem related to the Item.

e.    Collection Items.  We may handle checks and other paper Items as a "collection Item" instead of as a deposit.
This means that instead of accepting the Item for deposit into your Account, we will send the Item to the
issuer's bank for payment and credit your Account when we receive payment for the Item.    We may charge a
fee for this service.  If the collection Item is returned unpaid, we will return it to you.

f.    Check Cashing.  We may require you to deposit a check or other noncash Item payable to you into your
Account instead of cashing it.  If we cash a check or other noncash Item for you, we may put a Hold on your
Account for a corresponding amount until we collect it or until we are required to release the Hold under
applicable law.

g.    Crediting of Deposits.  All non-cash Items deposited to your Account are credited to your Account subject to
our receipt of final payment by the payor bank. When we receive final payment, the Item becomes a collected
Item.
1)    When you make a non-cash deposit and we credit your Account for that deposit, this credit is provisional
(temporary).  We may reverse or otherwise adjust any deposit or other credit we believe has been
erroneously made to your Account at any time and without prior notice to you.
2)    If any funds you deposit become "available" and you can withdraw the funds, this does not mean the Item
you've deposited is "good," has "cleared" or has been paid by the paying bank.  It is possible that the Item
will be returned unpaid months after the funds have been made available to you and you've withdrawn
them.  We cannot guarantee that an Item you deposit will not be returned and you will continue to be liable
to us for all deposited noncash Items before and even after we make the funds available to you.

h.    Returned Items.  This subsection applies to Items that you deposit or cash, including Items drawn on us as
well as Items drawn on other financial institutions.
1)    We have the right to charge back or otherwise debit your Account or other accounts you hold with us for
any deposited Item that is returned, even if you have made withdrawals against it.
2)    If we do not receive final payment or if any Item you have deposited or cashed is charged back to us for
any reason, we receive notice of or have reason to believe there is a claim or problem related to the Item
(for example, that the Item was altered, forged or unauthorized) or we are unable to collect the Item for
some other reason, you authorize us to do one or all of the following without prior notice and at any time:
(i) charge your Account or any other accounts you have with us for the amount of the returned Item, our
returned Item fee, any interest paid on that Item and any other fee we pay or incur; (ii) put a Hold on your
Account or any other accounts you have with us for the amount of the Item until we have resolved the
claim or problem; (iii) resubmit the Item for payment by any means or attempt to collect the Item by other
means; and (iv) pay any claim related to the Item.  Any resulting deductions or Holds will cause a
deduction to your Available Balance and may result in overdrafts.
3)    In connection with the return of an Item, we will have no duty to question the truth of facts that are being
asserted, to assess the timeliness of any claim or to assert any defense.
4)    If an Item to be charged back is lost in the process of collection or unavailable for return, we may rely upon
a photocopy of the Item or upon any other generally accepted notification of return of the Item, in charging
you for the amount of the returned Item.

i.    Direct Deposits.  If we allow direct deposit services for automatic preauthorized deposits to your Account of
Social Security payments, other government payments or automatic transfers from your other accounts with

EXHIBIT R

us, you must notify us at least thirty (30) days prior to the next scheduled direct deposit or preauthorized transfer. If you withdraw your deposit (and we deposit it) or if a service provider demands deposit, we must be returned to any government entity for any reason, you authorize us to deduct the amount from your Account as provided in the "Returned Items" section above.

Case 23-50096-djk    Doc 30-2    Filed 07/13/23    Entered 07/13/23 21:15:40    Desc
Plaintiffs Original Petition    Page 105 of 140

10. **Withdrawals From Your Account.**  The following terms apply to withdrawals from and other debits to your Account:

   a. <u>Making Withdrawals</u>.  You may make withdrawals from your Account in any manner that is permitted by us for the type of Account that you have opened.  We may subtract from your Account the amount of any debit Item that you or any authorized signer creates or approves.  When you ask for a withdrawal in person, we may require you to show identification or other evidence satisfactory to us proving that you are authorized to make withdrawals.  We do not have to ask questions of a person proving a withdrawal request with your signature, or investigate any request with your signature.

   b. <u>Notice of Withdrawals</u>.  Unless otherwise provided, we do not have to notify you of any withdrawal or transfer from your Account other than the notice you receive in your Statement.

   c. <u>Restrictions on Withdrawals</u>.  Withdrawals and transfers from your Account may be restricted as provided in the Agreement, in applicable Schedules or by applicable law. We do not have to allow you to make a withdrawal from your Account if your Available Balance is not sufficient to cover the full amount of the withdrawal. We also may refuse to allow a withdrawal if there is a dispute about the Account, the Account is subject to legal process, the Account has been pledged as collateral for a debt, the availability of the funds on deposit cannot be verified, any required documentation has not been presented or you fail to repay an obligation to us on time.

   d. <u>Electronic Check Conversion</u>.  You may authorize a merchant or other payee to make a one-time electronic payment from your Account using information from one of your checks to pay for purchases or pay bills. The merchant or other payee uses the check information, along with the transaction amount, to initiate an ACH debit transaction. The transaction is electronically transferred through the ACH system and the funds will be debited directly from your account and deposited automatically into the merchant or payee's account. When information from your check is used to make an electronic fund transfer, funds may be withdrawn from your account as soon as the same day you make your payment. A description of the transaction will appear on your Statement. Checks used in these types of transactions will not be included with your Statement or otherwise returned to you.

   e. <u>Checks Re-Presented Electronically</u>.  You may authorize a merchant to electronically re-present a check and collect a fee associated with a re-presentment of a check.  Checks re-presented electronically will not be included with your Statement or otherwise returned to you.

   f. <u>Remotely Created Checks</u>.  A "remotely created check" is not issued by the paying bank and does not contain the signature of the account owner (or a signature purported to be the signature of the account owner).  In place of a signature, the check usually has a statement that the owner authorized the check or has the owner's name typed or printed on the signature line.  You may not create or deposit a remotely created check unless specifically agreed to in writing by us.  Further, you warrant and agree to the following for every remotely created check we receive from you for deposit or collection:  (i) you have received express and verifiable authorization to create the check in the amount and to the payee that appears on the check; (ii) you will maintain proof of the authorization for at least two (2) years from the date of the authorization, and supply us the proof if we ask; and (iii) if a check is returned you owe us the amount of the check, regardless of when the check is returned. We may take funds from your Account to pay the amount you owe us, which will reduce your Available Balance and may result in overdrafts.

   g. <u>Pre-Authorized Drafts</u>.  If we are unable to enforce presentment and transfer warranties on remotely created checks under Regulation CC, then if you voluntarily give information about your Account (such as our routing number and your account number) to a party who is seeking to sell you goods or services, and you do not physically deliver a check to the party, any debit to your account initiated by the party to whom you gave the

EXHIBIT R

h.  <u>Non-Customer Check Cashing; Fee and Identification.</u>  If a person who is not a customer of ours presents a check drawn against your Account for payment over the counter, we may require identification that meets our standards (which may include a thumbprint or fingerprint from the person) and we may charge the person a service charge for cashing the check.  We may refuse to cash the check and we will have no liability to you for refusing to cash the check if: (i) the person attempting to cash the check refuses to comply with our identification standards or refuses to pay a service charge or (ii) we have reason to believe or we suspect that the person attempting to cash the check is not entitled to the funds or there is some other problem with the check.

i.  <u>Large Cash Withdrawals.</u>  We may place reasonable restrictions on the time and method of any large cash withdrawal, including by cashing a check.  This may include requiring advance notice before we allow such a withdrawal.  We may also impose other conditions for making large cash withdrawals, and we may refuse the cash withdrawal if you do not agree with these conditions.

j.  <u>Notice Requirements.</u>  Federal law requires us to retain the right to require you to give at least seven (7) days' notice in writing prior to any intended withdrawal from a savings, negotiable order of withdrawal ("NOW"), or money market account.  Although we usually pay withdrawals or checks without notice on these accounts, doing so does not mean that we give up this right.

**11. Funds Transfers.**  Unless otherwise provided by the Agreement or any separate agreement between you and us, the following terms apply to payment orders you give us for the transfer of funds out of your Account by wire transfer or otherwise, and payment orders we receive for the transfer of funds into your Account:

a.  <u>Rights and Obligations.</u>  Your and our rights and obligations with respect to funds transfers will be governed by: (i) any separate written agreement you have with us; (ii) this section; and (iii) to the extent not specified in a separate written agreement or this section, Article 4A of the Uniform Commercial Code ("UCC4A") as enacted in the state whose law governs this Agreement.  Payment orders sent by Fedwire will be subject to the Federal Reserve's Regulation J.  Payment orders sent via other payment systems will be subject to the rules of those systems.

b.  <u>Accepting Payment Orders.</u>  We reserve the right to refuse to accept any payment order.  We may process any payment or cancellation of a payment order that we believe is transmitted or authorized by you if we act in compliance with security procedures agreed upon by you and us in any separate agreement or otherwise.  Such payment orders will be deemed effective as if made by you, and you will be obligated to pay us the amount of such orders, even if they are not transmitted or authorized by you.  Unless we agree on another security procedure, you agree that we may confirm the authenticity and content of a payment order (among other ways) by placing a telephone call to you.  If we cannot reach you, or if the payment order is not confirmed or approved in the manner we require, we may refuse to execute the payment order.

c.  <u>Processing Payment Orders.</u>  If a payment order identifies a beneficiary by both name and an identifying number, and the name and number identify different persons or account holders, the payment order may be processed by any financial institution solely on the basis of the identifying number.  If a payment order identifies an intermediary bank or beneficiary bank by both name and an identifying number and the name and number identify different persons, the payment order may be processed by any financial institution solely on the basis of the identifying number.

d.  <u>Cancellation; Modification.</u>  Outgoing payment orders may not be amended or modified.  If the payment order involves a beneficiary bank located within the United States and is to be paid in U.S. dollars, it may be cancelled.  Other outgoing payment orders may not be cancelled.  We must receive your cancellation in a time and manner affording us reasonable opportunity to act on it prior to the time we process the payment order.

e.  <u>Wire and ACH Transactions.</u>  With respect to wire transfers or other electronic transfers of funds not governed by the Electronic Funds Transfer Act, you agree to enter into and comply with our wire transfer (if

EXHIBIT R

applicable) agreement and to comply with our security procedures and this section. Credit given by us to you with respect to an ACH or wholesale (wire) funds transfer entry is provisional until we receive final settlement for such entry through a Federal Reserve Bank. If we do not receive final settlement, we are entitled to a refund of the amount credited to your Account in connection with such entry, and the party (the originator of the entry) making payment to you via such entry will not be deemed to have paid you the amount of such entry. We do not have to notify you of any receipt of payments other than the notice you receive in your Statement, and we will not give next day notice to you of receipt of an ACH or wholesale (wire) funds transfer Item.

**12. Checks and Items.** The terms and conditions of this section may apply to checks and other Items that are drawn against your Account, Items that you cash or deposit or both.

a. <u>Endorsements.</u> An "endorsement" is a signature, stamp or other mark made on a check or other Item to transfer it to another person.

   1) An endorsement may be necessary for the transfer or negotiation of a non-cash Item you cash or deposit. If an endorsement is required, you must endorse (sign the back of) the Item. All checks and other non-cash Items deposited to your Account should be endorsed payable to the order of us for deposit only, followed by your signature and Account number. All endorsements must appear on the back of the check or other Item within the first 1-1/2 inches from the left side of the Item when looking at it from the front. Endorsements should be in blue or black ink.

   2) We may refuse to pay or cash any Item or accept any Item for deposit if we are unable to verify to our satisfaction that all of the necessary endorsements are present on the Item. We may, but are not required to, accept Items with non-conforming endorsements or that otherwise do not meet our endorsement requirements. We will not be liable to you for accepting such Items and you will be responsible for any loss incurred by us due to the return of the Item or any delay in processing the Item.

   3) If an Item is payable to more than one person, we may require such Items to be endorsed by all parties to whom the Items are payable. We may also require verification of any endorsement by a third party, through either an endorsement guarantee or personal identification.

   4) You authorize us to supply your endorsement to any of your Items we cash for you or accept for collection or deposit to your Account. You also authorize us to collect any Item that is payable to you but missing an endorsement, and agree that we do not have to supply your endorsement before collecting the Item.

b. <u>Review of Items and Signatures.</u>

   1) We may inspect some checks or other Items, but you agree that we are not required to do so. You recognize that we have adopted automated collection and payment procedures so that we can process the greatest volume of Items at the lowest possible cost to our customers. In light of this, you agree that we do not fail to exercise ordinary care in paying an Item solely because our procedures do not provide for the sight examination of Items with a face amount below an amount specified by us from time to time.

   2) If we inspect an Item drawn against your Account, we may use your Signature Card information in doing so. You authorize us to store and use Signature Card information in any reasonable form we deem necessary, including any digitized signature capture process. If we return an Item because we believe it did not match your Signature Card, we will not be liable to you even if the Item was actually authorized. We will have no liability to you if we fail to detect a forgery of your signature or an alternation of one of your Items if the forgery or alteration is such that a reasonable person could not reasonably be expected to detect it.

   3) We will have no responsibility for reviewing the number or combination of signatures on or with an Item drawn against your Account, even if you specify that more than one signature is required for Items drawn against your Account or you specify any other signature requirements. We will not be liable to you if an Item we process is contrary to any signature requirements you specify as long as the Item has at least one authorized signature.

   4) If the numeric amount on an Item drawn against your Account doesn't match an amount written out in words, we may select either one when paying that Item.

c. <u>Non-Handwritten Signatures.</u>

   1) A "non-handwritten signature" is any mechanically reproduced signature, including without limitation

EXHIBIT R

facsimile signatures or other form of mechanically reproduced signature (such as desktop publishing, digital or other computer software generated signatures).

2) If you authorize us to honor a non-handwritten signature, they will not be considered a forgery or an unauthorized signature and will be effective as your signature or endorsement whether or not you have been negligent

3) You agree you will have the sole responsibility for maintaining security of any non-handwritten signature and any device by which the non-handwritten signature is affixed. You will bear the entire risk for the unauthorized use of such non-handwritten signatures or device whether or not you are negligent.

4) You further agree to indemnify and hold us harmless from and against any and all loss, costs, damage, liability, or exposure (including reasonable attorney's fees) we or you may suffer or incur as a result of the unlawful use, unauthorized use, or misuse by any person of any such facsimile or mechanically reproduced signature or the device by which it is affixed. If you use any form of facsimile or mechanically reproduced signature device, you agree to deliver a sample to us if we request it.

d. <u>Check Legends and Notations</u>. We may disregard information on any Item other than the signature of the drawer, the identification of the drawee financial institution and payee, the amount, the endorsements, and any other information that appears on the magnetic ink character recognition ("MICR") line. We are not responsible to take action on, or for failure to notify you of, any "restrictions" (including without limitation legends, notations and other restrictive or conditional language such as "Void after 90 Days," "Paid in Full," "Void Over $100" or similar statements). We may pay any Item drawn against your Account regardless of any restrictions printed on it, unless we have agreed in writing to honor restrictions.

e. <u>Your Liability</u>. You are liable for all losses, claims, damages or expenses incurred by any person that cashes or accepts your Items for deposit due to a delay in the return of the Item which results from: (i) any restriction printed on the Item written against your Account; (ii) any material appearing on the back of the Item (including without limitation blacked out areas and printed or written text or numbers); or (iii) the condition of the Item when you issue it.

f. <u>Dates on Items</u>.

1) We reserve the right to pay or return Items drawn against your Account without notice to you and without any liability to you, regardless of whether an Item is "stale" (meaning that the Item bears a date more than six (6) months in the past) or the Item is not dated.

2) If you date a check in the future (referred to as a "postdated" check) and the check is presented for payment before the date of the check, we may pay it or return it unpaid. You agree that if we pay the check, the check will be posted to your Account on the date we pay the check, even though the posting date is prior to the date of the check. You further agree that we are not responsible for any loss to you if we pay the check. If we return a postdated check, we may return it to the presenter of it.

3) You may submit a request for us to not honor a postdated check (a "Postdating Request"). Unless otherwise provided by the Agreement, Postdating Requests will be treated as Stop Payment orders (see the section entitled "Stop Payments" for more details). You are responsible for revoking Postdating Requests once the check is no longer postdated.

g. <u>Substitute Checks and Electronic Files Pertaining to Original Checks</u>.

1) You will not cash or deposit any substitute check (a paper reproduction of an original check that meets the requirements of federal law and is suitable for automated processing by banks) or image documents intended as substitute checks that have not been previously endorsed by a bank.

2) If you cash or deposit a substitute check or a purported substitute check into your Account instead of an original check, you are liable for losses, costs and expenses we may pay or incur due to: (i) that substitute check not meeting applicable substitute check standards or (ii) duplicate payments associated with the Item.

h. <u>Image Copies</u>.

1) A financial institution on which a returned Item is drawn, also referred to as a "returning bank," may send us an electronic notice of return, an indemnified copy of the original Item, an image replacement document or an image (all of these referred to as an "image copy"). We may in our sole discretion receive the return

EXHIBIT R

of any Item you deposit or cash by Image Copy from the returning bank. You will be bound by an image copy just as if the original Item had been returned to you. If we receive the deposited cashier's or other paper Item, we may not be able to provide you the original Item to the person who request it.

2) We may in our sole discretion return any Item presented to us for payment from your Account by providing the Item to the returnee using an image copy of the Item or other form of electronic return.

i. <u>Foreign Items/Foreign Currency</u>. A "non-U.S. Item" is an Item that is drawn on a financial institution not chartered in the U.S. or that is payable in a foreign currency. We may, but are not required to, accept non-U.S. Items for deposit or collection. The Regulation CC Funds Availability Disclosure may not apply to any Non-U.S. Item we accept for deposit or collection. If we accept a non-U.S. Item for deposit or collection, the actual amount you receive will be determined using our exchange rate that's in effect when we're paid for the Item, and will be adjusted to reflect final exchange rate. You accept all risks associated with foreign currency fluctuation (exchange rate risk) and with any late return of the Item, and you will be responsible for any loss incurred by us as a result of our processing the Item. If a non-U.S. Item we accept for deposit or collection is returned later for any reason, we will charge your account at the applicable exchange rate in effect at the time of the return, which may be more or less than the exchange rate originally used for the deposit.

j. <u>Lost or Destroyed Items</u>.
1) We will not be liable for the loss or destruction of an Item or notice of nonpayment that is in transit or not in our possession.
2) If an Item you cash or deposit is lost or destroyed, you agree to cooperate with us in recreating it. If you fail to cooperate with us, we may at any time without notice to you reverse or otherwise adjust any credit made to your Account for the lost or destroyed Item.
3) If any Item you cash or deposit cannot be collected because it is lost or destroyed through no fault of ours: (i) we will have no responsibility to you for the actions or inactions of any collecting or returning back and (ii) we may deduct the amount of that Item from your Account and we may reverse any interest we paid in connection with the deposit.

13. **Stop Payments.** Subject to certain limitations, you may request us to stop payment ("Stop Payment") on checks and other Items written against your Account. To request a Stop Payment, you may do so in writing, in person, or by telephone. We may charge you a fee each time you request a Stop Payment order. Please refer to the applicable Schedule for more details.

a. <u>Content</u>. To be valid for each Item a Stop Payment order covers, the content of a Stop Payment order must include: (i) your name; (ii) the date of the Item; (iii) the Account number on which the Item is drawn; (iv) the exact amount of the Item; (v) the Item number (or range of numbers if applicable); (vi) the name of the payee; and (vii) any other information we request. We may, but are not required to, process a Stop Payment order using only a portion of this required content. We will not be liable for failing to honor a Stop Payment order if any of the information you provide that we rely upon in processing a Stop Payment order is incorrect or incomplete. A confirmation letter detailing your stop payment request will be sent to you. You must notify us immediately of any inaccuracies in the confirmation letter.

b. <u>Other Requirements</u>. A Stop Payment order will only be processed if we receive it in a time and manner giving us reasonable opportunity to act upon it before we pay, accept or otherwise become accountable for the Item(s) covered by it. Each Stop Payment order is subject to our verification that the Item described in the Stop Payment order has not been already paid.

c. <u>Effectiveness</u>. Unless otherwise provided, each valid Stop Payment order processed by us will expire six (6) months after the date you request the Stop Payment order. If you wish to revoke a Stop Payment order earlier than this, you must notify us of this in a time and manner that gives us reasonable opportunity to act. For ACH transactions, a Stop Payment order will expire at the earlier of (i) six (6) months; (ii) the return of the ACH entry Item to which the Stop Payment order relates or (iii) your revocation of the Stop Payment order pursuant to the Agreement. We may, but are not required to, pay any Item covered by a Stop Payment order after it expires, with no duty to notify you except for identifying the Item as paid on your Statement.

d. <u>Renewal</u>. You must renew a Stop Payment order if you do not want it to expire. A Stop Payment order may

EXHIBIT R

be renewed for an additional six (6) month period following the date it would otherwise expire if renewed while the Stop Payment Order is still effective. Each renewal is treated as an additional Stop Payment order.

Case 23-50096-rlj11 Doc 80-2 Filed 07/13/23 Entered 07/13/23 23:19:10 Desc
Plaintiffs Original Petition    Page 110 of 140

e.  <u>Limitations.</u>  You may not stop payment on an official bank check, certified check, cashier's check or teller's check issued by us or request us to Stop Payment on any Item if we have already paid, accepted or otherwise become accountable for the Item. In addition, you may not stop payment on Items governed by separate agreement, such as a check guaranty agreement. Further, you may stop payment on an Item after acceptance of the Item by us.

f.  <u>Liability to Payee.</u>  A Stop Payment order will not have any effect on any liability you might have to the payee of a check covered by the Stop Payment order or the payee's right to collect on that check or the transaction underlying it.

g.  <u>Items Paid Over Valid Stop Payment Orders.</u>  Unless otherwise provided, if we pay a check over a valid Stop Payment order, we will credit your Account for the amount of loss you prove has occurred or the face amount of the check, whichever is less. However, we will not be liable to you if we pay a check over a valid Stop Payment order and will not credit your Account if: (i) your Stop Payment order does not meet the requirements of this section; (ii) you cannot show to our reasonable satisfaction that you were not liable for payment of the check and were not otherwise required to pay the payee; (iii) you cannot show to our reasonable satisfaction that you did not benefit from our payment of the check or (iv) if we are not liable for paying the check under applicable law or we are required to pay the check under applicable law.

**14. Insufficient Funds and Overdrafts.**

a.  <u>Generally.</u>  "Insufficient funds" means that there are not enough funds in your Account to pay for a withdrawal or debit Item being presented against your Account. If there are insufficient funds in your Account to cover any withdrawal or debit Items presented against your Account, such Items will be handled in accordance with our overdraft procedures, including the procedures described by this section and possibly the discretionary "Overdraft Privilege" policy described in the following section, or in accordance with any other agreement you may have with us (such as an agreement for an overdraft protection program).

b.  <u>Determining Overdrafts.</u>  We may determine the funds available in your Account in connection with determining whether payment of an Item will create an overdraft at any time between the time we receive the Item and the deadline for us to take action on the Item. We are not required to make this determination more than one (1) time during this period. You should note that sometimes we authorize a transaction at a time when you have enough available funds to cover it, but because other transactions post before it and reduce your Available Balance, the transaction creates an overdraft when we post it to your Account. If we get a batch or multiple batches of Items in a day, and if one, some or all of them would overdraw your Account if paid, we will generally post Items in accordance with the procedures described in the "Posting" section. This may result in larger dollar Items being processed before small dollar Items, even though this would have the effect of reducing your Available Balance more quickly.

c.  <u>Our Options.</u>  You do not have the right to withdraw funds that exceed the funds available in your Account. When an Item will overdraw your Account and cause an overdraft, we can either pay the overdraft or return the Item. You have no right to choose which Items we pay or return. If we choose to pay one or more overdrafts, we are not obligated to cover any future overdrafts.

d.  <u>Fees.</u>  A service charge may be assessed on any Item that will overdraw your Account, regardless of whether we pay or return the Item. This is referred to as an "overdraft fee" if we pay the Item and a "returned Item fee" if we return the Item. An overdraft fee is assessed for each Item we pay that causes your Account to be overdrawn or while your Account is already overdrawn. Please refer to the applicable Schedule for more information about what fees will apply and how fees are calculated.

e.  <u>Avoiding Overdrafts.</u>  It is important to keep track of your Available Balance and to manage your funds responsibly by keeping track of transactions (including outstanding checks or debit transactions you have

EXHIBIT R

authorized). You can avoid fees for overdrafts and returned Items by making sure that your Account always contains enough available funds to cover all your transactions. If your Account balance includes some funds that are subject to a Hold, dispute or legal process, you should note that those funds are not available to cover your transactions.

f.  <u>Your Responsibility</u>.  You must promptly pay the amount of any overdraft or any other negative Account balance along with any applicable service charges.  You agree, immediately upon notice from us, to deposit funds into your Account sufficient to cover any overdraft plus applicable service charges, if required.  If you do not meet these obligations, we may charge you additional fees, close your Account, report you to a credit reporting agency or all of these.  You authorize us to use the funds from any subsequent deposit to your Account to pay any overdraft and resulting fees.

**15. Discretionary Overdraft Privilege Policy; Other Overdraft Protection.**

a.  <u>Applicability</u>.  As a general matter, the overdraft policies outlined in the section entitled "Insufficient Funds and Overdrafts" will apply when overdrafts occur on your Account.  The overdraft procedures and the other terms of the Agreement will control any possible conflict between any provision of this section relating to the "Overdraft Privilege" policy outlined below and the other term and conditions of the Agreement.

b.  <u>Overdraft Privilege</u>.  If your Account remains in good standing your Account will be eligible for Overdraft Privilege, an automated service for approving your overdrafts up to a pre-determined limit.  Keeping your account in "good standing" includes, at minimum: (i) making regular deposits consistent with your past practices; (ii) depositing an amount equal to the amount of discretionary overdraft privilege extended to you or more in your Account within each thirty (30) day period and bringing your account to a positive balance and maintaining that balance in a positive position for 24 hours within every thirty-five (35) day period; (iii) not being in default on any loan or other obligation to us; and (iv) not being subject to any legal or administrative order or other legal process.  For Overdraft Privilege, we will consider approving your reasonable overdrafts, limited to a maximum "overdraft privilege limit" of $750 Overdraft (negative) balance.  Overdraft Privilege will apply to your ATM and Card transactions unless you "opt out" of receiving overdraft coverage for such transactions.  If you do not wish to participate in Overdraft Privilege or wish to opt out of Overdraft Privilege for ATM and Card transactions, please contact your local branch.

c.  <u>Fees and Charges</u>.  Any and all applicable fees and charges, including overdraft fees and any interest charges (as set forth in the applicable Schedule) will continue to be charged to you and will be included in the overdraft privilege limit.  The total of the discretionary overdraft privilege (negative) balance, including any and all applicable fees and charges such as overdraft fees, are due and payable upon demand.

d.  <u>Discretionary Courtesy</u>.  Payment of reasonable overdrafts under the standard or full overdraft privilege is a discretionary courtesy and not a right or obligation.  It is within our sole discretion and we can cease either standard or full overdraft privilege at any time without notice and for any reason.

**16. Setoff and Security Interest.**  This section details some of our rights regarding debts owed by you to us.  The term "debts" includes all debts and liabilities owed by you to us, whether existing now or in the future, whether direct or contingent and whether joint or individual.  These debts include without limitation debts or fees arising from overdrafts, endorsements, guarantees, loans, attachments, garnishments, levies, attorneys' fees or other obligations or amounts you owe us.

a.  <u>Setoff and Recoupment</u>.  If you owe a debt to us, we will have the right to deduct funds from your Account and all your other accounts held with us without notice for all or part of the debt, unless applicable law requires otherwise.  This includes setoffs and any other deductions not considered setoffs but that are authorized under the Agreement, referred to as "recoupments."  Our right to deduct funds applies to any debts you owe to us, whether or not the debt is due at the time of the deduction.

b.  <u>Security Interest</u>.  You give us a lien on and security interest in your Account and all your other present or future accounts held with us to secure any debts you owe to us.  If you fail to pay any debt you owe to us when

EXHIBIT R

c.   Enforcement of Our Rights.  Our enforcement of our right to deduct funds from your Account or our lien and security interest in your Account will reduce your Available Balance and may result in interest penalties, early withdrawal charges or other fees to you or in overdrafts.

d.   Exceptions.  Our rights under this section do not apply: (i) to any IRA, HSA, Keogh plan or Trust Accounts or other tax-deferred retirement accounts; (ii) to transactions with us if we fail to provide any required disclosure of our rights under this section; or (iii) if our records show to our satisfaction that you own the Account in a representative capacity.

17. **Checking Accounts.**  If your Account is a checking account (meaning that it is an account you can write checks against), the following terms apply:

a.   Checking Sub-Accounts.

1)  We may establish on your behalf a transaction sub-account and a savings sub-account.
2)  All Account information will continue to be provided to you as if you had one Account, and this structure will not affect your Available Balance, service charges, FDIC insurance, interest earnings, your Statement or any other feature of your Account.
3)  We will allocate funds between the two sub-accounts as we consider appropriate.  When we receive debit Items payable from your Account, they will be charged against the transaction sub-account.  Funds not routinely needed to pay debits may be periodically transferred to the savings sub-account.  We will transfer funds from the savings sub-account back to the transaction sub-account as necessary to pay debit Items in excess of the balance in the transaction sub-account. The remainder of your balance will be maintained in the transaction sub-account. If interest is paid on your Account balance, the interest calculation will be the same for both the savings sub-account and the transaction sub-account. If interest is not paid on your account balance, the savings sub-account will be non-interest bearing.

b.   Checks.  Checks and other Item documents you use must be on forms obtained through or approved by us. You must comply with our specifications for such Items. We will not be liable for the untimely return of any Item you have issued or any presentment-related problem resulting from the failure of an Item to confirm in any respect to our specifications. We will not be responsible for losses that result from improper printing on documents we don't approve.  We may refuse to accept for deposit or pay checks in a form that we cannot process using our customary equipment.

18. **Savings and Money Market Accounts.**  If your account is an interest bearing account and is not a NOW account or time deposit, the following terms will apply:

a.   Limits on Transfers and Withdrawals.

1)  If your Account is a savings or money market deposit account, federal law requires that you may make no more than six (6) transfers and/or withdrawals during any one (1) calendar month or Statement cycle (the period from one Statement to the next) or similar period of at least four (4) weeks: (i) to another of your accounts with us or to a third party by means of a preauthorized or automatic transfer; (ii) by telephone (including fax) or online banking agreement, order or instruction; (iii) by check or draft (if you can write checks or drafts against your Account); (iv) by debit card (if we have issued a debit card for your Account); or (v) by similar order by you and payable to third parties.
2)  These limits do not apply to withdrawals from your Account: (i) to another of your accounts with us (if not by pre-authorized or automatic transfer); (ii) for purposes of repaying loans you have with us and related expenses; or (iii) if made by mail, messenger, at an ATM or in person.

b.   Excess Transactions. If you make withdrawals or transfers from your Account which exceed these limits we may: (i) close your Account and place the funds in it in another account that you are eligible to maintain (which may pay less or no interest); (ii) change your type of Account; or (iii) take away the transfer and draft capabilities of your Account.  We may also refuse to allow withdrawals or transfers that go over these limits

**EXHIBIT R**

and may charge you a fee for requesting those withdrawals or transfers.

**19. Interest.** If your Account earns interest, the following terms apply:

a. <u>Payment of Interest</u>. We will pay interest at the annual rate of interest ("Interest Rate") specified on the applicable Schedule we provide to you.  This Schedule sets forth the frequency of interest payments, the frequency of any compounding and crediting, the interest accrual basis, the balance on which interest will be paid and any minimum balance requirements; but does not reflect compounding.

b. <u>Minimum Balance Requirements</u>. The applicable Schedule may specify a minimum balance that you are required to maintain in your Account. If the minimum balance is not maintained during a specified period, we may decide, at our option, not to pay interest on your Account, to charge a fee for that period or both. You should review any minimum balance requirements on the applicable Schedule.

c. <u>Interest Rate</u>. The applicable Schedule will indicate the method used to calculate interest.  The initial Interest Rate is the current annual rate of interest that we will pay on the specified balance in your Account. We may pay interest at different rates, depending on the amount deposited and the type of depositor.  If your Account has a variable Interest Rate, we have the right to change the rates and fees in accordance with the terms of the Schedule, without limits and without notice.

d. <u>Interest Compounding and Crediting</u>. The applicable Schedule will indicate the interest compounding and crediting frequency for your Account (if any). Compounding generally means that interest is being accrued on earned interest. Interest may be compounded more frequently than interest is credited to your Account.

e. <u>Interest Accrual</u>.  Interest for your Account will begin to accrue on the business day we receive credit for your deposit.  For deposits made by cash or electronic fund transfers, interest begins to accrue on the business day of your deposit.  We may accrue interest on your Account more frequently than we pay or credit interest.

**20. Account Ownership.**  We may rely solely on our records to determine the form of ownership of your Account.   If the Owner of your Account is an entity and not a natural person, this entity is the Owner and not any agent acting on behalf of the Owner. We may presume that any person named in addition to you on our records for your Account owns the funds in your Account as a Co-Owner unless our records indicate that person is an authorized signer or has some other relationship to the Account.  The failure of a person identified in our records as an Owner or Co-Owner of your Account to sign a Signature Card (or other documentation) does not prevent us from treating such a person as an Owner or Co-Owner of your Account.  Each Owner of your Account is, acting alone, authorized to perform all the transactions available to your Account, including: (i) making deposits or withdrawals by whatever means available for your Account; (ii) obtaining and releasing information regarding your Account; (iii) signing or authenticating any document in connection with your Account; and (iv) designating authorized signers or otherwise giving rights to others to access your Account.

**21. Authorized Access.**

a. <u>Agents</u>.  An "agent" is any person authorized by the Owner(s) of your Account to act on behalf of the Owner(s) regarding the Account.  An agent includes without limitation: (i) any person listed on a Signature Card for your Account or in any resolution or certificate of authority as being authorized to act on behalf of the Owner(s) of the Account and other persons that you authorize to make withdrawals or transfers from your Account by whatever means the Agreement allows; (iv) any person to whom you make your unissued checks or other paper Items or Account number(s) available for purposes of transacting business on your Account; (v) any person to whom you make any access device or access information available; and (vi) any person appointed by a court or other administrative body of competent jurisdiction to act on your behalf or your estate's behalf concerning your Account.

b. <u>Powers of Agents</u>.  Agents for your Account may: (i) make deposits to your Account or withdrawals from your Account; (ii) get and release information concerning your Account; (iii) sign any Item or document concerning your Account; and (iv) change the ownership on your Account.



c. Designating Agents. Any Owner of the Account may designate authorized signers to act on the behalf of all Owners of the Account concerning the Account. This designation is effective:

1) We may require you to sign forms we approve or provide us with other legal documents acceptable to us for this designation to be effective.

2) We are not responsible for monitoring the actions of your agent or making sure the acts of your agent are for your benefit.

3) The powers you give your agent and any limitations on these powers are between you and your agent, even if we have express written notice of those powers. Unless otherwise provided by applicable law, all Owners of your Account will be liable for all actions of an agent concerning your Account, regardless of whether these actions exceeded the authority given to the agent or whether the agent is not approved by all Owners.

4) On any transactions involving the Account, we may rely on the instructions of any agent and you agree not to hold us responsible for any loss or damage you incur as a result of us following the instructions given to us by your agent.

d. Other Authorization. If you authorize any third person, such as a bookkeeping service, an employee or agent of yours, to retain possession of or prepare Items, you agree to assume full responsibility for any errors or wrongdoing performed or caused by such third person or any of its agents or employees.

e. Modification/Revocation. We may continue to recognize your designation of an agent or other authorization related to your Account until we have received written notice from you regarding the modification or revocation of this authorization and we have had reasonable time to act upon this notice.

## 22. Restricting Your Account; Legal Process.

a. Restricting Your Account. For any of the reasons outlined in this provision, we may "restrict" your Account, meaning that we may do any or all of the following: (i) put a "Hold" on all or part of the funds in your Account; (ii) refuse to accept deposits to your Account or process other credit transactions to your Account; (iii) remove all or part of the funds in your Account and hold them in a separate account that does not pay interest; (iv) close your Account; (v) pay part or all of the funds in your Account over to a court or other administrative body of competent jurisdiction; or (vi) require you to give us a liability bond. Unless otherwise provided by applicable law, we may restrict your Account for any reason provided by this section without advance notice to you and without any liability to you for doing so. If we restrict your Account, we will generally provide notice to you as soon as reasonably possible, though we may not provide advance notice if we believe that doing so could result in a security risk to us or the Owner(s) of the Account. If applicable law requires notice, we will provide it.

b. Legal Process. "Legal process" means any document that appears to have the force of law that requires us to place a Hold on, or pay out funds from, your Account. Legal process includes without limitation any garnishment, levy, government request for information, forfeiture, seizure, or other order from a court or government agency relating to your Account.

1) We may accept and act on any legal process we believe is valid, whether served in person, by mail or by electronic notification, with no liability to you for doing so. In acting on any legal process, or if we are not sure how your Account is affected by legal process, we may restrict your Account, including by putting a Hold on your Account until we determine who has the legal right to the funds in the Account (which may include requiring a court order telling us where to pay the funds).

2) Any legal process is subject to our security interest and right of setoff. Any fees or expenses we incur in responding to any legal process may be charged against your Account or any other account you hold with us. We may charge you a legal processing fee or charge you for costs or expenses we incur in complying with legal process as permitted by applicable law.

c. Legal or Administrative Proceeding. We may restrict your Account if it is involved in any legal or administrative proceeding or if we reasonably believe that doing so is necessary to avoid loss. If you file for bankruptcy or bankruptcy is filed against you, we may restrict your Account, including by putting a Hold on your Account or turning funds in your Account over to a bankruptcy trustee.

EXHIBIT R

d. <u>Adverse Claims or Disputes</u>. If any person makes a claim against funds in your Account or there is a dispute over matters such as the ownership of your Account or the authority to withdraw funds from your Account we may, without any liability to you, take one or more of the following actions: (i) restrict your Account until the claim or dispute is resolved to our satisfaction; (ii) continue to rely on the Signature Card(s) for your Account; or (iii) honor a claim upon our receipt of evidence satisfactory to us to justify the claim. We may charge your Account for expenses and fees we incur in taking these actions. If we are notified of a dispute, we do not have to decide if the dispute has merit before taking further action.

e. <u>Conflicting Instructions</u>. If we receive conflicting instructions from agents regarding the Account, we may place a Hold on the Account until such conflict is resolved to our satisfaction.

f. <u>Loss Prevention</u>. As part of our loss prevention program, when we suspect that irregular, unauthorized or unlawful activities may be involved with your Account, we may put a Hold on your Account pending an investigation of such suspected activities; or we may close your Account and open a new account.

g. <u>Requests for Information</u>. If we receive any subpoena, court order or request for information or documents relating to your Account from a governmental entity, we are authorized to comply with it.

23. **Systems and Software.** We will not be responsible to you for any loss or damages suffered by you as a result of the failure of systems and software used by you to interface with our systems or systems and software utilized by you to initiate or process banking transactions whether such transactions are initiated or processed directly with our systems or through a third party service provider. You are solely responsible for the adequacy of systems and software utilized by you to process banking transactions and the ability of such systems and software to do so accurately.

24. **Account Information.**

a. <u>Statements</u>. We will from time to time provide you with Statements. Unless otherwise provided, we will send Statements monthly. You must notify us in writing within thirty (30) days if you do not receive a scheduled Statement.

b. <u>Communications</u>. We will from time to time provide to you other information related to your Account, which may include disclosures, notices, messages and other information or data relating to the Agreement or your Account (together these are referred to as "Communications" or a "Communication").

c. <u>Delivery</u>. Depending on the type of account, we will send you Statements to your Mailing Address or provide you access to electronic Statements. You are responsible for notifying us of your correct Mailing Address or e-mail address and updating us of any changes to either. We will provide Communications to you by sending them separately to your Mailing Address, including them with a Statement or, if authorized, via electronic communication. We will be considered to have delivered Statements and Communications we mail to you as of the second business day following the day a Statement or Communication was mailed to your Mailing Address or as of the first business day following the day a Statement or Communication was sent to you via electronic communication.

d. <u>Your Responsibility to Review</u>. You are responsible for promptly and carefully reviewing all Statements or Communications we provide to you (together referred to as "Account Information") and for reporting any transactions that were not authorized by you ("Unauthorized Transactions") or errors reflected by Account Information to us. Account Information will be considered to correctly reflect your transactions, such as deposits, withdrawals, refunds, imposition of fees, interest or dividends, and other debits and credits to your Account, unless you notify us in writing within the time limits provided in the Agreement. Please refer to the section entitled "Unauthorized Transactions and Errors" for more details regarding the time limits and procedures for notifying us of Unauthorized Transactions and errors and other related provisions.

e. <u>Changing Your Address</u>. You must notify us of any change in your Mailing Address. We may act on any instruction to change your Mailing Address from any person we reasonably believe is acting on your behalf.

**EXHIBIT R**

We will act on instructions to change your Mailing Address within a reasonable time after we receive such instructions. We may act on a change of address if we receive an address change notification from the U.S. Postal Service, or if we receive information in our business records that provides corrected address information.

f. <u>Combined Statements</u>. If you have multiple Accounts with us under the same name, your Statements for these Accounts will be automatically combined into a single Statement.

g. <u>Returned and Unclaimed Account Information</u>. Unless otherwise provided by applicable law:
   1) *Returned Account Information.* If Account Information sent to you is returned as undeliverable, we may discontinue mailing Account Information to you until you provide a valid address to us, though they will be considered available to you on the day they are made available. We may destroy any Statements or Communications that are sent to you and returned as undeliverable.
   2) *Unclaimed Account Information.* If you have requested us to hold your Account Information for pickup, it will be considered as delivered to you on the day they are made available. If we hold your Account Information for pickup and you do not claim it within ten (10) days of it being made available, we may send it to your Mailing Address or destroy it.

25. **Lost or Stolen Items.** If any of your unissued checks have been lost or stolen, or someone is issuing unauthorized paper Items against your Account, or unauthorized Items occur against your Account, you must immediately notify us of this in writing. If we become aware of or we suspect any such problem, we may take one or more of the following actions: (i) close your Account and open a new account or (ii) dishonor any check you indicate or we believe may have been lost or stolen or pay such a check provided that you have instructed us to pay it (and given us the number of that check). Unless otherwise provided by applicable law, you will be liable for any losses that result from your failure to use ordinary care in safeguarding your unissued checks.

26. **Unauthorized Transactions and Errors.** This section contains general provisions regarding Unauthorized Transactions and errors related to your Account.

a. <u>Reporting Unauthorized Transactions or Errors</u>.
   1) You must notify us in writing within thirty (30) days after a Statement is made available to you if the Statement lists or indicates any Unauthorized Transactions or errors. This includes without limitation: (i) an Item that you did not authorize or that is altered; (ii) any encoding errors; or (iii) any other errors involving additions or subtractions (debits or credits) to your Account.
   2) You must notify us in writing of any unauthorized, improper or missing endorsements on Items within six (6) months after a Statement reflecting this is made available to you.
   3) You must notify us in writing of an altered or forged Item within thirty (30) calendar days after the Item or a Statement reflecting this is made available to you.

b. <u>Notification</u>. You must submit written notices required by this section in affidavit form if requested by us.

c. <u>Investigation</u>. We will investigate any Unauthorized Transactions or errors you report to us. You must provide us with all information we need to investigate an alleged Unauthorized Transaction or error. You must also file any police reports and provide any supporting affidavits and testimony we reasonably request.

d. <u>Failure to Notify</u>. Unless otherwise provided by the Agreement or applicable law: (i) we will not be liable to you for any Unauthorized Transaction or error if you do not notify us within the required period of time, and in such cases we will not be required to reimburse you for any related loss to you; (ii) we will not be liable to you for any Unauthorized Transactions committed by the same person on your Account that could have been prevented if you had complied with your obligations for notifying us of Unauthorized Transactions; and (iii) if you fail to notify us of an altered or forged Item or signature within the required period of time, we will not be liable for any subsequent Items we pay in good faith which contain an unauthorized signature or alternation by the same person unless you notify us within ten (10) calendar days after the first altered or forged Item or a Statement reflecting this is made available to you.

e. <u>Credits to Your Account</u>. We may, but are not required to, provisionally (temporarily) credit your Account

**EXHIBIT R**

during our investigation regarding an Unauthorized Transaction or error for all or a portion of the amount claimed; we may determine this could be (i) you did not submit or provide documents required; (ii) you fail to cooperate fully with our investigation or make reasonable efforts to recover funds related to the claim; or (iii) we determine that the transaction that gave rise to the claim was proper.

    f.   Adjustments. If you or we (or both of us together) make an error on your Account, we may fix that error without first notifying you, including without limitation when the amount of one of your Items is paid for the incorrect amount, a deposit to your Account is added incorrectly or we apply a deposit to the wrong account.

**27. Protection Against Fraud and Unauthorized Items.** It is your responsibility to protect: (i) your Account Information, Account number(s) and other information related to your Account; (ii) any access device we provide for your Account (such as a debit card) or equipment that may allow access to your Account; and (iii) your checks and other paper Items. An unauthorized person's access to your Account number may alone be sufficient to allow that person to initiate Unauthorized Transactions.

    a.   Risk of Loss and Controlling Risk. You acknowledge that there is a growing risk of losses resulting from unauthorized Items. We offer services that help control the risk from unauthorized Items. These services include: (i) Positive Pay and Account Reconciliation Services and (ii) ACH Fraud Filters. Additionally, we strongly recommend that you impose a dual-control environment, maintain up-to-date virus protection software and firewalls, update employee access when employment is terminated or an employee is reassigned, and use a stand-alone personal computer for all online banking and ACH origination activity.

    b.   Assumption of Risk. If we have expressly recommended that you implement one or more of the services or controls listed above (or any other service or control related to fraud prevention that we offer after the date of the Agreement) and you either decide not to use the recommended service or fail to use the recommended service in accordance with the applicable service description or other documentation applicable to the service, you will be treated as having assumed the risk of any losses that could have been prevented if you had used the recommended service in accordance with the applicable service description or applicable documentation. As a result:

        1)   You will be precluded from asserting any claims against us with respect to any unauthorized, altered, counterfeit, or to other fraudulent transactions occurring in your accounts that the product or service was designed to detect or deter.
        2)   We will not be required to re-credit your Account or otherwise have any liability for such transactions.
        3)   You will indemnify us for any loss or expense (including, without limitation, reasonable attorney's fees to the extent permitted by law) relating in any way to such transactions, so long as we otherwise satisfied our duty of care with respect to the other aspects of such transactions.

**28. Standard of Care; Liability.** For the purposes of this section, "we," "our" and "us" includes us and our affiliates, officers, directors, employees and agents.

    a.   Standard of Care. We will exercise ordinary care in meeting our obligations under the Agreement. "Ordinary care" requires only that we follow standards that do not vary unreasonably from the general standards followed by similar situated banks.

    b.   Acts Beyond Our Control. Neither you or we will be deemed to be in default of any of the obligations required to be performed under the Agreement if performance is delayed, hindered or becomes impossible because of acts beyond your or our control (including without limitation any act of God, natural disasters, accident, equipment failure, system failure, labor dispute, the potential violation of any guideline, rule or regulation of any government authority or the failure of any third party to provide any service used in connection with providing services to you under the Agreement).

    c.   Our Liability. We are responsible for processing your Items and transactions concerning your Account using customary banking practices. If we make a mistake in processing Items or transactions and charge you more than we should have, or failed to give you credit you were due, we will correct the error as long as you give us sufficient and timely notice and an opportunity to fix it. However, we will not be liable in any event for losses or

EXHIBIT R

damages in excess of the amount of the transaction (the "face amount").

Case 23-50096-rlj12   Doc 30-2   Filed 07/13/23   Entered 07/13/23 21:19:40   Desc
Plaintiffs Original Petition   Page 118 of 140

d.  <u>Limitation of Liability</u>.  Unless otherwise provided by applicable law, we will not be liable for:

1)  Errors that do not result in a financial loss to you.
2)  Any losses that result from our use of customary banking practices or for any losses provided that we have acted in good faith and with ordinary care.
3)  Any action we are authorized or permitted to take by the Agreement (including without limitation making deductions to your Account or putting a Hold on your Account), even if this results in your account having insufficient funds or causes an overdraft or otherwise causes you to incur fees, expenses or damages.
4)  Your misconduct, errors or negligence or an act or failure to act of any person not directly within our control.
5)  Anything we do in following your instructions (or those of your agents), or for not following such instructions if we reasonably believe that this would expose us to potential loss or civil or criminal liability, or conflict with customary banking practices.

e.  <u>Limitation on Damages</u>.  IN CONNECTION WITH YOUR ACCOUNT AND THE AGREEMENT, WE WILL NOT BE LIABLE FOR INDIRECT, SPECIAL, CONSEQUENTIAL OR PUNITIVE DAMAGES REGARDLESS OF THE FORM OF ACTION AND EVEN IF YOU OR WE HAVE BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES.  This limitation will not apply where expressly prohibited by applicable law.

29. **Indemnification.**  For the purposes of this section, "we," "our" and "us" includes us and our affiliates, officers, directors, employees and agents.  Except to the extent that we fail to exercise ordinary care or we breach the Agreement, and to the extent permitted by applicable law, you agree to indemnify us and hold us harmless from all claims, demands, losses, liabilities, judgments and expenses (including attorney fees and legal expenses) arising out of or in any way connected with: (i) the Agreement and performance under the Agreement and (ii) services we provide to you under the Agreement or pursuant to your instructions (or those of your agents).   This section will survive the closing of your Account and the termination of the Agreement.

30. **Changes to the Agreement.**

a.  <u>Our Right to Change the Agreement</u>.  The terms and conditions of the Agreement may be changed by us from time to time (each constituting a "Change").  We may make Changes by adding, modifying or deleting terms and conditions of the Agreement.  Changes we make may include without limitation changes to rates, fees, and charges associated with your Account and features of your Account.

b.  <u>Notice of Changes</u>.  We will notify you of Change as provided by the Agreement and as required by applicable law.  Unless otherwise provided, notice of any Change will be given to you at least thirty (30) days before the effective date of the change applies, though the Agreement may be changed without notice to you and effective immediately if necessary to comply with any applicable law or regulation.  If any other federal or state law requires a longer notice period, we will comply with that requirement.  Notice of any Change will be deemed to have been given to and received by you on the third business day after notice of the Change was provided or made available to you.  Your continued use of Account after the effective date of any Change will constitute your acceptance of that Change.

c.  <u>Application of Changes</u>.  Unless otherwise provided by law, Changes to the Agreement will apply only to transactions that occur, or claims that arise, after the Changes become effective.

31. **Account Changes.**  We may convert your Account to another type of deposit account offered by us at any time subject to any notice required by applicable law.  If you have a high volume of activity, inappropriate activity or a negative balance or if we stop offering the type of Account you have, we may convert your Account to another type of account designed to accommodate your needs.  We will provide information about any new account we open for you when we convert your Account.

32. **Closing Your Account.**

a.  <u>Our Right to Close</u>.  At any time for Accounts that are not Time Deposits and on any maturity date for

EXHIBIT R

Accounts that are Time Deposits we may close your Account or temporarily stop a service related to your Account for any reason and without notifying you in advance, unless otherwise required by applicable law. We will provide written notice to you within three (3) business days after we terminate your Account relationship for any reason other than abuse of the account relationship or to prevent a loss, either separately or enclosed with a Statement. You agree that advance written notice from us will be reasonable if it is mailed to your Mailing Address immediately upon Account closure. You agree that in instances of account abuse or to prevent a loss, notice is reasonably given by us if mailed immediately upon Account closure. We may require you to close your Account and to open a new account if: (i) there is a change in authorized signers; (ii) there has been a forgery or fraud reported or committed involving your Account; (iii) any Account checks are lost or stolen; (iv) you have too many transfers from your Account; or (v) any other provision of our Agreement with you is violated.

b.  <u>Your Right to Close</u>.  You may close your Account for any reason at any time by: (i) giving us written notice or (ii) submitting a request at any of our branches.  Transferring all the money in your Account or reducing the balance in your Account to $0.00 will not necessarily close your Account and may result in additional fees charged to your Account.

c.  <u>Our Obligations After Closing</u>.  After your Account is closed: (i) we will not pay further interest on the Account (if your Account pays interest); (ii) we will have no obligation to accept deposits or pay any outstanding checks or other debit Items (and you agree to hold us harmless for refusing to honor any check or other debit Item drawn on a closed Account), even if we receive or accept deposits intended for your Account after it is closed; and (iii) we may return any deposits we receive via ACH transaction to the sender.

d.  <u>Your Obligations After Closing</u>.  You agree that you will not attempt to make any further deposits or authorize any further debits to your Account once it is closed.  After your Account is closed, you will remain liable for: (i) any fees or other obligations incurred prior to the date your Account is closed; (ii) any fees assessed by us in the process of closing your Account; or (iii) your responsibility to maintain sufficient funds in your Account to cover any outstanding checks or other debit Items.  If an Item is submitted to us for payment after your Account is closed and we pay the Item, you will be liable to us for the amount of the Item.

e.  <u>Recurring Transactions</u>.  If you have made arrangements with a third party for recurring transactions to your Account (whether in the form of credits or debits), you must notify this third party to stop these transactions once your Account is closed.  We may receive funds or other credit transactions intended for your Account after it is closed, but this does not mean your Account is "open."  We will have no liability to you if you do not receive any regularly scheduled deposit or if a regularly scheduled payment is not made for you due to your failure to notify that party in a timely fashion of your Account closure.

f.  <u>Returning Your Account Balance</u>.  The balance remaining in your Account after it is closed will be returned to you, subject to the following conditions: (i) we may hold any remaining Account balance until you claim it and we determine you are entitled to receive it, except as provided by applicable state law governing unclaimed property and (ii) any fees, claims, setoffs or other amounts will be subtracted from your Account balance before we return it to you.  To return your Account balance, we may mail you a Cashier's Check for the applicable remaining Account balance.  Your returned Account balance will be sent to your last known Mailing Address.

g.  <u>Interest</u>.  If your Account is an interest bearing account and is closed, there may be accrued interest that has been calculated but not credited to your Account, referred to as "accrued unpaid interest."  If there is accrued unpaid interest, we will pay you that interest UNLESS we have told you otherwise.

h.  <u>Reopening Your Account</u>.  We may, but are not required to, reopen your closed Account if we receive a deposit to the Account.

## 33. Dormant/Abandoned Accounts.

a.  <u>Dormant</u>.  A "dormant" is an account that has been inactive.  Subject to applicable state law, "inactive" means that there has been no deposit or withdrawal to your Account or other communication from you about your

EXHIBIT R

Account for an extended period of time. If your Account is inactive and we have been unable to contact you, your Account may be classified by us as "dormant" subject to applicable law. If we classify your Account as dormant we may charge the dormant account fee provided by any applicable Schedule and we may continue charging other fees applicable to your Account, and the Account may be presumed as abandoned.

b. <u>Abandoned</u>. State law governs when your Account is considered "abandoned." Your account may be considered abandoned if you do not take certain actions within a specified period of time, as determined by applicable state law. In accordance with applicable state law, funds in abandoned accounts will be remitted to the custody of the applicable state agency, also referred to as "escheat." If we escheat the funds in your Account, we will close your Account. We will not be liable for funds after we escheat them, and to recover funds escheated to a state you must file a claim with that state. Unless otherwise provided by applicable law, we may charge you an abandoned account fee.

c. <u>Statements</u>. We reserve the right not to send Statements on Accounts that are dormant or abandoned, subject to applicable law.

**34. Resolving Claims.** In this section, "Claim" means any claim, dispute or controversy by either you or us against the other, or against the employees or agents of the other, arising from or relating in any way to this Agreement or the deposit relationship between us. Provisions in this section limit your rights to a jury trial. You should review this section carefully.

a. <u>WAIVER OF JURY TRIAL</u>. YOU AND WE AGREE TO WAIVE ANY RIGHT TO HAVE A JURY PARTICIPATE IN THE RESOLUTION OF ANY DISPUTE OR CLAIM, TO THE EXTENT ALLOWABLE UNDER THE LAWS OF THE STATE THAT GOVERN THIS AGREEMENT.

b. <u>Jurisdiction and Venue</u>. Any action or proceeding regarding your Account or this Agreement must be brought in a court of competent jurisdiction located in the state whose law governs this Agreement. You and we submit to the personal jurisdiction of any such court and waive the right to claim that it is an inconvenient forum.

**35. Governing Law.** The Agreement shall be governed by and construed in accordance with all applicable federal laws and all applicable substantive laws of Texas, the state in which our main office is located. In addition, we are subject to certain federal and state regulations and applicable clearing house and Federal Reserve rules and regulations governing the subject matter of the Agreement. You understand that we must comply with these laws, regulations and rules. You agree that if there is any inconsistency between the terms of the Agreement and any applicable law, regulation, or rule, the terms of the Agreement will prevail to the extent any such law, regulation, or rule may be modified by agreement.

**36. Assignability.** In this section, "transfer" means to sell, assign or pledge your Account, give a lien or security interest in your Account or otherwise transfer your Account or a portion of your Account to another person. You may not transfer your Account to anyone other than us except with our written consent. If you transfer this Account without our written consent, that transfer will not be valid or binding on us. Any pledge of your Account we approve remains subject to any right we have under the Agreement and applicable state and federal law. If you request to transfer ownership of your Account, we may require the Account be closed and a new account opened in the name of the transferee or pledgee. We may prevent you from withdrawing or transferring funds from your Account if you transfer your Account to another person.

**37. Additional Terms.**

a. <u>Entire Agreement</u>. The Agreement constitutes the entire agreement between you and us regarding your Account and supersedes any prior oral or written representations, conditions, warranties, understandings, proposals or agreements regarding your Account.

b. <u>Monitoring</u>. You understand that supervisory personnel may randomly monitor customer service telephone conversations to ensure that you receive accurate, courteous, and fair treatment. In addition, we may monitor, record and retain telephone conversations, electronic messages and other data transmissions between you

EXHIBIT R

and us at any time and without notice, unless applicable law requires otherwise. We will have no liability for doing or failing to do so.

Case 23-50096-rlj12    Doc 30-2    Filed 07/13/23    Entered 07/13/23 21:19:40    Desc
Plaintiffs Original Petition    Page 121 of 140

c.  <u>Illegal Activities</u>.  You agree to comply with all applicable laws and regulations, including without limitation economic sanctions laws and regulations issued by the Office of Foreign Assets Control of the U.S. Department of the Treasury.  You agree not to use your Account for any illegal activity, including without limitation unlawful internet gambling or the purchase of goods or services in violation of the law.  We may refuse any gambling transaction, whether lawful or not.  We may also refuse any transaction that we reasonably believe may involve illegal or suspicious activity.  If we suspect that you or anyone else is using your Account for illegal activities, we may close your Account, put a Hold on your Account and any other accounts you have with us or both without notifying you in advance, unless otherwise required by applicable law.

d.  <u>Third Party Beneficiary</u>.  No person will be deemed to be a third party beneficiary under the Agreement.

e.  <u>Survival</u>. The applicable terms of the Agreement continue in effect after we or you close your Account or after this Agreement is terminated.

f.  <u>Severability</u>.  If a court finds any provision of the Agreement to be invalid or unenforceable, such finding shall not make the rest of the Agreement invalid or unenforceable. If feasible, any such offending provision shall be deemed to be modified to be within the limits of enforceability or validity; however, if the offending provision cannot be so modified, it will be stricken from the Agreement and all other provisions of the Agreement in all other respects will remain valid and enforceable.

g.  <u>Waiver</u>.  You agree that we may waive, in our sole discretion, any fee, charge, term or condition set forth in the Agreement at the time the Account is opened or any time afterwards, on a one-time basis or for any period or duration, without changing the terms of the Agreement or your obligation to be bound by the Agreement. Doing so will not obligate us to provide similar waivers in the future or waive our rights to enforce the terms of the Agreement.

h.  <u>No Waiver</u>.  If we fail to exercise any of our rights under the Agreement, that failure will not waive that right or any other right, and we may still enforce all of our rights in the future.

i.  <u>Conflicts</u>.  If the Agreement conflicts with any statements made by one of our employees or agents, the Agreement will control.

j.  <u>Captions and Headings</u>.  Captions, headings and subheadings used in the Agreement are only for reference purposes and are not intended to limit the meaning or scope of the terms and conditions of the Agreement.

k.  <u>English Language</u>. English is the controlling language of the Agreement.  We may translate the Agreement or any documents or materials related to it into another language for the purposes of convenience.  However, if there is a discrepancy between English language materials and materials in another language, the English language version is controlling unless applicable law provides otherwise.

l.  <u>Fiduciary Relationship</u>.  Our relationship to you concerning your Account is that of debtor and creditor.  No fiduciary, quasi-fiduciary or special relationship exists between you and us.

EXHIBIT R

# Regulation CC Funds Availability Disclosure

This Regulation CC Disclosure is applicable to the following member banks of Heartland Financial USA, INC: Arizona Bank & Trust, Bank of Blue Valley, Citywide Banks, Dubuque Bank and Trust, First Bank & Trust, Illinois Bank & Trust, Minnesota Bank & Trust, New Mexico Bank & Trust, Premier Valley Bank, Rocky Mountain Bank and Wisconsin Bank & Trust and will be referred to as WE or Member Bank.

**YOUR ABILITY TO WITHDRAW FUNDS AT THE MEMBER BANK.** Our policy is to make funds from your cash and check deposits available to you on the first business day after the day we receive your deposit. Funds from electronic direct deposits will be available on the day we receive the deposit. Once the funds are available, you can withdraw them in cash and/or we will use them to pay checks that you have written. For determining the availability of your deposits, every day is a business day, except Saturdays, Sundays, and federal holidays. We do not have deposit cutoff times established for our branches; rather we will accept deposits until closing.

If you make a deposit on a day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit after the bank is closed or on a day, we are not open, we will consider that the deposit was made on the next business day we are open.

**Reservation of Right to Hold.** In some cases, we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the second business day after the day of your deposit. The first $225 of your deposit, however, may be available on the first business day after the day of your deposit. If we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the business day after the day we receive your deposit. If you need the funds from a deposit right away, you should ask us when the funds will be available.

**Holds on Other Funds.** If we cash a check for you that is drawn on another financial institution, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it. If we accept for deposit a check that is drawn on another financial institution, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the time periods that are described elsewhere in this disclosure for the type of check that you deposited.

**Longer Delays May Apply.** The Member Bank reserves the right to delay your ability to withdraw funds deposited by check into your account for an additional number of days under certain circumstances. If we choose to take this action, we will notify you of the delay and we will tell you when funds will be available. Generally, funds will be available no later than the seventh business day after the day of deposit. We may impose these longer delays for any of the following reasons:

- You deposit checks totaling more than $5,525 on any one day.
- You redeposit a check that was previously returned unpaid.
- You have overdrawn your account repeatedly in the last six months.
- We believe a check you deposit will not be paid.
- There is an emergency, such as a failure of computer or communications equipment.

**Special Rules for New Accounts.** If you are a new customer, the following special rules apply during the first 30 calendar days your account is open:

Funds from electronic direct deposits to your account will be available the day we receive the deposit. Funds from deposits of cash, wire transfers, and the first $5,525 of a day's total deposits of cashier's, certified, teller's, traveler's, and federal, state, and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions (e.g. the checks must be payable to you). The excess over $5,525 will be available on the seventh business day after the day of deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,525 will not be available until the second business day after the day of your deposit.

Funds from deposits of checks drawn on your Member bank will be available on the second business day after the day of your deposit.

Funds from all other check deposits will be available not later than the seventh business day after the day of deposit.

**Deposits at Automatic Teller Machines.** Deposit services may not be available at all terminals.

- For deposits (cash and checks) made at ATMs owned or operated by your Member bank, the first $225 of your deposit will be available immediately. The portion of your deposit over $225 will be available on the first business day after the day of your deposit, unless it is subject to one of the exceptions mentioned above. ATMs owned or operated by your Member bank will be labeled as such.
- For deposits (cash and checks) made at a non-proprietary ATM (i.e. an ATM not owned or operated by your Member bank) the funds will be available the next business day, unless it is subject to one of the exceptions mentioned above. This rule does not apply to ATMs owned or operated by your Member bank.

MEMBER FDIC


EXHIBIT R

**Substitute Check Policy Disclosure**

**What is a substitute check?**

To make check processing faster, federal law permits banks to replace original checks with "substitute checks." These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute checks states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

Some or all of the checks you receive back from us may be substitute checks. This notice describes rights you have when you receive substitute checks from us. The rights in this notice do not apply to original checks or to electronic debits to your account. However, you have rights under other law with respect to those transactions.

**What are my rights regarding substitute checks?**

In certain cases, federal law provides a special procedure that allows you to request a refund for losses you suffer if a substitute check is posted to your account (for example, if you think that we withdrew the wrong amount from your account or that we withdrew money from you account more than once for the same check). The losses you may attempt to recover under this procedure may include the amount that was withdrawn from your account and fees that were charged as a result of the withdrawal (for example, bounced check fees).

The amount of your refund under this procedure is limited to the amount of your loss or the amount of the substitute check, whichever is less. You also are entitled to interest on the amount of your refund if your account is an interest-bearing account. If your loss exceeds the amount of the substitute check, you may be able to recover additional amounts under other law.

If you use this procedure, you may receive up to $2,500.00 of your refund (plus interest if your account earns interest) within 10 business days after we received your claim and the remainder of your refund (plus interest if your account earns interest) not later than 45 calendar days after we received your claim.

We may reverse the refund (including any interest on the refund) if we later are able to demonstrate that the substitute check was correctly posted to your account.

**How do I make a claim for a refund?**

If you believe that you have suffered a loss relating to a substitute check that you received and that was posted to your account, please contact your Member bank at the contact information listed below:

| Local Bank | Phone | Address | City | State | Zip |
|---|---|---|---|---|---|
| Arizona Bank & Trust | 877-280-1857 | 2063 East Camelback Road | Phoenix | AZ | 85016 |
| Bank of Blue Valley | 877-280-1862 | 11935 Riley Street | Overland Park | KS | 66213 |
| Citywide Banks | 877-280-1859 | 1800 Larimer St., Suite 100 | Denver | CO | 80202-1404 |
| Dubuque Bank & Trust | 877-280-1851 | 1398 Central Avenue PO Box 778 | Dubuque | IA | 52004-0778 |
| First Bank & Trust | 877-280-1864 | 9816 Slide Road | Lubbock | TX | 79424 |
| Illinois Bank & Trust | 877-280-1853 | 6855 East Riverside Blvd. PO Box 15400 | Rockford | IL | 61114 |
| Minnesota Bank & Trust | 877-280-1860 | 7701 France Ave S., Suite 110 | Edina | MN | 55435 |
| New Mexico Bank & Trust | 877-280-1856 | 320 Gold SW, Suite 100 PO Box 1048 | Albuquerque | NM | 87102 |
| Premier Valley Bank | 877-280-1863 | 255 E. River Park Circle Dr., Suite 180 | Fresno | CA | 93720 |
| Rocky Mountain Bank | 877-280-1858 | 2615 King Ave W. | Billings | MT | 59102 |
| Wisconsin Bank & Trust | 877-280-1855 | 119 Junction Rd. | Madison | WI | 53717 |

You must contact the Bank within 40 calendar days of the date that we mailed (or otherwise delivered by a means to which you agreed) the substitute check in question or the account statement showing that the substitute check was posted to your account, whichever is later. We will extend this time period if you were not able to make a timely claim because of extraordinary circumstances.

Your claim must include:
- A description of why you suffered a loss (for example, you think the amount withdrawn was incorrect);
- An estimate of the amount of your loss;
- An explanation of why the substitute check you received is insufficient to confirm that you suffered a loss; and
- A copy of the substitute check.

MEMBER FDIC

EXHIBIT R

# EXHIBIT 2

IN THE _____ JUDICIAL DISTRICT COURT
DEAF SMITH COUNTY, TEXAS

| | | |
|---|---|---|
| AGTEXAS FARM CREDIT SERVICES,<br>AGTEXAS, PCA<br>THORLAKSON DIAMOND T FEEDERS, LP | §<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | |
| v. | §<br>§ | CAUSE NO. _____ |
| MCCLAIN FEED YARD, INC,<br>7M CATTLE FEEDERS, INC. and<br>CHELSEA WALTERS MCCLAIN,<br>AS PRESUMED HEIR AND<br>PERSONAL REPRESENTATIVE OF<br>THE ESTATE OF BRIAN MCCLAIN, AND<br>RABO AGRIFINANCE, LLC, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Defendants. | §<br>§ | |

**Plaintiffs' Original Petition,**
**Application for Emergency Appointment of a Receiver, and**
**Request for Injunctive Relief**

1.      Plaintiffs AgTexas Farm Credit Services, a federally chartered agricultural credit association formed under the Farm Credit Act of 1933 and AgTexas, PCA a federally chartered production credit association formed under the Farm Credit Act of 1933 (collectively "AgTexas"), Thorlakson Diamond T Feeders, LP ("Thorlakson"), complaining of McClain Feed Yard, Inc., 7M Cattle Feeders, Inc. Chelsea Walters McClain, Defendant in her capacity as presumed heir and personal representative of the estate of Brian McClain (the McClain Defendants"), and Rabo AgriFinance, LLC ("Rabo") submit the following for their Original Petition, Application for Emergency Appointment of a Receiver, and Request for Injunctive Relief.

## Discovery Control Plan

2.      Pursuant to TEX. R. CIV. P. 190, Plaintiffs state that discovery in this matter is
intended to be conducted under Level 3, as specified by TEX. R. CIV. P. 190.3.

## Statement of Relief Requested

3.      Pursuant to Rule 47 of the Texas Rules of Civil Procedure, Plaintiffs assert a cause
of action for injunction, interpleader, for declaratory judgment, and for damages within the
jurisdictional limits of the Court.

4.      Pursuant to TEX. R. CIV. P. 47 and TEX. CIV. PRAC. & REM. CODE §64.001(a)(2),
(5), and (6), Plaintiffs make an application for emergency appointment of a receiver for
sequestration and the protection of property rights of Plaintiffs and other interested parties.

## Parties and Service

5.      Plaintiffs allege that the requirements of Section 30.014 of the Texas Civil Practice
& Remedies Code impinge a fundamental right guaranteed to them by the Texas Constitution, and
Plaintiffs accordingly withhold any further identifying information other than as set forth below,
unless and until ordered to do so by the Court.

6.      AgTexas Farm Credit Services, Plaintiff, is a federally chartered agricultural credit
association formed under the Farm Credit Act of 1933.  It does business in various locations in
Texas, including Deaf Smith County, Texas.

7.      AgTexas, PCA, Plaintiff, is a federally chartered production credit association
formed under the Farm Credit Act of 1933.  It does business in various locations in Texas,
including Deaf Smith County, Texas.

8.      Thorlakson Diamond T Feeders, LP, is a Texas limited partnership.  It does
business in various locations in Texas, including Deaf Smith County, Texas.

9.      Rabo AgriFinance, Defendant, is a limited liability company that does business in various locations in Texas, including Deaf Smith County.  It can be served by serving it registered agent, Corporate Creations Network Inc., 5444 Westheimer #1000, Houston, Texas 77056.

10.     McClain Feed Yard, Inc., Defendant, is a domestic for-profit corporation.  It can be served through its registered agent Brian McClain, 320 Schley Street, Hereford, Texas 79045.

11.     7M Cattle Feeders, Inc., Defendant, is a foreign for-profit corporation incorporated under the laws of Kentucky and registered to do business in Texas.  It may be served through its registered agent, McClain Feed Yard, Inc., 4010 FM 1057, Hereford, Texas 79045.

12.     Chelsea Walters McClain, Defendant in her capacity as presumed heir and personal representative of the estate of Brian McClain, is the widow of Brian McClain, a deceased individual resident of Kentucky who engaged in business in this State.  Mrs. McClain does not maintain a designated agent for service of process in Texas.  Service of process on this Defendant may therefore be obtained under TEX. CIV. PRAC. & REM. CODE §17.044, by serving the Texas Secretary of State for forwarding to Defendant Brian McClain at 824 Mullins Lane, Benton, KY 42025.  The forwarding address for the Texas Secretary of State to issue citation to this Defendant is:  Texas Secretary of State Statutory Document Section, P.O. Box 12887, Austin, Texas 78711. The address of this Defendant is stated above.

13.     There are many additional parties who are believed to have an interest in the subject matter of this case.

### Jurisdiction and Venue

14.     This case falls within the general jurisdiction of this Court.

15.     Venue is mandatory in this county pursuant to Texas Civil Practice and Remedies Code 64.07 because this is a suit to appoint a receiver for a corporation with property in Texas and this is the county where the principal office of the corporation is located.

16.     Venue is proper in this case pursuant to Texas Civil Practice and Remedies Code section 15.002(a)(1) because it is the county in which all or a substantial part of the events or omissions giving rise to the claims occurred and 15.002(a)(3), because it is the county in which Defendants McClain Feed Yard and 7M Feeders have their principal office in this state.

17.     Venue exists in this case over the Defendants under TEX. CIV. PRAC. & REM. CODE §15.035 because one or more of these Defendants entered into contracts in whole or in part, in Deaf Smith County, Texas.

18.     The acts of all Defendants the subject of this suit involve their purposeful contacts involving Texas. The causes of action asserted in this case arise from or are connected with the acts committed by Defendants in Texas. As a result, this Court can assert in personam jurisdiction over Defendants in accordance with state and federal constitutional guarantees, and the Texas Secretary of State is an agent for service of process for Defendants.

19.     Venue is proper in Deaf Smith County in accordance with TEX. CIV. PRAC. & REM. CODE § 15.002 because it is the county in which all or a substantial part of the events or omissions giving rise to the claim occurred, and if venue is valid as to one Defendant, it is valid as to all, pursuant to TEX. CIV. PRAC. & REM. CODE § 15.003.

## Facts

20.     This case concerns the business of buying, selling, feeding, or providing financing for cattle feeding and related activities. Plaintiff AgTexas and their borrowers purchased cattle to be delivered to grow yard facilities in Texas under the name "McClain Feed Yard, Inc." which

were owned and operated in whole or in part by Decedent Brian McClain; Decedent also owned

and operated Defendant 7M Cattle Feeders, a Kentucky corporation.  The cattle were delivered for

growing and health care before there were to be shipped to a finishing feedyard.

21.    Rabo provided a credit facility to the McClain Defendants.  On information and

belief, Plaintiffs allege that Rabo has itself or through contract with third parties started liquidating

the cattle and other assets of the McClain Parties and taken custody and control of the records of

the McClain Parties.

22.    Some of these cattle were and are believed to be currently located in Deaf Smith

County, Texas.

23.    In April of 2023, Plaintiffs learned of some of the issues that are the subject of this

suit, including disappearance or inability of the McClain Parties to account for many thousands of

cattle and millions of dollars in cattle proceeds.  Before this, the McClain Defendants had

represented to Plaintiffs that they had possession of thousands of cattle in which Plaintiffs had an

interest, which Plaintiffs paid.  The chart below summarizes the cattle and monetary claims of the

Plaintiffs known at this time:

| Party | Approximate Missing Cattle Head Count | Approximate Claim Amount |
|---|---|---|
| AgTexas | Lender to Thorlakson and others | $8,000,000 |
| Thorlakson | 9,605 | $9,000,000 |

24.    On April 18, 2023, decedent passed away unexpectedly at age 52.

25.    Because of the movable nature of the cattle, the uncertain location of the cattle, Mr.

McClain's sudden death, and because of the unaccountability for the cattle entrusted to

Defendants, a reasonable conclusion can be drawn that there is immediate danger that Defendants

will neglect, conceal, dispose of, ill-treat, waste, or destroy the cattle, or remove them from their present location during the pendency of this suit.

26.    Rabo has engaged a third party or parties to gather cattle and records in the possession of the McClain Defendants and has refused to permit one or more of the Plaintiffs to have access to such cattle and records.  A reasonable conclusion can also be drawn that Rabo should be ordered to protect and preserve assets and records of the McClain Parties and of its dealings with the McClain Parties.

27.    Throughout this Petition, where it is alleged that any Defendant performed or failed to perform any acts or activities, or made any representations, it is meant that such Defendant's agents, officers, servants, employees or representatives performed or failed to perform such acts or activities and at the time such acts or activities were done, they were with full authorization or ratification of said Defendant, or were in the normal or routine course of business.

## Conversion and Common Law Fraud

28.    The allegations stated above are incorporated by reference.

29.    Plaintiffs are entitled to and seek recovery of judgment for conversion against the McClain Defendants for the value of any cattle they accepted for feed and care and which they have not returned, and/or cattle misappropriated and converted from Plaintiffs, and the profits they would have made from these cattle.

30.    Plaintiffs are entitled to and seek recovery of judgment for conversion against Rabo to the extent that Rabo acquired cattle or proceeds belonging to Plaintiffs.

31.    The McClain Defendants made misrepresentations to Plaintiffs recklessly without any knowledge of the truth and as a positive assertion.  Moreover, the misrepresentations were made with the intention that they should be acted on by Plaintiffs, and Plaintiffs in fact relied

upon on those misrepresentations, suffering injury and damage as a result thereof. Thus, the

misrepresentations and reliance so described were a proximate cause of injury and damage to the

Plaintiffs for which Plaintiffs now sue in a sum within the jurisdictional limits of the Court.

30.     Plaintiffs seek judgment for their reasonable attorney fees at trial and through all

applicable appellate levels, pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(6).

## Negligence of Defendants in Care and Maintenance and Hiring or Supervision or Management Personnel

31.     The allegations stated above are incorporated by reference.

32.     Defendants were negligent in the care and maintenance of cattle including, but not

limited to keeping proper records of feeding and ownership, and in the hiring or supervision of

their management personnel. Defendants are therefore liable for the losses Plaintiffs suffered as a

result of their actions and omissions. Their actions and omissions are described above.

33.     The losses incurred by Plaintiffs as a proximate result of Defendants' negligent

actions exceed the minimum jurisdictional limits of this Court. Plaintiffs seek judgment for these

damages.

## Tortious Actions by the Individual Defendant

34.     The allegations stated above are incorporated by reference.

35.     Decedent directed and controlled the actions and omissions of the McClain

Defendant-entities in a manner that was tortious in at least the following ways:

a.     They misrepresented the existence of cattle in their possession;

b.     They promised and agreed to purchase individual lots of cattle for customers, but sent false yard sheets to the customers for whom they promised and agreed to purchase cattle, although there were far fewer lots of cattle than were represented, such that multiple customers were being informed they were owners if the same cattle;

c.      They used the yard sheets, and other means, such as verbal reports and inspections, to report to Plaintiffs that cattle delivered to Defendants were in their possession and under their control when in fact they were not;

d.      They directed and allowed the Defendant-entities to keep and use the proceeds of their wrongdoing for their own purposes.

36.    The Decedent's estate is therefore personally liable for all damages, both actual and punitive, that Plaintiffs suffered as a result of Defendant-entities' actions and omissions.

## The Corporation Fiction of McClain Feed Yard Inc. and 7 M Cattle Company, LLC Should be Disregarded

37.    The allegations stated above are incorporated by reference.

38.    McClain Feed Yard, Inc.'s and 7M Cattle Company, LLC's corporate entity should be disregarded and the Decedent's estate held personally liable for the damages, both actual and punitive, suffered by Plaintiffs because:

a.      The corporate entity has been used by the Defendants and their owners and principals as a sham to perpetuate a fraud;

b.      The corporate entity was organized and perpetrated as a mere tool or business conduit of Decedent's personal business;

c.      The corporate fiction has been used as a means to evade an existing legal obligation;

d.      The corporate fiction has been used to circumvent a statute; or

e.      The corporate fiction has been used to commit a protection of crime or to justify a wrong.

## Civil Conspiracy

39.    Additionally, and/or in the alternative and based on information and belief, the McClain Defendants, and their agents or employees had an agreement with and/or understanding among them to commit and to cover up the wrongs and damages inflicted on Plaintiffs.  To this end, Defendants and their agents, employees and/or representatives had a meeting of the minds

and committed unlawful and overt acts which proximately caused further and additional damages to Plaintiffs. Therefore, the McClain Defendants and their agents, employees and/or representatives are directly and vicariously liable for the actions of each other in furtherance of this conspiracy.

40.     Plaintiffs seek judgment for all damages, both actual and punitive, that Plaintiffs suffered as a result of the actions of any of them.

41.     Plaintiffs seek judgment for their reasonable and necessary attorney's fees at trial and through all applicable appellate levels.

**Attorneys' Fees**

42.     By reason of the wrongful acts and conduct of the Defendants, Plaintiffs have been required to employ attorneys to bring and prosecute this action. Plaintiffs seeks to recover the reasonable and necessary attorneys' fees and legal expenses, including expert witness fees.

43.     Under all claims asserted herein, Plaintiffs seek recovery of their reasonable and necessary attorneys' fees at trial and all appellate levels.

**Damages**

44.     The facts and allegations stated above are incorporated herein by reference.

45.     The McClain Defendants' acts, omissions, conduct, and breaches were, and continue to be, a proximate and/or producing cause of damages to Plaintiffs, and the McClain Defendants have been unjustly enriched by their actions.

46.     To the extent that Rabo has receive funds or property in which the Plaintiffs have superior rights, Plaintiffs seek recovery of their damages from Rabo, either directly or by way of disgorgement.

47.     Plaintiffs will respectfully request the Court or Jury to determine the amount of

Plaintiffs' damages.  Plaintiffs seek recovery of their damages proximately caused by any

responsible party, including without limitation, all damages caused by the Defendants, both actual

and punitive.

48.     The conduct of the McClain Defendants as described above, was done in bad faith

and in violation of the law and public policy of the State of Texas, was done willfully, knowingly

and maliciously, was intentional and/or committed with conscious indifference to the rights of

Plaintiffs such as to warrant the imposition of punitive and/or exemplary damages, expert witness

fees and attorney's fees which Plaintiffs seeks to recover from the McClain Defendants.

## **Request for Declaratory Judgment**

49.     The facts and allegations stated above are incorporated herein by reference.

50.     Plaintiffs seek declaratory judgment as to priority of their claims to cattle and sales

proceeds.

## **Application for Injunctive Relief**

51.     The facts and allegations stated above are incorporated herein by reference.

52.     Plaintiffs pray for a temporary restraining order, and following a hearing, a

temporary injunction to restrain and enjoin the Defendants from interfering with their request to

move the remaining cattle to a secure location for feeding and care.  Plaintiffs also seek an order

requiring Defendants to preserve their records.

53.     Plaintiffs need immediate injunctive relief in this case to avoid the following

irreparable injuries:

        a.     Rabo and the McClain Defendants threaten to, have and unless
restrained and enjoined, will continue to prevent access to the
enclosures or pens where the Cattle are located, either in Deaf Smith
County or other locations, and therefore jeopardize the health and
values of these cattle, and the integrity of these records, and thus

jeopardize Plaintiffs' rights before the question of ownership and priority of claims can be determined.

b.      The McClain Defendants have demonstrated their willingness to falsify records and conceal the location of cattle and should be ordered to preserve any and all business records concerning their cattle and financial affairs.

c.      The McClain Defendants have demonstrated their willingness to falsify records and conceal the location of cattle and should be ordered to refrain from withdrawing the funds from financial institutions.

54.    Plaintiffs have no adequate remedy at law because the health of the cattle, or their physical location if moved, may deprive Plaintiffs from recourse against the Defendants and recourse to possession of cattle they claim to own.  The inability to gain access to the cattle may put the Defendants in the position of an insolvent without the ability to respond in damages and, as a result Plaintiffs' interest in the cattle may be lost and their ability to recover from the party(ies) who wrongfully caused the problem may also be lost.  In addition, Defendants have demonstrated their willingness to falsify records and conceal the location of cattle and should be ordered to preserve any and all business records concerning their cattle and financial affairs to enable Plaintiffs to determine the status of their cattle and accounts.

55.    The enjoined Defendants will not be harmed by any delay resulting from an injunction.

56.    To prevent irreparable harm to Plaintiffs, all and any persons having notice of the injunction requested by Plaintiffs should be restrained and prevented from transferring in any respect, selling, disposing, moving, transferring, concealing, or encumbering any property, including any cattle and including the funds at any bank accounts.

57.    Plaintiffs are therefore entitled to a temporary restraining order restraining the Defendants, their agents, in any person having notice of the order from taking any action in selling,

disposing, moving, transferring, encumbering, or otherwise affecting any of the Defendants' property, or cattle or funds in the Defendants' possession, and, upon hearing, that the terms of the temporary restraining order become a temporary injunction.

### **Request for Appointment of Receiver**

58.     Plaintiffs incorporate the allegations stated above.

59.     Plaintiffs request the Court to appoint a receiver in this action who is qualified under the provisions of TEX. CIV. PRAC. & REM. CODE , § 64.021, who is not a party to this lawsuit, is not an attorney for a party to this lawsuit, and is not otherwise interested in this lawsuit including the application for appointment of a receiver.

60.     Plaintiffs have a probable interest in or right to the cattle described above.

61.     The property, and particularly the remaining cattle, is in danger of being lost, removed, wasted or materially injured.  Because of the McClain Defendants' defaults and Decedent's sudden death, it is likely that the McClain Defendants cannot to properly care for the Cattle.

62.     Receivers may be appointed to prevent fraud or protect rights of persons in property which is in danger of being lost or suffering material injury. *Ellis v. Filgo*, 185 S.W.2d 739 (Tex. Civ. App. - Dallas 1945, no writ).  Here a receiver is appropriate to protect Plaintiffs' rights in the property and to prevent the property from being further lost, removed, wasted or materially injured by Defendants.

63.     Receivers may be appointed when, among other things, (a) in an action by a creditor to subject any property or fund to his claim; (b) for a corporation that is insolvent, is in imminent danger of insolvency, has been dissolved, or has forfeited its corporate rights; or (c) in any other case in which a receiver may be appointed under the rules of equity.  TEX. CIV. PRAC. & REM. CODE, §§ 64.001(a)(4), (5) and (6); and 64.001(c)(1) and (2).

## Sequestration

64.     Plaintiffs incorporate the allegations stated above, as if fully set forth verbatim hereunder, and incorporates the exhibits referenced therein.

65.     If this Court does not immediately enter an order appointing a Receiver, Plaintiffs request the issuance of a Writ of Sequestration for the cattle.

66.     Because of the movable nature of the cattle, and because of the defaults of Defendants, a reasonable conclusion may be drawn that Defendants will engage in using, selling, disposing, encumbering, mortgaging, leasing, moving, operating, pledging, or otherwise adversely affecting the interests of Plaintiffs in the cattle, Defendant-entities and any asset that secures repayment of the loans.

67.     Plaintiffs seek assistance through a writ of sequestration to enforce its security interest and it meets the requirements of TEX. CIV. PRAC. & REM. CODE Ch. 62.

## Injunction and Restraining Order

68.     Plaintiffs incorporate the allegations stated above, as if fully set forth verbatim hereunder, and incorporates the exhibits referenced therein.

69.     Pending the final outcome of this action, and until further order, and for the purpose of affording Plaintiffs appropriate protection under the Texas Rules of Civil Procedure, Plaintiffs request the issuance of a mandatory injunction and restraining order directing Defendants to deliver the Defendant-entities to the Receiver and restraining Defendants and its respective partners, officers, agents, servants, employees, attorneys or associates from using, selling, disposing, encumbering, mortgaging, leasing, moving, operating, pledging, or in any manner adversely affecting the interests of Plaintiffs in the Defendant-entities.

70.     If this Court does not immediately enter an order appointing a Receiver, sequestering the cattle, proceeds, and accounts receivables and granting such other relief as is necessary or appropriate to protect Plaintiffs' ownership and security interests and liens, Plaintiffs will be irreparably harmed.  It has no adequate remedy at law if such relief is not granted.

71.     If the Court does not immediately appoint a Receiver, and if Defendants are permitted to stay in possession or control of its assets, Plaintiffs also request the Court to grant additional relief protecting Plaintiffs' interest and liens as follows:

    a.    Prohibiting any payments or distributions to or for the benefit of the McClain Defendant-entities' insiders, affiliates, parents or partners or other related individuals or entities for management services, commissions or otherwise, or Rabo;

    b.    Requiring Defendant-entities to furnish Plaintiffs, without further demand, the following information:

        i.    Cattle sales and purchase records;

        ii.    Banking records;

        iii.    Cattle movement records;

### Conclusion

WHEREFORE, PREMISES CONSIDERED, Plaintiffs respectfully pray that all Defendants be cited to appear and to answer this Petition and that upon final hearing hereof, Plaintiffs have Judgment as follows:

    a.    An Order from this Court restraining and enjoining Defendants and their attorneys and agents and employees from removing the Cattle and permitting inspection of the records;

    b.    An Order from this Court restraining and enjoining Defendants and their attorneys and agents and employees from disposing of records of their activities related to the subject of this case;

    c.    An Order from this Court restraining and enjoining Defendants from disposing or, altering, or concealing records concerning their cattle and financial affairs;

d.    An Order declaring the rights of the parties to the cattle and their proceeds;

e.    Judgment for actual and punitive damages;

f.    Judgment for attorneys' fees through trial and at all applicable appellate levels, and costs;

g.    Any and all further relief, legal and equitable, to which Plaintiffs may be now and ever more entitled.

Respectfully submitted,

NAMAN HOWELL SMITH & LEE, PLLC
8310 N. Capital of Texas Hwy., Ste. 490
Austin, Texas 78731
(512) 479-0300; FAX (512) 474-1901
Email: dlebas@namanhowell.com

By:    */s/ David L. LeBas*
       David L. LeBas
       State Bar No. 12098600
       Rachel Barr
       State Bar No.24118185

**Attorneys for Plaintiffs**

# VERIFICATION

STATE OF TEXAS           §
                               §
COUNTY OF _Potter_       §

      BEFORE ME, the undersigned authority, on this day personally appeared _Brandon Brock_, who upon oath says that he is authorized to make this verification on behalf of _Ag Texas Farm Credit Services,_ and states that he has read the foregoing Plaintiffs' Original Petition and Application for Injunctive Relief, and that the factual statements are true and correct to the best of his knowledge.

      SUBSCRIBED to and before me on this the _21st_ day of April, 2023.

CHARLOTTE MULLICAN
Notary Public, State of Texas
Comm. Expires 08-27-2025
Notary ID 125268xx

Notary Public, State of Texas